**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NABIL HELO, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br><br> SEMA4 HOLDINGS CORP., ERIC SCHADT, KATHERINE STUELAND, ISAAC RO, AND RICHARD MIAO, <br><br> Defendants. | Case No.: 3:22-cv-01131-KAD <br><br><br><br><br><br><br><br><br> OCTOBER 6, 2023 |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE**
**AMENDED COMPLAINT**

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................. 1

II.   STATEMENT OF FACTS .................................................................................... 3

      A.    Sema4's Business and the Centrality of Third-Party Payor Reimbursement ......... 3

      B.    The Start of the Class Period: SemA4 Announces Positive Q4 and FY 2021
            Results ......................................................................................................... 4

      C.    The GeneDx Transaction Closes; Defendants Continue to Tout Improvements in
            Sema4's Key Metrics and Their Positive Outlook ................................................ 5

      D.    Defendants Reveal the Truth and Sema4's Stock Price Plummets........................ 7

      E.    After the Class Period, the Company Eliminates Sema4's Core Business Segment
            and More Layoffs Ensue ..................................................................................... 8

III.  APPLICABLE LEGAL STANDARDS DISCOURAGE DEFENDANTS' MOTION ..... 9

IV.   PLAINTIFF ALLEGES VIOLATIONS OF THE EXCHANGE ACT ........................... 10

      A.    Plaintiff Alleges Falsity ...................................................................................... 10

            1.    Defendants' Statements About Sema4's Financial Results, ASPs, Test
                  Volumes, and Reimbursements from Third-Party Payors Were False and
                  Misleading.................................................................................................... 10

            2.    Defendants Made False and Misleading Statements Regarding
                  Centrellis ..................................................................................................... 14

            3.    Defendants' Remaining Falsity Arguments Fail........................................ 14

      B.    Plaintiff Alleges Scienter .................................................................................... 20

            1.    Plaintiff's Motive Allegations Support a Strong Inference of Scienter.... 21

            2.    Plaintiff Alleges Strong Circumstantial Evidence of Recklessness.......... 25

      C.    Plaintiff Alleges Loss Causation......................................................................... 32

      D.    Plaintiff Alleges Control Person Liability ........................................................... 35

V.    CONCLUSION...................................................................................................... 36

## TABLE OF AUTHORITIES

<u>CASES</u>

*Abbad v. Amman*,
  285 F. Supp. 2d 411 (S.D.N.Y. 2003)................................................................... 25

*Abuhamdan v. Blyth, Inc.*,
  9 F. Supp. 3d 175 (D. Conn. 2014).................................................................... 19

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995)................................................................................... 25

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002)................................................................................ 25

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
  28 F.4th 343 (2d Cir. 2022) ............................................................................... 18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................... 10

*ATSI Comms., Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)................................................................................. 36

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................ 9, 10

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
  506 F. App'x 32 (2d Cir. 2012) .......................................................................... 15

*Born v. Quad/Graphics, Inc.*,
  521 F. Supp. 3d 469 (S.D.N.Y. 2021)................................................................. 15

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
  556 F. Supp. 3d 100 (D. Conn. 2021)............................................................ 34, 35

*Burstyn v. Worldwide Xceed Grp., Inc.*,
  2002 WL 31191741 (S.D.N.Y. Sept. 30, 2002)................................................... 22

*Chapman v. Mueller Water Prod., Inc.*,
  466 F. Supp. 3d 382 (S.D.N.Y. 2020)................................................................. 14

*Chill v. General Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996)............................................................................... 25

*City of Lakeland Employees Pension Plan v. Baxter Int'l Inc.*,
    2012 WL 607578 (N.D. Ill. Jan. 23, 2012) ................................................................. 15

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012) ................................................................ 16, 21

*City of Providence v. Aeropostale, Inc.*,
    2013 WL 1197755 (S.D.N.Y. Mar. 23, 2013) ......................................................... 19

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*,
    412 F. Supp. 3d 206 (E.D.N.Y. 2019) .................................................................... 29

*CompuDyne Corp. v. Shane*,
    453 F. Supp. 2d 807 (S.D.N.Y. 2006) ..................................................................... 36

*Cornwell v. Credit Suisse Grp.*,
    689 F. Supp. 2d 629 (S.D.N.Y. 2010) .............................................................. 29, 31

*Cortina v. Anavex Life Scis. Corp.*,
    2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) ......................................................... 16

*Das v. Rio Tinto PLC*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018) ..................................................................... 16

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................................. 33, 34, 35

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
    2023 WL 5496507 (9th Cir. Aug. 25, 2023) ...................................................... 13, 14

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015) ............................................................................. 29, 30

*Flynn v. Sientra, Inc.*,
    2016 WL 3360676 (C.D. Cal. June 9, 2016) .......................................................... 15

*Francisco v. Abengoa, S.A.*,
    481 F. Supp. 3d 179 (S.D.N.Y. 2020) ............................................................... 21, 23

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC.*,
    376 F. Supp. 2d 385 (S.D.N.Y. 2005) ............................................................... 15, 16

*Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017) ..................................................................... 22

*Freudenberg v. E\*Trade Financial Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................................. 31, 33, 34, 35

*Friedman v. Rayovac Corp.*,
    295 F. Supp. 2d 957 (W.D. Wisc. 2003)...................................................................... 19

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000)...................................................................................... 9, 25

*Gray v. Wesco Aircraft Holdings, Inc.*,
    454 F. Supp. 3d 366 (S.D.N.Y. 2020)........................................................................... 17

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ...................................................................................... 24

*In re Adient plc Sec. Litig.*,
    2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)........................................................... 17, 29

*In re AppHarvest Sec. Litig.*,
    2023 WL 4866233 (S.D.N.Y. July 31, 2023) ............................................................. 31

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
    980 F. Supp. 2d 564 (S.D.N.Y. 2013)........................................................................... 23

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005)........................................................................... 15

*In re BP p.l.c. Sec. Litig.*,
    2012 WL 432611 (S.D. Tex. Feb. 13, 2012) ............................................................... 17

*In re Citigroup Inc. Sec. Litig.*,
    753 F. Supp. 2d 206  (S.D.N.Y. 2010)........................................................................... 34

*In re CIT Grp., Inc. Sec. Litig.*,
    349 F. Supp. 2d 685 (S.D.N.Y. 2004)........................................................................... 14

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
    469 F.Supp.2d 88 (S.D.N.Y.2006) ............................................................................... 29

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
    2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) ......................................................... 29, 31

*In re Flowers Foods, Inc. Sec. Litig.*,
    2018 WL 1558558 (M.D. Ga. Mar. 23, 2018)............................................................. 29

*In re Francesca's Holdings Corp. Sec. Litig.*,
  2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) ................................................................ 17

*In re Garrett Mot. Inc. Sec. Litig.*,
  2022 WL 976269 (S.D.N.Y. Mar. 31, 2022) ................................................................... 16

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)............................................................................. 36

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivs. Litig.*,
  2012 WL 1632762 (S.D.N.Y. May 4, 2012) ................................................................... 24

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
  2012 WL 2512280 n.141 (S.D.N.Y. June 29, 2012) ............................................... 18, 36

*In re MF Global Holdings Ltd. Sec. Litig.*,
  2013 WL 5996426 (S.D.N.Y. Nov. 12, 2013).................................................................. 21

*In re MRU Holdings Sec. Litig.*,
  769 F. Supp. 2d 500 (S.D.N.Y. 2011).............................................................................. 21

*In re N. Telecom Ltd. Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000).............................................................................. 21

*In re Nokia Corp. Sec. Litig.*,
  2021 WL 1199030 (S.D.N.Y. Mar. 29, 2021) ................................................................. 15

*In re NTL, Inc. Sec. Litig.*,
  347 F. Supp. 2d 15 (S.D.N.Y. 2004)................................................................................ 14

*In re Oxford Health Plans, Inc.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ..................................................................................... 16

*In re Parmalat Sec. Litig.*,
  497 F. Supp. 2d 526 (S.D.N.Y. 2007).............................................................................. 36

*In re Reserve Fund Sec. and Deriv. Litig.*,
  2010 WL 685013 (S.D.N.Y. Feb. 24, 2010).................................................................... 30

*In re Salix Pharm., Ltd.*,
  2016 WL 1629341 n.10 (S.D.N.Y. Apr. 22, 2016)............................................... 17, 18, 30

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)............................................................................................... 29

*In re ShengdaTech, Inc. Sec. Litig.*,
   2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014) ................................................................ 36

*In re Sirrom Capital Corp. Sec. Litig.*,
   84 F. Supp. 2d 933 (M.D. Tenn. 1999) ........................................................................ 13

*In re Synergy Pharms. Inc.*,
   2023 WL 5526675 (2d Cir. Aug. 28, 2023) ................................................................. 30

*In re Twinlab Corp. Sec. Litig.*,
   103 F. Supp. 2d 193 (E.D.N.Y. 2000) ........................................................................ 23

*In Re Vale S.A. Sec. Litig.*,
   2020 WL 2610979 (E.D.N.Y. May 20, 2020) ............................................................ 19

*In re Veeco Instruments, Inc. Sec. Litig.*,
   235 F.R.D. 220 (S.D.N.Y. 2006) ................................................................................ 31

*In re Vivendi Universal, S.A.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003) ........................................................................ 22

*In re Vivendi Universal, S.A.*,
   2004 WL 876050 (S.D.N.Y. Apr. 22, 2004) ............................................................... 17

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ........................................................................... 16, 17, 18

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003) ................................................................... 35, 36

*Iowa Public Employees' Retire. Sys. v. MF Global, Ltd*,
   620 F.3d 137 (2d Cir. 2010) ....................................................................................... 18

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) .................................................................................................... 16

*Jones v. Corus Bankshares, Inc.*,
   701 F. Supp. 2d 1014 (N.D. Ill. 2010) ........................................................................ 32

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ....................................................................................... 25

*Karinski v. Stamps.com, Inc.*,
   2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ............................................................... 15

*Krasner v. Rahfco Funds LP*,
   2012 WL 4069362 (S.D.N.Y. Aug. 9, 2012) ........................................................................ 16

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
   897 F. Supp. 2d 168 (S.D.N.Y. 2012) .................................................................................. 19

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ................................................................................................ 33

*Malin v. XL Cap. Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007) .................................................................................. 29

*Manavazian v. Atec Grp., Inc.*,
   160 F. Supp. 2d 468 (E.D.N.Y. 2001) ................................................................................. 17

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ........................................................................................................ 10, 21

*McMahan & Co. v. Wherehouse Entertainment, Inc.*,
   900 F.2d 576 (2d Cir. 1990) ................................................................................................ 14

*Metz v. U.S. Life Ins. Co. in the City of New York*,
   662 F.3d 600 (2d Cir. 2011) .................................................................................................. 9

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) .............................................................................. 19, 20

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
   455 Fed App'x 10 (2d Cir. 2011) ................................................................................... 30, 31

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ............................................................................................... 21

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ............................................................................... 21, 25, 26, 28

*Oklahoma L. Enf't Ret. Sys. v. Telefonaktiebolaget LM Ericsson*,
   2020 WL 127546 (S.D.N.Y. Jan. 10, 2020) ........................................................................ 31

*Oklahoma Firefighters Pensions & Retirement System v. Six Flags Entertainment Corp.*,
   58 F.4th 195 (5th Cir. 2023) ............................................................................................... 24

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) ............................................................................................................ 19

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
    432 F. Supp. 3d 131 (D. Conn. 2019)..................................................................... 22

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management LLC*,
    595 F.3d 86 (2d Cir. 2010).................................................................................... 14

*Optimum Strategies Fund I, LP v. U.S. Oil Fund, LP*,
    2023 WL 2526394 (D. Conn. Mar. 15, 2023) ....................................................... 34

*P. Stolz Family Partnership L.P. v. Daum*,
    355 F.3d 92 (2d Cir. 2004)..................................................................................... 18

*Padilla v. Cmty. Health Sys., Inc.*,
    2022 WL 3452318 (M.D. Tenn. Aug. 17, 2022) ................................................... 17

*Plichta v. SunPower Corp.*,
    790 F. Supp. 2d 1012 (N.D. Cal. 2011) ................................................................ 15

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
    89 F. Supp. 3d 602 (S.D.N.Y. 2015)...................................................................... 29

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
    2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020)........................................................ 19

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of*,
    *Com.*, 694 F. Supp. 2d 287 (S.D.N.Y. 2010) ........................................................ 14

*Porwal v. Ballard Power Sys., Inc.*,
    2019 WL 1510707 (S.D.N.Y. Mar. 21, 2019) ....................................................... 19

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) ................................................................................. 23

*Rich v. Maidstone Fin., Inc.*,
    2001 WL 286757 (S.D.N.Y. Mar. 23, 2001) ........................................................ 16

*Rihn v. Acadia Pharm. Inc.*,
    2016 WL 5076147 n.1 (S.D. Cal. Sept. 19, 2016).................................................. 15

*RMED Intern., Inc. v. Sloan's Supermarkets, Inc.*,
    878 F. Supp. 16 (S.D.N.Y. 1995) .......................................................................... 23

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).................................................................................... 18

viii

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000)..................................................................................... 22

*Sec. & Exch. Comm'n v. Rio Tinto plc*,
41 F.4th 47 (2d Cir. 2022) ..................................................................................... 16

*Schottenfeld Qualified Associates, L.P., v. Workstream, Inc.*,
2006 WL 4472318 (S.D.N.Y. May 4, 2006) ........................................................... 22

*Sgalambo v. McKenzie*,
739 F. Supp. 2d 453 (S.D.N.Y. 2010)...................................................................... 18

*Shapiro v. UJB Fin. Corp.*,
964 F.2d 272 (3d Cir. 1992)..................................................................................... 13

*Skiadas v. Acer Therapeutics Inc.*,
2020 WL 3268495 (S.D.N.Y. June 16, 2020) ......................................................... 23

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010).............................................................................. 16, 17

*Stein v. Tangoe, Inc.*,
2014 WL 12767210 (D. Conn. Sept. 30, 2014)........................................................ 23

*Stevelman v. Alias Research Inc.*,
174 F. 3d 79 (2d Cir. 1999)...................................................................................... 21

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
250 F.3d 87 (2d Cir. 2001)....................................................................................... 21

*Tecku v. Yieldstreet, Inc.*,
2022 WL 1322231 (S.D.N.Y. May 3, 2022) ............................................................ 33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)........................................................................................... *passim*

*U.S. v. Karimu*,
470 F. App'x 45 (2d Cir. 2012) ............................................................................... 17

*U.S. v. Morris*,
80 F.3d 1151 (7th Cir. 1996) ................................................................................... 13

*Varghese v. China Shenghou Pharm. Holdings, Inc.*,
672 F. Supp. 2d 596 (S.D.N.Y. 2009)...................................................................... 32

*Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp., Inc.*,
   2014 WL 3569338 (E.D.N.Y. July 18, 2014) ........................................................................ 36

*Woolgar v. Kingstone Companies, Inc.*,
   477 F. Supp. 3d 193 (S.D.N.Y. 2020) .................................................................................. 29

## STATUTES

15 U.S.C. §78j(b) .......................................................................................................... 10

15 U.S.C. §78t(a) .......................................................................................................... 36

15 U.S.C. §78u-4(b)(2) ................................................................................................. 20

15 U.S.C. §78u-4(b)(4) ................................................................................................. 33

15 U.S.C. §78u–5(c)(1)(B)(i) ........................................................................................ 19

## RULES

Fed. R. Civ. P. 8 ..................................................................................................... 33, 36

## I.    INTRODUCTION

This action seeks redress for a putative class of Sema4 investors who collectively lost millions of dollars due to material misrepresentations made by Defendants[1] between March 14, 2022 and August 15, 2022, inclusive (the "Class Period"), in violation of §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.

During the Class Period, Defendants touted Sema4's business, operations, and prospects, including increases in key metrics for its core diagnostic testing business—third-party payor reimbursement, average selling prices of tests ("ASP" or "ASPs"), and testing volume.  For example, Defendants stated: on March 14, 2022 that Sema4 was making *"substantial progress advancing key initiatives as evidenced by the nearly 83,000 resulted tests in the quarter"* (¶56), on May 12, 2022 that "we've got a really significant capability that we didn't have just a few quarters ago, we're in a position to … drive better ASPs[]" and that [reimbursement]'s making good progress and *[we're] on track with our plan to realize better reimbursement by the middle of the year[,]*" (¶66), and on June 16, 2022, that Sema4 was achieving *"top line growth in terms of volume, revenue, and improved ASPs"* (¶67).  Throughout the Class Period, Defendants also touted the potential of Sema4's data platform, Centrellis as "the most extensive and fastest-growing database[.]"  ¶56.

As Sema4 had been unprofitable since its inception, Defendants were highly motivated to complete Sema4's pending $623 million acquisition of GeneDx, Inc. ("GeneDx"), a company that provided rare disease diagnostic and exome sequencing services.  Defendants told investors that the merger of the two companies would lead to a *65%* increase in revenue for fiscal year 2022 as

---

[1] Sema4 Holdings Corp. ("Sema4" or the "Company"), Sema4's founder and Chief Executive Officer ("CEO") until May 2022 Eric Schadt ("Schadt"), Sema4's CEO since May 2022 Katherine Stueland ("Stueland"), Sema4's Chief Financial Officer ("CFO") from July 2021 through June 14, 2022 Isaac Ro ("Ro"), and Sema4's interim CFO from June 14, 2022 to September 2, 2022 Richard Miao ("Miao") are collectively referred to as "Defendants."  Schadt, Stueland, Ro, and Miao are collectively referred to as the "Individual Defendants."

Unless otherwise indicated, all emphasis is added, and all internal citations and quotations are omitted.  Citations to "¶__" refer to Plaintiff's Amended Complaint (the "Complaint") (Dkt. No. 33).  Citations to "Mot." refer to Defendants' motion to dismiss the Complaint (the "Motion") (Dkt. No. 50-1).

compared to fiscal year 2021. Defendants' positive representations, which would have led a reasonable investor to believe that Sema4's business had substantially improved and was continuing to improve, enabled them to raise $200 million in a private placement offering, and the GeneDx transaction was completed in May 2022.

But unknown to investors, and as confirmed by former employees of Sema4, Sema4's reimbursements from third-party payors had been problematic going back years before the Class Period and had not resolved at the time of Defendants' rosy Class Period statements. Reimbursement was Sema4's most important metric. ASPs and testing volumes, as well as Sema4's revenue, depended upon reimbursement rates.

On August 15, 2022, Defendants were forced to reveal the truth. Defendants disclosed that due to a dispute with one of Sema4's larger commercial payors over potential recoupments of services rendered from *2018 to early 2022,* the Company had reversed $30.1 million of revenue and had established a $39.2 million reserve in case of other potential issues with payors. This shocking news caused Sema4's stock price to plummet by *33.3%,* to close at $1.60 per share on August 16, 2022, damaging investors.

The well-pleaded allegations of the Complaint—which must be taken as true and all reasonable inferences therefrom drawn in Plaintiff's favor—more than sufficiently allege a violation of the Exchange Act and satisfy the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Defendants attack falsity, scienter, and loss causation. Defendants' arguments, which largely rely on inapposite authority, are unavailing.

First, Plaintiff has alleged falsity. The detailed accounts of numerous Sema4 former employees and Defendants' own admissions confirming those accounts at the end of the Class Period demonstrate the falsity of Defendants' Class Period statements. At the very best, Defendants raise premature factual disputes which cannot be decided on a motion to dismiss.

Second, the Complaint alleges scienter. Defendants undoubtedly had material, adverse information in their possession at the time of their misstatements—which is shown by, *inter alia,* the former employee accounts and Defendants' own admissions. Defendants further had the

motive to defraud investors so that Sema4 could acquire GeneDx and to keep the struggling company afloat.

Finally, Plaintiff alleges loss causation, which only requires Plaintiff to allege that the Company's share price fell significantly after the truth became known—here the Company's share price fell by 33.3% upon Defendants' disclosure at the end of the Class Period. Defendants' Motion should be denied in its entirety.

## II.   STATEMENT OF FACTS

### A.   Sema4's Business and the Centrality of Third-Party Payor Reimbursement

Sema4 is a Connecticut-based company focused on personalized medicine solutions. ¶¶11, 28. The Company commenced operations as a commercial entity in mid-2017 and its stock began publicly trading on the NASDAQ in July 2021. ¶29. Historically and during the Class Period, the Company's core business was its Women's Health and Oncology solutions, from which it derived the majority of its revenue. ¶28. Sema4's Women's Health and Oncology solutions included prenatal testing, newborn screening, and hereditary cancer testing. *Id.*

Among the key metrics of the success of Sema4's core diagnostic testing business are ASP, testing volumes, and reimbursement rates from third-party payors. Reimbursement from third-party payors is the most critical factor; improvements in ASPs and testing volumes, and in turn, revenue, depend upon improvements in reimbursement. ¶83. Being in-network with third-party payors (private health insurers, government health plans, and managed care organizations) is imperative to improving and maintaining reimbursement for companies like Sema4. ¶28. If a company does not have an agreed-upon fee schedule for reimbursement of its services and products with a health plan (*i.e.,* if the company is out-of-network), the company's claims may be denied upon submission, or paid in an insufficient amount, requiring the company to appeal.[2] The appeals process can be lengthy and ultimately unsuccessful.[3] Significantly, if a company is not in-network with major payors, doctors will be far less likely to recommend the company's offerings to

---

[2] *See* Mot., Ex. 3 at 21-22 (Sema4's Form 10-K for the fiscal year ended December 31, 2021). Dkt. No. 50-4.
[3] *Id.*

patients, and patients will be far less likely to choose the company's offerings, because patients will have to pay greater amounts in copayments or copayment fees compared to what they would pay if their insurer provided coverage.  ¶28.  Thus, being in-network with as many third-party payors as possible was paramount to increasing reimbursement and, in turn, adoption of Sema4's offerings.  ¶57.

Since its inception, Sema4 had been struggling financially to stay afloat.  ¶37.  Though primarily known as a diagnostic testing company, Sema4 touted its aspirations to expand its business into data and analytics solutions as part of its efforts to improve business—specifically, Sema4 sought to commercialize its database platform called Centrellis.  ¶¶30, 35.  But by year-end 2021, Sema4 had accumulated a deficit of approximately $575.4 million.  ¶37.  Then, in January 2022, things appeared to be turning around: Sema4 announced that it would acquire GeneDx, a company that provided rare disease diagnostic and exome sequencing services, for $623 million.  ¶37.  Sema4 announced that combining its core business with GeneDx's would increase revenues for the combined company to ***$350 million*** in 2022—a massive increase compared to Sema4's $212.1 million in revenues for fiscal year ("FY") 2021.  ¶¶37, 38.  Sema4 noted that its core women's health segment was expected to account for greater than half of the combined companies' 2022 revenue.  ¶37.

### B.      The Start of the Class Period: SemA4 Announces Positive Q4 and FY 2021 Results

On March 14, 2022, the first day of the Class Period, Sema4 announced positive Q4 and FY 2021 financial results.  ¶38.  In a press release issued that same day, Sema4 touted its "substantial progress advancing key initiatives", including significant 37% growth in test volumes and total revenue increase of 24% over Q4 2021 as compared to the same period in 2020.  ¶38; Mot., Ex. 1 at 2 (March 14, 2022 press release) (Dkt. No. 50-2).  The March 14, 2022 press release stated that the Company's material $32.9 million revenue increase for FY 2021 as compared to FY 2020 was ***"driven primarily by an increase in testing volumes of [ ] our Women's Health and Oncology product[s]."***  ¶38.

The March 14, 2022 press release quoted Schadt as saying, "2021 was a transformative year during which we grew our test volumes and patient database …. ***We are well positioned for 2022 and are excited to see the investments in our key initiatives begin to scale our core business and further grow our data engine.***" Mot., Ex. 1 at 2. The March 14, 2022 press release also quoted Ro as stating, "…I am encouraged by the trajectory of volumes and gross margins …. We expect gross margins to further improve throughout 2022." *Id.* The Company additionally reassured investors in the March 14, 2022 press release that the pending GeneDx acquisition would bolster the Company's overall success, and allow Sema4 to capitalize on Centrellis. ¶40.

The Company held a public conference call that same day, where Ro further emphasized Sema4's positive progress, stating, ***"from a reimbursement perspective, we had a bunch of irons in the fire this year to drive better payment so that the revenue attached to our volume starts to catch up."*** ¶39. On the March 14, 2022 call, Schadt reiterated Sema4's increasing test volumes, noting the Company's ***"substantial progress advancing key initiatives as evidenced by the nearly 83,000 resulted tests in the quarter …. We are pleased to see our growing patient and provider engagement translate into increasing test volumes[.]"*** ¶56. Schadt assured investors that the pending GeneDx transaction would enhance the Company's existing core business and would bolster the success of its new ventures, namely, Centrellis. Specifically, Schadt stated that ***"[c]ombining GeneDx's clinical genomic solutions with our core women's health business allows us to better serve health system and pharmaceutical and biotech partners …. This transaction will significantly enhance the power of our Centrellis database[.]"*** ¶56.

### C.    The GeneDx Transaction Closes; Defendants Continue to Tout Improvements in Sema4's Key Metrics and Their Positive Outlook

On May 2, 2022, Defendants announced that the GeneDx transaction had closed. ¶42. Defendants announced that in connection with the transaction, Sema4 had completed a private placement offering, in which it sold $200 million of Sema4's Class A common stock, and in which a number of institutional investors, including Pfizer, had participated in. ¶42. The Company announced that GeneDx's CEO, Stueland, would serve as the combined company's CEO while

Schadt would turn his focus to research and development efforts and growing the Company's data business.  ¶42.

On May 12, 2022, the Company announced positive Q1 2022 financial results and reaffirmed its FY 2022 guidance of pro forma revenue of $350 million.  ¶43.  The Company issued a press release that day, which highlighted increases in test volumes in Women's Health and Oncology and which quoted Schadt as saying,

> I am very pleased by our start to the year, which shows fundamental improvements from a financial perspective, as well as significant progress across our strategic objectives.  *We delivered record test volume and expanded engagement across our health system partnerships.*

¶65.  The May 12, 2022 press release quoted Stueland as saying,

> *We have strong momentum that puts us on a path to deliver on our 2022 pro forma revenue target of $350 million* …. Since closing the GeneDx acquisition, we have streamlined our leadership team and established a new, agile, operating model to drive growth, operating efficiency, and the delivery of transformational partnerships, all of which put us on a scalable path to profitability.

¶65.   The Company also held a public conference call on May 12, 2022, where Ro similarly assured investors that testing volumes had increased, and that Sema4's core Women's Health and Oncology segments were delivering positive results.  ¶66.  Specifically, Ro stated,

> *[T]otal revenue in the first quarter was $50.1 million, up 4% year-on-year and up 6% versus the fourth quarter of 2021.  Regarding volumes, we achieved a new record this quarter* …. This represents a 27% year-over-year increase versus the first quarter of 2021.  *Women's Health grew 23% and Oncology grew 159%.*

¶66.  Ro further assured investors that the combined company was well-positioned to improve ASPs and reimbursement, stating,

> *[W]e've got a really significant capability that we didn't have just a few quarters ago, we're in a position to … drive better ASPs* …. We've talked before about pushing forward with reimbursement for somatic profiling. *That's making good progress and on track with our plan to realize better reimbursement by the middle of the year.*

¶66.

6

On June 16, 2022, Sema4 participated in the Goldman Sachs Healthcare Conference. ¶67. At the conference, Stueland emphasized the Company's *"top line growth in terms of volume, revenue and improved ASPs."* ¶67. Stueland noted the positive progress being made on combining Sema4's business with GeneDx's, stating, "we're taking a close look at how the business is operating and ensuring that we're really targeting revenue that is high-value revenue[.]" ¶67. Stueland stated that *"the leading reproductive health franchise on the Sema4 side of things[,]"* combined with GeneDx's core offerings and "the data engine, Centrellis, that [Schadt] and the [Sema4] team have expertly built[,]" was "an incredible combination" that would set the new business apart. ¶67.

### D.    Defendants Reveal the Truth and Sema4's Stock Price Plummets

On August 15, 2022, after the close of market and to the shock of investors, the Company announced that it had *"reversed $30.1 million of revenue this quarter related to prior periods. [The reversal was in connection with negotiations with] one of [Sema4's] larger commercial payors regarding the potential recoupment of payments for Sema4 carrier screening services rendered from 2018 to early 2022."* ¶47. The Company further disclosed:

> As a result of this matter, and in connection with a review of certain billing policies and procedures undertaken by management following the acquisition of GeneDx, the Company considered the need to establish reserves for potential recoupments of payments previously made by third-party payors. *As of June 30, 2022, the Company has established liabilities of $39.2 million as a result of this matter and other potential settlements with payors[.]*

¶50. The Company announced that it had lowered its FY 2022 revenue guidance to a range of $245 to $255 million, noting material declines in ASP from $712 to $520 over the quarter. ¶48.

Contrary to Defendants' prior representations during the Class Period, Defendants disclosed that the Company was "expecting for the remainder of the year, *at least double-digit sequential declines from 2Q into 3Q for those ASPs* in the reproductive health business." ¶48. The Company noted that going forward, it would be "taking a more conservative view on both volume and ASPs[.]" ¶49.

7

The Company also announced that it would be undergoing a series of "corporate realignments" and restructuring.  ¶46.  In connection with these "realignments" and restructuring efforts, the Company would eliminate 250 employees, or about 13% of its workforce; "[r]eorganiz[e] the commercial team to deploy a more productive and data-driven strategy"; eliminate Sema4's somatic oncology testing segment; Sema4 would close down its Branford, CT facility, and; effective that same day, Schadt had resigned from the Company.  ¶46; Mot., Ex. 8 at 1 (August 15, 2022 press release) (Dkt. No. 50-9).

On this news, the Company's share price dropped by $0.80, or *33.3%,* to close at $1.60 per share on August 16, 2022, on unusually heavy trading volume—a far cry from the Class Period high of $3.28 per share on March 30, 2022.  ¶51.  Sema4's investors lost millions.

**E.      After the Class Period, the Company Eliminates Sema4's Core Business Segment and More Layoffs Ensue**

On November 14, 2022, Defendants disclosed to investors that the Company was eliminating Sema4's core reproductive testing segment, which would include closing down Sema4's Stamford, CT laboratory and eliminating approximately 500 more employees—a 1/3 reduction of the Company's workforce.  ¶52.  In contrast to their Class Period representations, Defendants disclosed the reproductive testing segment, along with the somatic oncology testing segment, had been losing approximately $35 million per quarter and were subject to numerous difficulties related to reimbursement, lack of scale and competition.  ¶52.  Defendants stated that they had attempted to find a buyer for the Company's reproductive health testing segment but had been unsuccessful.  ¶52.  Defendants further stated that going forward, the Company's business would focus on GeneDx's differentiated exome and genome testing in the pediatric and rare disease markets.  ¶52.

On January 9, 2023, Defendants announced that the Company had changed its name to GeneDx and that its shares of Class A common stock would trade under a new ticker symbol, "WGS."  ¶53.  Defendants projected pro forma revenues for FY 2022 of between just $170-$173 million.  ¶53.

8

On January 10, 2023, the *CT Insider* published an article titled "Embattled CT company Sema4 announces name change as it cuts jobs," which highlighted the Company's ongoing difficulties, including the elimination of Sema4's core reproductive health testing segment and mass layoffs—primarily of employees that had been employed at Sema4's pre-merger Connecticut operations. ¶54. The article stated:

> [T]he lab shutdowns in Connecticut are proceeding …. Those shutdowns, which were announced last year, reflect the company's exit from testing for reproductive health and somatic tumors …. ***The company also announced last year two rounds of layoffs, affecting a total about 700 employees—with those positions largely based in Connecticut.*** The company now has about 1,100 employees.

>       *                *                *

> The company expects further revenue growth in 2023, while it aims to turn profitable in 2025. ***For the first nine months of 2022, it sustained a loss of about $240 million …. [I]ts share price has declined precipitously in recent months, as it was worth about 15 times its current value at this point a year ago.*** As a result of the plunge, the company was informed on Dec. 28 by Nasdaq that, based on the closing bid price of its Class A common stock for the past 30 trading days, it no longer complied with the required minimum bid price of $1 per share for continued listing on the Global Select Market.

## III.    APPLICABLE LEGAL STANDARDS DISCOURAGE DEFENDANTS' MOTION

In ruling on a motion to dismiss under Rule 12(b)(6), courts must "accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Metz v. U.S. Life Ins. Co. in the City of New York,* 662 F.3d 600, 602 (2d Cir. 2011); *see Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007). Further, courts must also draw "all reasonable inferences in the plaintiffs' favor." *Ganino v. Citizens Utilities Co*., 228 F.3d 154, 161 (2d Cir. 2000). A plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, a court should not dismiss a complaint

for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## IV.    PLAINTIFF ALLEGES VIOLATIONS OF THE EXCHANGE ACT

Section 10(b) of the Exchange Act makes it unlawful "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. §78j(b). To state a claim, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011). Defendants challenge the Complaint with respect to falsity, scienter, and loss causation. As to these and all other required elements, the Complaint is sufficient.

### A.    Plaintiff Alleges Falsity

#### 1.    Defendants' Statements About Sema4's Financial Results, ASPs, Test Volumes, and Reimbursements from Third-Party Payors Were False and Misleading

Throughout the Class Period, Defendants made false and misleading statements regarding the Company's financial results, ASPs, test volumes, and reimbursements from third-party payors. *E.g.,* ¶55 (on March 14, 2022, Defendants claimed that the Company experienced a "37% increase in fourth quarter test volumes… compared to the same period last year" and noted "[r]ecord quarterly test volume"); ¶66 (on May 12, 2022, Defendants stated that reimbursement was "making good progress and on track with our plan to realize better reimbursement by the middle part of the year" and "now that we've got a really significant capability that we didn't have just a few quarters ago, we're in a position to … push on several fronts to drive better ASPs."); ¶¶56, 57, 65, 67.

Defendants' statements, however, were false and misleading. As revealed on August 15, 2022, the Company announced that it had "reversed $30.1 million of revenue this quarter *related to prior periods"* and that "[this reversal was in connection with negotiations with] one of

10

[Sema4's] larger commercial payors regarding the potential recoupment of payments for Sema4 carrier screening services rendered from 2018 to early 2022 . . . ." ¶47. Defendants admitted that "$24.2 million of this decrease *is related to the years December 31, 2021 and prior.*" Mot., Ex. 10 at 23. The Company disclosed on that same day that ASP had materially declined over the previous quarter and that the Company was "expecting for the remainder of the year, at least double-digit sequential declines from 2Q into 3Q for those ASPs[,]" (¶48).

Additionally, the former employee ("FE") accounts demonstrate the falsity of Defendants' statements. For example, FE 1, who served as Senior Vice President of Production and Bioinformatics at the Company from February 2020 to September 2022, stated that Defendants absolutely knew that reimbursements were at risk as early as mid-2020. ¶¶59, 69, 93, 94. In fact, FE 1 received an email from Schadt in mid-2020 that stated, "[t]he reimbursements are under attack." *Id*. According to FE 1, this statement meant that payors and health systems were claiming that they did not have to pay the Company's bills at the full rate because they thought the Company was charging prices that were too high. *Id*. FE 1 stated that because Defendants knew the Company's reimbursements would suffer if the Company did not have a publication to back up the reimbursements, the Company was conducting intensive research projects because Defendants knew that their position on reimbursement was weak. *Id*. FE 1 stated that Defendants knew the Company's billing was not supported by the current standard of care or science. *Id*.

Further, FE 1 stated that physicians often ordered tests on one or two genes and would select one particular gene they wanted to know about or would select a disease-specific panel of seven to 10 genes. ¶¶60, 70. However, according to FE 1, the Company would always test the same way – which was to test about 500 genes. *Id*. According to FE 1, although physicians would order a subset of tests, the Company would still invoice for the full test. *Id*. FE 2, who served as Director, Alliance Management Business Development at Sema4 from 2021 through September 2022, further confirmed that no matter what type of test physicians ordered, the Company ran the same expansive testing. *Id*.

11

Additionally, FE 5, who worked as a Billing Authorization Supervisor at Sema4 from February 2018 through September 2020, personally received calls on behalf of insurers "regularly" requesting refunds for overpayments—"a bare minimum of two or three times a month." ¶¶61, 71, 95, 96. During that time, there were eight to nine other people besides FE 5 who were responsible for answering such calls. *Id*. FE 5 and FE 5's coworkers relayed these messages to their manager, Revenue Cycler Manager, Marta Ales ("Ales"), but Ales directed them to send the messages to voicemail—which meant that FE 5's manager did not intend to follow up with the insurer inquiries. *Id*.

FE 6, who worked in various roles in Sema4's billing department from July 2018 until March 2022, had a similar account to FE 5. ¶¶62, 72, 95, 97. For most of 2021, FE 6 was responsible for retrieving the Company's mail and recalled receiving letters on behalf of insurers requesting recoupments for overpayments throughout that time. *Id*. FE 6 stated that their manager, Ales, told FE 6 and FE 6's coworkers that "the higher-ups had said to disregard [the letters], and they'd provide instructions later. And I never received an instruction." *Id*. FE 6 believed that these orders came from Sean Lunde, Sema4's Vice President, Finance and Strategy. *Id*. FE 6 and FE 6's coworkers would shred such letters, which FE 6 thought was "crazy." *Id*.

Moreover, FE 3 and FE 4, both of whom worked as Women's Health Services Representatives at Sema4 from August 2021 through November 2022, and from June 2021 to November 2022, respectively, stated that Sema4 was out-of-network with most health plans, which in their view, was harmful to the Company's prospects. ¶¶63, 73. FE 4 stated that the Company was out-of-network "with everybody. They were billing these astronomical rates and [ ] writing off the patient's portions. Being in-network is important. Sometimes I felt that they were purposefully staying out-of-network because they could bill higher rates." *Id*. FE 3 stated that Sema4's lack of being in-network with more major payors was "a major obstacle" to the Company's success and that "[i]t was clearly an unprofitable business, based on how many tests were run and by the amount of reimbursements." *Id*.

12

Additionally, FE 3 and FE 4 both stated that, contrary to Defendants' representations, the Company's core women's health testing segment had been struggling.  ¶¶64, 74.  FE 4 stated, "When GeneDx merged, I said the women's health division was going to go under and they'd take our hereditary cancer testing, because that was the only profitable test we sold. The rest of them were losses."  *Id*.  FE 3 stated, "on the OB/GYN side, [customers] weren't really interested in the tests."  *Id*.  Thus, Defendants' positive representations about the strength of Sema4's core business segment were misleading because they "would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists."  *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 2023 WL 5496507, at *7 (9th Cir. Aug. 25, 2023).

Defendants' remaining contentions also fail.  Mot. at 16-18.  Essentially, Defendants argue that a company can never be held liable for securities fraud when a company later makes adjustments for its reserves.  *Id*.  Defendants are wrong.  "There is nothing unique about representations and omissions regarding . . . reserves that removes them from the purview of the antifraud provisions of the federal securities laws."  *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. 1992), *as amended* (May 27, 1992).  "[R]epresentations by management about the adequacy of reserves" may "be fraudulent if they are knowingly false or misleadingly incomplete."  *U.S. v. Morris*, 80 F.3d 1151, 1164 (7th Cir. 1996); *see also In re Sirrom Capital Corp. Sec. Litig*., 84 F. Supp. 2d 933, 942 (M.D. Tenn. 1999) ("the deliberate failure to recognize problem loans, thus understating the reserve, constitutes an actionable omission or misrepresentation of existing fact").  Defendants' statements relating to reserves were false and misleading not because they turned out to the wrong, but because Defendants knew, based upon information *at the time* of their statements that the reserves were inadequate because, as Schadt had admitted, "reimbursements are under attack."  *E.g*., ¶¶58-64, 68-74, 93-97.[4]

---

[4] Defendants suggest that securities claims cannot be based upon the disclosure of accurate data.  Mot. at 16.  But "[t]he veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers."  *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management LLC*, 595 F.3d 86, 92 (2d Cir. 2010).  "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors."  *McMahan & Co. v. Wherehouse Entertainment, Inc*., 900 F.2d 576, 579 (2d Cir. 1990).  Additionally, that an audit was purportedly conducted in the second quarter (Mot.

### 2. Defendants Made False and Misleading Statements Regarding Centrellis

Defendants touted Centrellis as "the most extensive and fastest-growing database of clinically relevant patient data in the industry" and claimed Centrellis would "be able to deliver improved and personalized health insights with our exome and genome as a backbone[,]" (¶¶56, 67), and claimed that the GeneDx acquisition would establish "the power of our Centrellis® platform and distance us as the market leader." ¶55. According to FE1, however, Centrellis did not exist and was made up by Defendants in hopes of increasing the Company's valuation. ¶¶58, 68. Thus, these statements were misleading because they "would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *NVIDIA*, 2023 WL 5496507, at *7.[5]

### 3. Defendants' Remaining Falsity Arguments Fail

Defendants raise several additional arguments in support of their claim that Plaintiff has not adequately alleged falsity. Mot. at 11-23. Each of Defendants' arguments fail.

First, Defendants contend that the Complaint engages in puzzle pleading. Mot. at 11-13. Defendants contend that although the Complaint places in bold and italics certain statements that Plaintiff alleges are false and misleading, Defendants are purportedly unable to discern which statements are at issue in the case. *Id.* Courts have repeatedly rejected this argument. *See, e.g., In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 22 (S.D.N.Y. 2004) (rejecting argument that by "reproducing blocks of text from allegedly deceptive [ ] statements without specifying which portions are misleading[]" in the complaint, plaintiff failed to state a claim).[6] "Moreover, based

---

at 17) does not negate the Complaint's allegations demonstrating Defendants' contemporaneous knowledge. ¶¶58-64, 68-74, 93-97. These facts render Defendants' cases distinguishable. *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382 (S.D.N.Y. 2020); *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287 (S.D.N.Y. 2010); *In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685 (S.D.N.Y. 2004).

[5] Defendants argue that FE1's account regarding Centrellis is purportedly inconsistent and that FE1 allegedly was not in a position to know about Centrellis. Mot. at 21-22. Both assertions are incorrect. First, FE1 stated that the Company merely had AI called Centrellis, and that the Company misrepresented Centrellis to tout itself as a data company rather than just a diagnostics company to increase the Company's valuation. ¶¶58, 68. Second, Plaintiff adequately alleges the basis of FE1's knowledge. ¶22.

[6] *See also Rihn v. Acadia Pharm. Inc.*, 2016 WL 5076147, at *5 n.1 (S.D. Cal. Sept. 19, 2016) ("Although the CCAC includes multiple block quotes, it is clear from the italicized portions of the quotes and the other allegations of the complaint what statements Plaintiff alleges are misleading and why Plaintiff believes they are misleading."); *Flynn v.*

14

on the Motion, Defendants appear to have been able to identify the alleged misstatements and the reasons why the statements were misleading." *Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *9 (C.D. Cal. Jan. 17, 2020), *order clarified,* 472 F. Supp. 3d 747 (C.D. Cal. 2020).[7]

Second, Defendants' group pleading argument is unavailing. Mot. at 13-15. Defendants make two arguments to support this contention: (1) Miao served as the Company's interim CFO for only a few months, and therefore was purportedly not responsible for certain statements; and (2) Stueland did not join the Company until after it closed the GeneDx acquisition and purportedly cannot be held liable for misrepresentations made earlier. *Id.* But Plaintiff is not seeking to hold Defendants liable for statements they did not make. Defendants ignore that the group pleading doctrine "recognizes, solely for pleading purposes, that some corporate documents, including SEC filings and the like, generally are not created by a single author, but by a group of corporate insiders involved in the daily management of a company." *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 440 (S.D.N.Y. 2005). "Put another way, the group pleading doctrine allows a plaintiff to attribute certain documents to a corporate insider, regardless of whether that insider is the only defendant in the suit or one of many." *Id.*; *see also Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC.*, 376 F. Supp. 2d 385, 395 n.60 (S.D.N.Y. 2005), *as amended* (July 6, 2005) ("Under the group pleading doctrine, plaintiffs may rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective

---

*Sientra, Inc.*, 2016 WL 3360676, at *9–10 (C.D. Cal. June 9, 2016) ("Defendants' argument regarding the volume of material the reader must digest before arriving at Plaintiffs' analysis as to why certain statements were false or misleading is unavailing" because "Plaintiffs highlight in bold and italics the particular statements in these filings that they shortly thereafter contend to be false or misleading"); *City of Lakeland Employees Pension Plan v. Baxter Int'l Inc.*, 2012 WL 607578, at *5 (N.D. Ill. Jan. 23, 2012) (rejecting defendants' argument and holding that "[t]he complaint identifies and quotes the statements allegedly misleading, including bolding and italicizing the precise statements"); *Plichta v. SunPower Corp.*, 790 F. Supp. 2d 1012, 1016–17 (N.D. Cal. 2011) (rejecting defendants' attempt to dismiss a complaint that contained "lengthy blocks of text quoting various . . . SEC filings and conference calls" because "each statement alleged to be false or misleading is plainly identified through the use of bold and italic fonts, and that the [complaint] otherwise includes the requisite specificity as to the circumstances surrounding each of those statements").

[7] Defendants' cases are inapposite. In *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32 (2d Cir. 2012), that court found that plaintiff's 280-page complaint left the court to search "for particular false statements, and then determine on its own initiative how and why the statements were false and how other facts might show a strong inference of scienter." *Id.* at 38. Similarly, the courts in *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 478 (S.D.N.Y. 2021) and *In re Nokia Corp. Sec. Litig.*, 2021 WL 1199030, at *14 (S.D.N.Y. Mar. 29, 2021) found that falsity was not adequately alleged. Such is not the case here.

work of those individuals with direct involvement in the everyday business of the company."). "This [doctrine] allows plaintiffs, to a limited extent, to circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of fraudulent intent and remains available after enactment of the [PSLRA]." *Fraternity Fund*, 376 F. Supp. 2d at 395 n.60; *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999).  Further, after *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), most courts "have continued to conclude that group pleading is alive and well." *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012).  Thus, Defendants' argument fails.[8]

Third, contrary to Defendants' assertions (Mot. at 18-21), the PSLRA's safe harbor provision does not protect their misrepresentations.  "Under that provision a defendant is not liable if (1) the forward-looking statement is identified and accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016).  "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Id.* at 247; *Slayton v. Am. Express Co.*, 604 F.3d 758, 772 (2d Cir. 2010).  Thus, defendants, "carry the burden of demonstrating that they are protected by the meaningful cautionary language prong of the safe harbor . . . ." *Slayton*, 604 F.3d at 773; *Vivendi*, 838 F.3d at 247.

---

[8] Defendants' cases are distinguishable because they do not analyze the group pleading doctrine.  *See Sec. & Exch. Comm'n v. Rio Tinto plc*, 41 F.4th 47 (2d Cir. 2022); *Krasner v. Rahfco Funds LP*, 2012 WL 4069362 (S.D.N.Y. Aug. 9, 2012), *judgment entered,* 2013 WL 12114473 (S.D.N.Y. Feb. 20, 2013); *Cortina v. Anavex Life Scis. Corp.*, 2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016).  In *In re Garrett Mot. Inc. Sec. Litig.*, 2022 WL 976269 (S.D.N.Y. Mar. 31, 2022), and *Rich v. Maidstone Fin., Inc.*, 2001 WL 286757 (S.D.N.Y. Mar. 23, 2001), the courts found that the doctrine was inapplicable based upon the unique facts of those cases which are not present here.  *Garrett*, 2022 WL 976269 at *16 n.13; *Rich*, 2001 WL 286757, at *7.  Indeed, Defendants' own authority holds that "[u]nder the group pleading doctrine, Individual Defendants would also be responsible for SEC filings issued while they worked at [the company]." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 808 (S.D.N.Y. 2018).

Defendants attempt to invoke the PSLRA's safe harbor provision for statements made on March 14, 2022 and May 12, 2022. Mot. at 18-19.[9] Defendants argue that certain statements made on the Company's March 14, 2022[10] conference call are protected by the safe harbor because the statements are forward-looking (Mot. at 19). But Defendants' March 14, 2022 statement represented that "from a reimbursement perspective", the Company's ***then-existing*** position was strong because it "***had*** a bunch of irons in the fire ***this year*** to drive better payment . . . ." *Id*. The same is true for Defendants' statements on May 12, 2022, that "***we've got*** a really significant capability that we didn't have just a few quarters ago, ***we're in a position*** to, I think, push on several fronts to drive better ASPs," and that "we've talked before about pushing forward with reimbursement for somatic profiling. ***That's making good progress and on track*** with our plan to realize better reimbursement by the middle part of the year . . . ." ¶56; Mot. at 19. Numerous courts have found nearly identical statements actionable. *See In re BP p.l.c. Sec. Litig.*, 2012 WL 432611, at \*34-\*36 (S.D. Tex. Feb. 13, 2012) (statements that a company "was making significant progress" were actionable); *In re Vivendi Universal, S.A.*, 2004 WL 876050, at \*7 (S.D.N.Y. Apr. 22, 2004) (statement that the company was "on track" was actionable); *Manavazian v. Atec Grp., Inc.*, 160 F. Supp. 2d 468, 480-81 (E.D.N.Y. 2001) (same).[11]

---

[9] Defendants reference ¶13 of the Complaint in their Motion (Mot. at 18 n.10), but ¶13 does not contain these statements. Also, Defendants assert that "there is a fundamental disconnect between the statements and plaintiff's theory of falsity" because the statements purportedly "in no way speak to the ability to collect on historic reimbursements or the risk of failing to do so" but rather "the opportunity to increase reimbursements *going forward*." Mot. at 18 (italics in original). There is, however, no prohibition against having multiple theories alleged within a complaint. *See Padilla v. Cmty. Health Sys., Inc.*, 2022 WL 3452318, at \*5 (M.D. Tenn. Aug. 17, 2022) (denying motion to dismiss where "Plaintiffs have multiple theories for why the statements were materially false and/or misleading"). Defendants cite *In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015), but that case does not hold otherwise. *Id*. at \*11.

[10] Defendants do not challenge the statements made in the Company's March 14, 2022 press release. Mot. at 19; *see also* ¶¶40, 55. Because Defendants bear the burden of demonstrating the applicability of the safe harbor provision (*Vivendi*, 838 F.3d at 247; *Slayton*, 604 F.3d at 773), they have waived any challenge to these statements. *U.S. v. Karimu*, 470 F. App'x 45, 46 (2d Cir. 2012).

[11] Defendants cite *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at \*19 (S.D.N.Y. Apr. 2, 2020), but *Adient* is distinguishable because the court found that the statements unique to that case provided no specific information regarding the company's current circumstances. *Id*. \*19. As explained above, however, such is not the case here. *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 387 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) is similarly distinguishable because rather than express a speaker's belief in a future outlook, Defendants' misrepresentations were predicated upon then-current statements of fact. *In re Salix Pharm., Ltd.*, 2016 WL 1629341, at \*12 n.10 (S.D.N.Y. Apr. 22, 2016).

Indeed, Defendants' statements contain false and misleading historical or present facts, and the "misrepresentation of present or historical facts cannot be cured by cautionary language." *P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004); *Iowa Public Employees' Retire. Sys. v. MF Global, Ltd*, 620 F.3d 137, 142-44 (2d Cir. 2010). Although these representations were mixed with future statements, the "safe harbor provision does not apply to any allegedly false statement that has both a forward-looking aspect and an aspect that encompasses a representation of present fact." *Salix*, 2016 WL 1629341, at *9; *see also Vivendi*, 838 F.3d at 246 ("[A] statement may contain some elements that look forward and others that do not, and forward-looking elements may be severable from non-forward-looking elements."); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 478 (S.D.N.Y. 2010) ("Many of the alleged misstatements are not forward-looking because they either state a present or historical fact alone or incorporate forward-looking aspects into statements of present or historical fact."). Thus, "these statements are only partially forward-looking and not protected." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 2012 WL 2512280, at *9 n.141 (S.D.N.Y. June 29, 2012).

Moreover, and contrary to Defendants' contentions (Mot. at 20-21), Defendants' purported disclaimers did not constitute meaningful cautionary language. Defendants' warnings were couched as hypothetical risks, such as, the "[l]oss of revenue caused by third-party payor cost containment efforts or an inability to negotiate satisfactory reimbursement rates ***could*** have a material adverse effect on our revenue and results of operations," and that "we ***could*** be adversely affected if we are required to repay other payers for alleged overpayments." Mot. at 20. As such, Defendants' purported risk disclosures themselves were false and misleading because Defendants knew at the time of their statements and even before the Class Period, that the Company's reimbursements were at risk. Thus, these supposedly hypothetical risks had already begun to materialize. "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).[12]

---

[12] This fact renders Defendants' cited authorities inapplicable because unlike here, the risk had not already transpired. *See* Mot. at 20-21 (*citing Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343 (2d Cir. 2022);

18

Finally, Defendants' assertions that several of their false and misleading statements are inactionable opinions or immaterial puffery are meritless. Mot. at 22-24. In *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015), the Supreme Court affirmed that statements of opinion are actionable if either "the speaker did not hold the belief she professed" or if "the supporting fact she supplied were untrue." *Id*. at 185-86. Importantly, the *Omnicare* Court held that opinions, even if sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor. *Id*. at 194.

Defendants initially suggest that their misrepresentations are immune from liability because they were prefaced with qualifying language such as "we believe" and "I think." Mot. at 23 (citing ¶¶55, 56, 66). However, "a statement is not immaterial as a matter of law simply because the speaker prefaces it with 'I believe' or 'I think.'" *Friedman v. Rayovac Corp*., 295 F. Supp. 2d 957, 990 (W.D. Wisc. 2003). "A reasonable investor could find statements significant even if they are not made with absolute certainty." *Id*.; *see also Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 967 (N.D. Cal. 2014) ("that certain statements are predicated with indications that the speaker thought or believed a given statement" does not change the fact that the statements "contain factual representations at their core"); *City of Providence v. Aeropostale, Inc*., 2013 WL 1197755, at *14 (S.D.N.Y. Mar. 23, 2013) ( "[w]e feel very good about the product going forward" and "we have also been very excited about some of the fashion components" were actionable).

Further, although Defendants claim that some of their representations constitute puffery (Mot. at 24), "[w]hether a representation is mere puffery depends, in part, on the context in which it is made." *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *10

---

*Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175 (D. Conn. 2014); *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168 (S.D.N.Y. 2012), *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013); *Porwal v. Ballard Power Sys., Inc.*, 2019 WL 1510707 (S.D.N.Y. Mar. 21, 2019)). Additionally, contrary to Defendants' contention (Mot. at 21), Plaintiff alleges Defendants' actual knowledge of the falsity of their statements. *See, e.g*., ¶¶58-64, 68-74, 93-97; 15 U.S.C. §78u–5(c)(1)(B)(i). "Given factual allegations that defendants knew their statements were false or misleading when made, the Court cannot at this stage conclude that they are protected by the PSLRA safe harbor . . . .") . *In Re Vale S.A. Sec. Litig*., 2020 WL 2610979, at *16 (E.D.N.Y. May 20, 2020).

(S.D.N.Y. Apr. 14, 2020). For instance, Defendants claim that their representation that "2021 was a transformative year" constitutes puffery (Mot. at 24) while ignoring the context of the statement, in which Defendants also claimed that during the year "we grew our test volumes and patient database." ¶¶55, 56. Similarly, Defendants contend that their representation that "we're like super pleased with the health system partnerships we formed today" is puffery while ignoring the rest of the statement that "the performance between the Mount Sinai system, NorthShore and Avera in terms of testing volume now accounts for a substantial percentage of the testing volume." ¶56. And Defendants' claim that the GeneDx acquisition will "distance us as the market leader" was made while simultaneously claiming that the Company would have "the most comprehensive clinically relevant data set available for research and development purposes." ¶55.

Defendants also claim that the phrase "that's all gone amazing" is inactionable while ignoring the later portion of their representation that "[n]ot only 90% of those primary care physicians ordering that testing, but over 80% indicating changes, substantial increases in standard of care, like are amazing." ¶56. These and the other statements Defendants claim are inactionable puffery (Mot. at 24) must be assessed in context, and when examined in such context, their falsity is apparent. Also, "in deeming a statement puffery at the motion to dismiss stage, courts must exercise great caution" because "determining whether a given statement is material entails fact-intensive assessments that are more properly left to the jury." *Mulligan*, 36 F. Supp. 3d at 966. Thus, Plaintiff has adequately alleged falsity.

### B.    Plaintiff Alleges Scienter

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2); *Tellabs*, 551 U.S. at 314. Importantly, "courts must consider the complaint in its entirety . . . [t]he inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter . . . ." *Tellabs*, 551 U.S. at 323 (emphasis in original). A strong inference of scienter arises if, "[w]hen the allegations are accepted as true and taken collectively," a "reasonable person would deem the inference of scienter at least as compelling as any opposing inference one could

20

draw from the facts alleged." *Tellabs*, 551 U.S. at 324-26. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences" – the inference need only be equally plausible to any non-culpable inference. *Id.* at 324. Moreover, "at the motion to dismiss stage, a tie on scienter goes to the plaintiff." *City of Pontiac*, 875 F. Supp. 2d at 372.

A plaintiff may establish scienter in one of two ways: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious behavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). "Either set of allegations will suffice to satisfy the necessary scienter element of a securities fraud claim." *Stevelman v. Alias Research Inc.*, 174 F. 3d 79, 84 (2d Cir. 1999). Plaintiff adequately alleges scienter under both prongs of the test.

### 1.    Plaintiff's Motive Allegations Support a Strong Inference of Scienter

"To show motive and opportunity, plaintiffs must allege a likelihood that defendants could realize concrete benefits through the deception." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001).

Defendants claim that a lack of stock sales "dooms plaintiff's ability to plead scienter." Mot. at 25, 32. But the Supreme Court has repeatedly declared that the "absence of a motive allegation" is "not dispositive." *Matrixx*, 563 U.S. at 48; *Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal"); *In re MF Global Holdings Ltd. Sec. Litig.*, 2013 WL 5996426, at \*31 (S.D.N.Y. Nov. 12, 2013) ("While Plaintiffs do not plead facts to show that the Officers had special motives to act fraudulently, that is not fatal to their claim"). Thus, "[s]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003).[13]

---

[13] Defendants' authorities do not hold otherwise. In *Novak*, the court did not hold that the absence of stock sales "dooms" a plaintiff's ability to plead scienter. 216 F.3d at 308. The same is true for *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500 (S.D.N.Y. 2011), *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446 (S.D.N.Y. 2000), and *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179 (S.D.N.Y. 2020).

Further, the Complaint alleges that Defendants were motivated to commit the alleged fraud for several reasons.  First, Defendants had a desire to enter into a lucrative agreement with GeneDx upon raising sufficient capital to finance the acquisition.  *E.g.,* ¶¶37, 40-42, 44, 64-65, 84, 99, 100-03.  Combining Sema4's platform with GeneDx's services would allow Sema4 to become one of the largest genomic screening providers in the United States, and the Company stated that the acquisition would allow it to greatly increase revenues to $350 million in 2022 for the combined companies.  ¶37.  The Second Circuit has recognized that "the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter."  *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000); *see also Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 169–70 (D. Conn. 2019) (allegation that "defendants' price-hike strategy was implemented to increase revenue and inflate the price of their stocks to use as currency" for an acquisition supported scienter); *Schottenfeld Qualified Associates, L.P., v. Workstream, Inc.*, 2006 WL 4472318, at *4 (S.D.N.Y. May 4, 2006) ("A jury could reasonably find that this motive alone – to keep the value of Workstream stock high in order to use the stock to consummate corporate acquisitions – is enough, along with the apparent falsity, to satisfy scienter.").  Thus, "[s]cienter may be imputed, as is the case here, to defendants when defendants were motivated to inflate company stock prices as a means to effectuate a specific acquisition that would not otherwise be possible without fraudulently inflating stock prices."  *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003).

Defendants assert – without citing any authority – that their alleged acquisition motive "makes no sense" because the closing of the transaction predated some of the alleged statements and because Stueland was previously an executive at GeneDx.  Mot. at 26-27.  Neither of these facts negate Defendants' motive to artificially inflate Sema4's stock price in order to acquire GeneDx.  Accordingly, the Complaint's motive allegation "is sufficiently concrete to support a strong inference of scienter."  *Burstyn v. Worldwide Xceed Grp., Inc.*, 2002 WL 31191741, at *5 (S.D.N.Y. Sept. 30, 2002); *see Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp.

3d 526, 554 (S.D.N.Y. 2017) ("The SAC plausibly alleges that . . . defendants had the motive to inflate comScore's stock price to acquire Rentrak.").

Second, Plaintiff alleges that Defendants were motivated to raise capital to keep Sema4 afloat. Indeed, Defendants represented in the Company's 2021 Form 10-K that "[w]e must continue to invest significant resources in research and development, including through acquisition and collaborations (such as the pending Acquisition on GeneDx [ ]) … in order to enhance our current diagnostics and health information and data science technologies, and existing and new products and services based off these technologies." ¶99. "[C]ourts have found allegations of motive adequate" where a company "needed to fundraise to survive." *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020); *see also RMED Intern., Inc. v. Sloan's Supermarkets, Inc.*, 878 F. Supp. 16, 19 (S.D.N.Y. 1995) (allegation that defendants were motivated to defraud investors because company "was in potential jeopardy of either divestiture of restrictions on the future acquisition of supermarkets in New York City or both" supported scienter). Contrary to Defendants' assertion (Mot. at 27), "an executive at a company that will go belly up if it fails to fundraise has different incentives from a generic corporate insider." *Skiadas*, 2020 WL 3268495, at *11. "One salient difference is that the former executive has a stronger incentive to bet the farm in a reckless gamble because the alternative is certain failure." *Id.*[14]

Third, Defendants' motivation to seek compliance with the Company's debt covenants bolsters a strong inference of scienter. ¶¶106-10. Courts have found scienter where defendants were motivated "so as to provide [the company] capital to retire debt." *In re Twinlab Corp. Sec. Litig.,* 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000); *see also PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 690 (6th Cir. 2004) (allegations that defendants "were motivated to engage in fraud in

---

[14] This fact renders Defendants' cases distinguishable: *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 213 (S.D.N.Y. 2020); *Stein v. Tangoe, Inc.*, 2014 WL 12767210 (D. Conn. Sept. 30, 2014); *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013), *aff'd,* 566 F. App'x 93 (2d Cir. 2014).

order to forestall [the company's] default of its bank loan agreement and to preserve the Company's ability to borrow pursuant to its credit facility" are "probative of scienter").

Here, for example, the Company entered into an agreement with Silicon Valley Bank which provided for a revolver up to an aggregate principal amount of $125 million, including a sublimit of $20 million. ¶106. The agreement required the Company to comply with certain financial covenants if liquidity fell below $135 million, which included the achievement of certain minimum revenue targets. *Id.* Additionally, a $9.5 million agreement with the Connecticut Department of Economic and Community Development ("DECD") was assigned to Sema4 in 2017, which the Company amended in June 2018 by increasing the total loan commitment to $15.5 million at the same interest rate. ¶107. Under the amended agreement, the DECD may grant partial loan forgiveness contingent upon the Company achieving job creation and retention milestones, such as, $3 million of Phase 3 funding ($6 million) would be forgiven based on creating an additional 181 full time positions in Connecticut. *Id.* As of December 31, 2021, $11 million of the loan balance from the DECD was outstanding. *Id.* Thus, Defendants' motivation to misrepresent the truth "so as not to violate loan covenants" also supports a strong inference of scienter. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1063-64 (9th Cir. 2000).

Finally, the structure of Defendants' compensation and bonus packages provides a motive for their alleged fraud. ¶¶104-05. Compensation and bonuses that are tied to a specific goal provide a motive to a defendant to misrepresent or manipulate information about such a goal. *See, e.g.*, *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivs. Litig.*, 2012 WL 1632762, at *3 (S.D.N.Y. May 4, 2012) (allegations that defendants "had a motive to commit fraud" because of the "executive compensation structure, which awarded bonuses based in part on [the company's] earnings per share" supported scienter); *Six Flags*, 58 F.4th at 215 ("[P]erformance-based compensation can establish motive in circumstances when the potential bonus is extremely high").

Plaintiff alleges that both Schadt and Ro were entitled to receive annual bonuses based on the achievement of corporate performance objectives. ¶104. For 2021 bonuses, the target annual bonuses for Schadt and Ro were equal to 100% and 50%, respectively, of their base salaries

($675,000 and $400,000, respectively). *Id.* Stueland and Miao were also motivated to defraud investors for personal gain. ¶105. Specifically, Stueland entered into an employment agreement with the Company dated January 14, 2022, as amended on April 29, 2022, which included a base salary of $675,000, a discretionary incentive bonus opportunity with a target amount of 100% of the annual base salary, an initial grant of stock options and restricted stock units with an aggregate grant-date value of $9,000,000, and standard employee benefit plan participation. *Id.* In connection with Miao's appointment, the Compensation Committee of the Board of Directors of the Company approved: (i) a salary increase for Miao for a total annual base salary of $360,000; (ii) target annual bonus of 50% of annual base salary; and (iii) a $100,000 cash retention bonus payable three months following the start date of the Company's permanent Chief Financial Officer. *Id.* All of these facts support Plaintiff's motive allegations because they constitute "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *See Ganino*, 228 F.3d at 170.[15]

### 2.    Plaintiff Alleges Strong Circumstantial Evidence of Recklessness

The Second Circuit has defined recklessness in securities cases as "at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak*, 216 F.3d at 308. "An egregious refusal to see the obvious, or to investigate the doubtful [can support] an inference of . . . recklessness." *Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996).

---

[15] Citing *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001), *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47 (2d Cir. 1995), and *Abbad v. Amman*, 285 F. Supp. 2d 411 (S.D.N.Y. 2003), *aff'd,* 112 F. App'x 97 (2d Cir. 2004), Defendants suggest that allegations regarding a motive to increase executive compensation can never support an inference of scienter. Mot. at 27-28. But "[w]hen financial incentives to exaggerate earnings go far beyond the usual arrangements of compensation based on the company's earnings, they may be considered among other facts to show scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002). Such is the case here. And although Defendants claim that the averment "is utterly devoid of specifics" (Mot. at 28), the Second Circuit has declared that "[e]ven with the heightened pleading standard under Rule 9(b) and the Securities Reform Act, we do not require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

25

a.      **The Former Employee Accounts Support a Strong Inference of Scienter**

A plaintiff can establish a strong inference of scienter through accounts of former employees ("FEs") and other confidential witnesses ("CWs"), "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. Plaintiff has done so here. ¶¶58-64, 68-74, 93-97.

For instance, FE 1, who served as Senior Vice President of Production and Bioinformatics at the Company from February 2020 to September 2022, stated that Defendants absolutely knew that the Company's reimbursements were at risk as early as mid-2020. ¶¶59, 69, 93, 94. In fact, FE 1 received an email from Schadt in mid-2020 stating that "[t]he reimbursements are under attack." *Id*. According to FE 1, this statement meant that third-party payors were claiming that they did not have to pay the Company's bills at the full rate because the payors had taken the position that that the Company was overcharging them. *Id*.

FE 1 stated further that Schadt charged chief health information officer, Rong Chen, with the task of writing a paper that would demonstrate better outcomes from the Company's comprehensive panel test. ¶69. FE 1 stated that because Defendants knew that the Company's reimbursements were going to suffer if the Company did not have a publication to back up the reimbursements, the Company was conducting intensive research projects to try to get out in front of the fact that Defendants knew that their position on reimbursement was weak. *Id*. Additionally, FE 1 stated that Defendants knew the Company's billing was not supported by the current standard of care or science. *Id*.

FE 1 also stated that physicians typically ordered tests on one or two genes and would select one particular gene they wanted to know about or would select a disease-specific panel of seven to 10 genes. ¶¶60, 70. However, according to FE 1, the Company would always test them the same way – which was to test about 500 genes. *Id*. FE 1 stated that Expanded Carrier Screening was the Company's flagship product, which tested a little over 200 genes. *Id*.

According to FE 1, the Company then launched a second version of the Expanded Carrier Screening Test in mid-2021, which tested over 500 genes. *Id*. FE 1 stated, however, that the Company had panels where a physician could test only the genes that were relevant for breast cancer or other medical conditions. *Id*. According to FE 1, although physicians would order a subset of tests, the Company would invoice for the full test. *Id*. FE 2, who served as Director, Alliance Management Business Development at Sema4 from 2021 through September 2022, further confirmed that no matter what type of test physicians ordered, the Company ran the same expansive testing. *Id*. Further, according to FE 1, Centrellis never existed. FE 1 stated that Defendants claimed to have AI called Centrellis solely so that Defendants could tout Sema4 as a data company rather than just a diagnostics company and thus, increase the Company's valuation. ¶¶58, 68.

In addition, FE 5, who worked as a Billing Authorization Supervisor at Sema4 from February 2018 through September 2020, personally received calls on behalf of insurers "regularly" requesting refunds for overpayments—"a bare minimum of two or three times a month." ¶¶61, 71, 95, 96. During FE 5's tenure, there were eight to nine other people besides FE 5 who were responsible for answering such calls. *Id*. FE 5 and FE 5's coworkers relayed these messages to their manager, Revenue Cycler Manager, Ales, but Ales directed them to send the messages to voicemail—FE 5 understood this to mean that their manager did not intend to follow up with the insurer inquiries. *Id*.

FE 6, who worked in various roles in Sema4's billing department from July 2018 until March 2022 had a similar account as FE 5. ¶¶62, 72, 95, 97. According to FE 6, for most of 2021, FE 6 was responsible for retrieving the Company's mail and recalled receiving letters on behalf of insurers requesting recoupments for overpayments throughout that time. *Id*. FE 6 stated that their manager, Ales, told FE 6 and FE 6's coworkers that "the higher-ups had said to disregard [the letters], and they'd provide instructions later. And I never received an instruction." *Id*. FE 6 believed that these orders came from Sean Lunde, Sema4's Vice President, Finance and Strategy. *Id*. FE 6 and FE 6's coworkers would shred such letters, which FE 6 thought was "crazy." *Id*.

27

Moreover, FE 3 and FE 4, both of whom worked as Women's Health Services Representatives from August 2021 through November 2022, and from June 2021 to November 2022, respectively, stated that Sema4 was out-of-network with most health plans, which in their view, was harmful to the Company's prospects. ¶¶63, 73. FE 4 stated that the Company was out-of-network "with everybody.  They were billing these astronomical rates and [ ] writing off the patient's portions. Being in-network is important. Sometimes I felt that they were purposefully staying out-of-network because they could bill higher rates." *Id*.  FE 3 stated that Sema4's lack of being in network with more major payors was "a major obstacle" to the Company's success and that "[i]t was clearly an unprofitable business, based on how many tests were run and by the amount of reimbursements." *Id*.  Additionally, FE 3 and FE 4 both stated that, contrary to Defendants' representations, the Company's core women's health testing segment had been struggling.  ¶¶64, 74.  FE 4 stated, "When GeneDx merged, I said the women's health division was going to go under and they'd take our hereditary cancer testing, because that was the only profitable test we sold. The rest of them were losses." *Id*.  FE 3 stated, "on the OB/GYN side, [customers] weren't really interested in the tests." *Id*.  These allegations support a strong inference of scienter.

Defendants' arguments to the contrary are meritless.  First, Defendants argue that the FEs are "not alleged to have held positions at the Company that would enable them to assess whether any statement was false, much less made with scienter by a particular defendant."  Mot. at 29. Defendants, however, misstate the governing standard.  An FE need only be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," (*Novak*, 216 F.3d at 314), not that they held positions that would have enabled them to assess whether statements were false or made with scienter.  Defendants cite no authority for their invented, unsupported standard.  All the FEs are described in the Complaint with sufficient particularity to support the probability that they would possess the information that they provided.  ¶¶58-64.  And while Defendants assert that some FEs "are not alleged to have had any contact with any of the individual at any time" (Mot. at 29), there

28

is "no baseline requirement of [contact with defendants] in order to allege sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615–16 (S.D.N.Y. 2015); *see also In re Fairway Grp. Holding Corp. Sec. Litig.*, 2015 WL 249508, at *16 (S.D.N.Y. Jan. 20, 2015) (rejecting argument that CW allegations were insufficient because CW "did not have contact with the defendants"); *In re EVCI Colleges Holding Corp. Sec. Litig.,* 469 F.Supp.2d 88, 97 (S.D.N.Y.2006) (crediting the testimony of confidential witnesses without regard to their contact with the individual defendants).[16]

Second, Defendants assert that the Court cannot rely upon the FE accounts if they were employed before the Class Period. Mot. at 30. As the Second Circuit has recognized, however, "[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant." *Scholastic*, 252 F.3d at 72. Indeed, "allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015). Thus, a witness' "statements are not rendered irrelevant merely because [the witness] was not employed during the Class Period." *In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *15 (M.D. Ga. Mar. 23, 2018); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 638 (S.D.N.Y. 2010) (pre-class period events were relevant to defendants' knowledge during the class period).

Finally, Defendants' contention that the FE accounts are insufficiently particular, uncorroborated, and secondhand fails. Mot. at 30-31. On the contrary, the FE accounts are specific

---

[16] Defendants' reliance upon *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193 (S.D.N.Y. 2020), *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd,* 312 F. App'x 400 (2d Cir. 2009), *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206 (E.D.N.Y. 2019), and *Adient*, 2020 WL 1644018, is misplaced. In *Woolgar* and *Adient*, the courts found that the CW accounts did not support a strong inference of scienter for distinguishable reasons, such as unspecified dates of employment and the lack of allegations demonstrating information that contradicted defendants' public representations. The same is true for *Malin*, which, unlike here, was based upon allegations the court found to be "general" and "unsupported." *Malin*, 499 F. Supp. 2d at 140. In *Foot Locker*, the court held that there were no allegations that the misrepresentations alleged had a negative effect on the company's sales. *Foot Locker*, 412 F. Supp. 3d at 222. Here, Defendants' misrepresentations caused Sema4's stock price to plummet more than 33%. ¶51.

29

and based upon the personal knowledge of each witness. ¶¶58-64, 68-74, 93-97. For instance, FE 1 stated that Defendants had actual knowledge that the Company's reimbursements were at risk as early as mid-2020 because FE 1 received an email from Schadt stating in mid-2020 that "[t]he reimbursements are under attack," which FE 1 understood to mean that third-party payors were claiming that they did not have to pay the Company's bills at the full rate. ¶¶59, 69, 93, 94. This allegation is specific, based upon personal knowledge, and involved Sema4's CEO. "Hence, the Complaint pleads sufficient particularity to support the probability that the witnesses possessed the information alleged." *Blanford*, 794 F.3d at 307.

> **b.** **Defendants' Access to Information and the Core Operations Doctrine Bolster the Strong Inference of Scienter**

Defendants' exposure to information within the Company that reflected the false and misleading nature of their statements also supports a strong inference of scienter. "Circumstantial evidence can support an inference of scienter" where defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Blanford*, 794 F.3d at 306. As described more fully above, the FE accounts demonstrate that Defendants were aware of, or at minimum, recklessly disregarded, information that contradicted their public statements. *See, e.g.*, ¶¶58-64, 68-74, 93-97. Thus, Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *In re Synergy Pharms. Inc.*, 2023 WL 5526675, at *2 (2d Cir. Aug. 28, 2023).

Further, that Defendants' misrepresentations involved the core operations of Sema4 supports a strong inference of scienter (*e.g.,* ¶¶81-83). "Once a plaintiff has adequately alleged that a defendant made false or misleading statements about the core operations of a company . . . an inference arises that the defendant knew or should have known the statements were false when made." *In re Reserve Fund Sec. and Deriv. Litig.*, 2010 WL 685013, at *9-*10 (S.D.N.Y. Feb. 24, 2010); *see New Orleans Emps. Ret. Sys. v. Celestica, Inc.,* 455 Fed App'x 10, 14 n.3 (2d Cir. 2011) ("allegations of a company's core operations . . . can provide supplemental support for allegations of scienter, even if they cannot establish scienter independently"); *Salix*, 2016 WL 1629341, at

*16 ("the fact that [the alleged fraud] involved the core operations of [the company's] business also support[s] a strong inference of scienter"). Defendants' core business was its diagnostic testing—for example, in 2021, 76% of the Company's revenue was generated by reimbursement from health plans for its diagnostic testing. ¶81. Additionally, Defendants' diagnostic testing business was dependent on the extent that payors would reimburse patients for the Company's diagnostic tests, and during 2021, reimbursement from health plans represented 79% and 76% of the Company's diagnostic test revenue and total revenue, respectively. ¶¶82-83.

Defendants' arguments regarding the core operations doctrine fail. First, they cite *Oklahoma L. Enf't Ret. Sys. v. Telefonaktiebolaget LM Ericsson*, 2020 WL 127546 (S.D.N.Y. Jan. 10, 2020) to question the validity of the doctrine. But in *Celestica*, the Second Circuit indicated that the core operations inference can provide additional support for scienter even if it cannot do so independently. *Celestica,* 455 Fed App'x at 14 n.3; *In re AppHarvest Sec. Litig.*, 2023 WL 4866233, at *24 (S.D.N.Y. July 31, 2023). Second, Defendants state that the doctrine cannot support scienter independently. Mot. at 31-32. Plaintiff, however, never suggested otherwise. Indeed, *Tellabs* counsels that scienter allegations must be assessed holistically. *Tellabs*, 551 U.S. at 324-26. Accordingly, because "the misstatements concerned [the company's] core operations" such facts support a strong inference of scienter. *Freudenberg v. E\*Trade Financial Corp*., 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010); *see also Fairway*, 2015 WL 249508, at *15 (finding a strong inference of scienter where plaintiff "alleges that defendants' misstatements concerned a core operation of their company").

### c.    The Company's History of Material Weaknesses in Financial Reporting Supports a Strong Inference of Scienter

Courts have routinely held that "a failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter." *In re Veeco Instruments, Inc. Sec. Litig*., 235 F.R.D. 220, 232 (S.D.N.Y. 2006); *see Cornwell,* 689 F. Supp. 2d at 637-38 (allegations regarding knowledge of the company's problems with internal controls supported a strong inference of scienter). Here, Sema4 had a history of severe material weaknesses in its internal controls. ¶¶111-

31

13. For instance, the Company identified material weaknesses in its internal control over financial reporting as of December 31, 2020, which had not been fully remediated as of December 31, 2021. ¶111. Additionally, during 2021, the Company identified a misclassification related to certain costs included within cost of services for the years ended December 31, 2021, 2020 and 2019, and identified numerous specific material weaknesses in internal controls. *Id*.

In connection with these material weaknesses in internal control over financial reporting, the Company had to restate its annual 2020 and 2019 financial statements to correct misstatements pertaining to the misclassification of certain expenses related to the genetic counseling department reported in cost of services that should have been reported in selling and marketing in the prior period financial statements. ¶112. Additionally, the Company restated 2021 and 2020 interim financial statements and identified quarterly out of period adjustments generally related to recognition of cost of services in the quarterly periods ended March 31, 2021, June 30, 2021 and September 30, 2021. ¶113. The adjustments affected certain current asset and liability accounts previously reported in the condensed balance sheets as of March 31, 2021 and June 30, 2021 and condensed consolidated balance sheets as of September 30, 2021. *Id*. These allegations also "support a strong inference of scienter." *Varghese v. China Shenghou Pharm. Holdings, Inc*., 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009).

Considering these allegations collectively as required (*Tellabs*, 551 U.S. at 322-22), Plaintiff has adequately alleged scienter under the Exchange Act. Defendants' suggestion otherwise based upon their purported disclosures (Mot. at 32) fails because, as described above, "the fact that [the company] disclosed certain of its difficulties during the class period does not necessarily negate an inference of scienter, for [the company's] statements may still have been intended to conceal the fact that its condition was substantially worse than its statements suggested." *Jones v. Corus Bankshares, Inc*., 701 F. Supp. 2d 1014, 1025 (N.D. Ill. 2010).

### C.    Plaintiff Alleges Loss Causation

The PSLRA provides that "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged . . . caused the loss for which the plaintiff seeks to recover

32

damages." 15 U.S.C. §78u-4(b)(4).  To adequately plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  To do so, a plaintiff need merely allege that "the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005) (italics in original).  Courts within the Second Circuit have declared that loss causation "is not subject to the heightened pleading standards of Rule 9(b) or the PSLRA." *Tecku v. Yieldstreet, Inc.*, 2022 WL 1322231, at *13 (S.D.N.Y. May 3, 2022); *see Freudenberg*, 712 F. Supp. 2d at 202 ("There is no heightened standard for pleading loss causation.").  "Instead, a short and plain statement suffices, as required under Rule 8 of the Federal Rules of Civil Procedure." *Tecku*, 2022 WL 1322231, at *13.  Thus, the pleading requirements for loss causation "are not meant to impose a great burden upon a plaintiff." *Dura*, 544 U.S. at 347.

Plaintiff has adequately alleged loss causation.  ¶¶46-51, 75-79.  Specifically, Plaintiff alleges that on August 15, 2022, Sema4 announced: (1) that Sema4 had reversed $30.1 million of revenue related to prior periods due to a dispute with one of its larger commercial payors and had established a $39.2 million reserve to cover potential recoupment disputes with other third-party payors; (2) the Company was eliminating its somatic oncology segment, and in connection with the elimination of the segment, the Company was closing its Branford, CT facility; (3) changes to its research and development leadership team, including that Schadt was resigning from the Company, and; (4) that it was eliminating 250 employees, or approximately 13% of its workforce. ¶¶46-47.

Also on August 15, 2022, the Company announced the material lowering of its fiscal 2022 revenue guidance to a range of $245 million to $255 million, down from its prior guidance range of $305 million to $315 million due in part to declining pricing, with "ASPs in [Sema4's] complex reproductive health segment [at] about $520 in the quarter," which "compared to about $712 in the quarter prior."  ¶48.  Sema4 also announced that, contrary to Defendants' earlier representations, the Company was "expecting for the remainder of the year, at least double-digit

sequential declines from 2Q into 3Q for those ASPs in the reproductive health business." *Id*. On this news, the Company's stock plummeted by 33.33%. These allegations more than adequately provide Defendants "with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347.

Defendants' assertions to the contrary are unavailing. First, Defendants contend that Plaintiff's loss causations allegations are insufficient because they purportedly consist of boilerplate allegations that Defendants made misstatements and the price of the Company's shares fell when the truth was revealed. Mot. at 33. But courts have routinely held that similar allegations are sufficient to allege loss causation. *See, e.g.*, *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 236 (S.D.N.Y. 2010) ("Plaintiffs have identified several corrective disclosures that allegedly demonstrated the falsity of defendants' previous statements, and plaintiffs have also alleged that the value of their securities declined following the corrective disclosures. Plaintiffs' allegations are sufficient at this early stage of the litigation."). Defendants cite *Optimum Strategies Fund I, LP v. U.S. Oil Fund, LP*, 2023 WL 2526394 (D. Conn. Mar. 15, 2023) (Mot. at 33), but *Optimum* is readily distinguishable. There, the court found that there were "no allegations" suggesting "there was a drop in the price of its stock" nor any "allegations concerning the price" of the company's securities "at any time." *Id*. at *14. Here, in contrast, Plaintiff has made such allegations. ¶¶51, 54.

Second, Defendants contend that the Company's August 15, 2022 announcement cannot support loss causation because "[n]o supposed fraudulent statement was revealed on that date." Mot. at 33-34. Defendants' argument, however, is premised upon a notion that courts have uniformly rejected. *Dura* did not confine the "relevant truth" to explicit identification of the earlier misrepresentations alleged or the identification of fraud. To be corrective, a disclosure need only relate back to the alleged misrepresentation – it need not precisely mirror the earlier misrepresentation or disclose the fraud alleged. *See, e.g.*, *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 140–41 (D. Conn. 2021) ("the corrective disclosures or materializations alleged need not be a mirror image tantamount to a confession of fraud"); *Freudenberg*, 712 F.

34

Supp. 2d at 202 ("neither the Supreme Court in *Dura,* nor any other court addressing the loss causation pleading standard require a corrective disclosure be a mirror image tantamount to a confession of fraud").    The Company's disclosures on August 15, 2022 **related** to the misrepresentations alleged, which is all that is required.  *Freudenberg,* 712 F. Supp. 2d at 202-04.

Third, Defendants claim that the Company's $30.1 million revenue adjustment in Q2 was based upon circumstances that purportedly arose solely in that quarter.  Mot. at 34.  But the Company admitted that the "$30.1 million decrease to revenue for tests in which the performance obligation of delivering the test results was met **in prior periods**" and that "$24.2 million of this decrease **is related to the years December 31, 2021 and prior**."  *See* Mot., Ex. 10 at 23.  Defendants again attempt to rely upon the Company's disclosures, but, as noted above (*see* Sec. IV(A)(3), *supra*), these disclosures did not constitute meaningful cautionary language and the risks identified had already materialized.  And, as alleged, Defendants were aware of, or were reckless in not knowing, information from third-party payors related to these transaction prices and contractual adjustments during these prior periods.  *See, e.g.*, ¶¶93-97.

Finally, Defendants claim that Plaintiff has not adequately alleged loss causation with respect to Defendants' misrepresentations regarding Centrellis because "nothing said on August 15 even mentioned Centrellis."  Mot. at 34.  Once again, however, "the corrective disclosures or materializations alleged need not be a mirror image tantamount to a confession of fraud."  *Alexion*, 556 F. Supp. 3d at 140–41.  The Company's August 15, 2022 disclosures regarding shuttering its facilities and its exit from testing for reproductive health and somatic tumors related to Defendants' representations regarding their ability to enhance Centrellis and to deliver improved personalized health insights.  *See, e.g.*, ¶¶40, 45, 53, 55, 56, 67, 84, 101.  Thus, Plaintiff has adequately alleged loss causation.

### D.    Plaintiff Alleges Control Person Liability

In the Second Circuit, control person liability under Section 20(a) of the Exchange Act has two elements: "(1) a primary violation by a controlled person; and (2) direct or indirect control of the primary violator by the defendant."  *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 414

(S.D.N.Y. 2003). "Control need only be alleged according to the Rule 8 standard." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 2012 WL 2512280, at \*12 (S.D.N.Y. June 29, 2012). Additionally, "[w]hether a person is a controlling person is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006). Contrary to Defendants' assertion (Mot. at 35) – and as demonstrated above – Plaintiff has adequately pled a primary violation and has also sufficiently alleged the Individual Defendants' control over the Company. ¶¶12-21, 131-34. Thus, Plaintiff has adequately alleged a control person claim. 15 U.S.C. §78t(a).[17]

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion in its entirety. Alternatively, if the Court grants any portion of the Motion, Plaintiff respectfully requests leave to amend. *See ATSI*, 493 F.3d at 108 ("District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)."); *Luce v. Edelstein*, 802 F.2d 49, 56-57 (2d Cir. 1986) ("Complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend.").

---

[17] Defendants cite *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) for the proposition that alleging culpable participation is required under Section 20 (Mot. at 35), but district courts in this circuit have not required such allegations. *See, e.g.*, *Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp., Inc.*, 2014 WL 3569338, at \*9 n.4 (E.D.N.Y. July 18, 2014) ("the statement in ATSI was dictum" and appears "to be at odds with the language of Section 20(a)."); *In re Parmalat Sec. Litig.*, 497 F. Supp. 2d 526, 532 n.42 (S.D.N.Y. 2007) (holding that the statement in *ATSI* "was *dictum*" and that "[t]his Court repeatedly has held that culpable participation need not be alleged to state a claim under and is not an element of Section 20(a) liability"). Defendants also cite *In re ShengdaTech, Inc. Sec. Litig.*, 2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014), which acknowledges that some district courts in this circuit have held that alleging culpable participation is not required. *Id.* at \*10 n.1 (citing *Parmalat*, 375 F. Supp. 2d at 307–10; *WorldCom*, 294 F. Supp. 2d at 414-16; and *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 392-97 (S.D.N.Y. 2003)). Even if culpable participation were required, however, Plaintiff has adequately alleged it. *See, e.g.*, ¶¶58-64, 68-74, 93-97.

Dated:  October 6, 2023

Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By:  *s/ Ex Kano S. Sams II*
Ex Kano S. Sams II (admitted *pro hac vice)*
Natalie S. Pang (admitted *pro hac vice)*
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Tel: (310) 201-9150
Fax: (310) 201-9160
Email: esams@glancylaw.com
Email: npang@glancylaw.com

**HURWITZ, SAGARIN, SLOSSBERG &
  KNUFF, LLC**
David A. Slossberg [ct13116]
Kristen L. Zaehringer [ct27044]
147 North Broad Street
Milford, CT 06460
Tel: (203) 877-8000
Fax: (203) 878-9800
Email: DSlossberg@hssklaw.com
Email: KZaehringer@hssklaw.com

*Counsel for Lead Plaintiff and the Class*

## CERTIFICATE OF SERVICE

This is to certify that on October 6, 2023, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to all parties that are unable to accept electronic filing.  Parties may access this filing through the Court's electronic system.

 /s/ Ex Kano S. Sams II
Ex Kano S. Sams II

38