## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| NABIL HELO, Individually and On Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No.: 3:22-CV-01131-KAD |
| v. | |
| SEMA4 HOLDINGS CORP., ERIC SCHADT, KATHERINE STUELAND, ISAAC RO, and RICHARD MIAO, | October 20, 2023 |
| Defendants | |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

**TABLE OF CONTENTS**

**Page(s)**

I.    INTRODUCTION ................................................................................................ 1

II.   THE OPPOSITION FAILS TO STATE A COGENT AND COMPELLING
      INFERENCE OF SCIENTER ........................................................................... 1

III.  PLAINTIFF'S ARGUMENTS ABOUT THIRD-PARTY PAYORS IGNORE THE
      COMPANY'S ACTUAL DISCLOSURES ...................................................... 6

IV.   CONCLUSION ................................................................................................ 10

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aceto Corp. Sec. Litig.*,
2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019)............................................................................1

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995) ...................................................................................................4

*In re Carter-Wallace, Inc. Sec. Litig.*,
1999 WL 1029713 (S.D.N.Y. Nov. 9, 1999) , *aff'd*, 220 F.3d 36 (2d Cir. 2000) ....................5

*C.D.T.S. v. UBS AG*,
2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013), *aff'd sub nom. Westchester
Teamsters Pension Fund v. UBS AG*, 604 F. App'x 5 (2d Cir. 2015) ....................................8

*Chapman v. Mueller Water Prods., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020).................................................................................9

*In re DRDGOLD Ltd. Sec. Litig.*,
472 F. Supp. 2d 562 (S.D.N.Y. 2007) .................................................................................5

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009).............................................................................................4, 6

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015)..........................9

*Malin v. XL Cap., Ltd.*,
312 F. App'x 400 (2d Cir. 2009) ........................................................................................5

*Malin v. XL Cap. Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) .......................4

*In re MRU Holdings Sec. Litig.*,
769 F. Supp. 2d 500 (S.D.N.Y. 2011).................................................................................3

*In re N. Telecom Ltd. Sec. Litig.*,
116 F. Supp. 2d 446 (S.D.N.Y. 2000)..................................................................................3

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) .............................................................................................3

ii

**Page(s)**

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of*
    *Com.*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010)......................................................................................10

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)...................................................................................................8

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)......................................................................................................5

*Schottenfeld Qualified Assocs., L.P. v. Workstream, Inc.*,
    2006 WL 4472318 (S.D.N.Y. May 4, 2006) ...........................................................................5

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..........................................................................................................1, 2, 5

*In re Vivendi Universal, S.A.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003)......................................................................................5

*Woolgar v. Kingstone Cos., Inc.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020) .....................................................................................5

**Other Authorities**

Local Rule 7(d) .........................................................................................................................1

## I.      INTRODUCTION

Plaintiff's Opposition fails to offer any meaningful response (or, in some instances, any response at all) to the fundamental pleading deficiencies identified in defendants' motion to dismiss (the "Motion").  In accordance with Local Rule 7(d), defendants limit this reply to two of the overarching deficiencies that cannot be cured with more pleading, and thus justify dismissal of this alleged securities fraud case with prejudice: (1) the Opposition does not offer any comprehensible theory of fraud, nor can it, given that the individual defendants joined and worked at the Company at different times in different capacities, sold no stock, and received no cognizable benefit by virtue of any alleged fraud; and (2) the Opposition does not explain how disclosure of an accounting adjustment, or a reserve for a threatened claim by a third-party payor, which were made timely pursuant to the Company's expressly stated accounting policies, somehow rendered earlier statements "fraudulent."

## II.      THE OPPOSITION FAILS TO STATE A COGENT AND COMPELLING INFERENCE OF SCIENTER

This is supposed to be a fraud case.  To avoid traducing the reputations of individuals serving as corporate officers, the law imposes a heightened pleading standard when a plaintiff asserts securities fraud.  That includes setting forth particularized facts giving rise to a "strong inference" of scienter — one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). And plaintiff must do so on a defendant-by-defendant basis. *See* Mot. at 14-15 (citing *Cortina v. Anavex Life Scis. Corp.*, 2016 WL 7480415, at *9 (S.D.N.Y. Dec. 29, 2016)); *see also In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, at *8 (E.D.N.Y. Aug. 6, 2019) ("The allegations must establish scienter on a defendant-by-defendant basis." (citation omitted)).  While the

Opposition pays lip-service to these rigorous pleading requirements (*see* Opp. at 20-21), it ultimately rests on a theory of fraud that is devoid of facts or common sense.

According to plaintiff, the alleged "fraud" occurred from March 14, 2022 through August 15, 2022.  The Opposition, like the AC, argues that the "fraud" was "motivated" in part so that the Company could acquire GeneDx in May 2022 with inflated Company common stock. Setting aside that that theory of inflation is entirely refuted by the Company's repeated disclosures on third-party reimbursements, plaintiff's theory on scienter does not align with the facts alleged here.  For example, Ms. Stueland was the ***CEO of GeneDx before the merger***, incented to maximize the value received in exchange for GeneDx, and thus would have been a victim of any such fraud.  Plaintiff is asking the Court to indulge the theory that Ms. Stueland was a victim of fraud until May, then at some unknown point in some unknown way was informed by some unknown person of the fraud, decided to join in for a few months for unknown reasons and with no personal benefit, only to then have the Company make a "corrective" disclosure "revealing" the fraud in August.  To put it mildly, that sort of fictional account is not the "cogent" and "compelling" inference *Tellabs* requires. The Opposition ignores the problem.

Plaintiff's allegations against the other individual defendants are equally incoherent.  Mr. Miao served as the Company's interim CFO for a few months (from June 14, 2022 to September 2, 2022), and did not hold that position at the time of the GeneDx acquisition.  Nor is he alleged to have made ***any*** alleged misstatements.  Instead, all he did was sign the Company's Form 10Q on August 15, 2022, which is the supposed ***corrective disclosure***.  The Opposition offers no explanation, including when and how Mr. Miao learned of the alleged fraud (which, according to plaintiff, was already ongoing before he became interim CFO), much less what he said to further the fraud during his brief, interim tenure.  The Opposition, like the AC, has no answers.

2

The Opposition fares no better as to Dr. Schadt (founder and former CEO), who stepped down as CEO in May and then retired in August 2022 shortly after the merger, or Mr. Ro (former CFO), who left the Company in June 2022.  The AC fails to allege that either defendant derived concrete, specific, personal benefits from the alleged misstatements, nor can it, given Dr. Schadt's and Mr. Ro's partial tenures during the putative class period.  And putting aside the utter lack of contemporaneous facts showing that they (or any other defendant) made any false or misleading statements, there is no allegation that they (or Ms. Stueland or Mr. Miao) sold any shares in the class period at all.  In other words, rather than cash-in on the alleged fraud, the value of their holdings declined the same way as all other stockholders.  Plaintiff has no answer to the case law in this Circuit rejecting scienter allegations predicated on supposed "motive and opportunity" in exactly that circumstance.  *See, e.g.*, *In re MRU Holdings Sec. Litig.,* 769 F. Supp. 2d 500, 516 (S.D.N.Y. 2011) (no scienter where plaintiff failed to allege a single sale of stock); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) ("The absence of stock sales by insiders, or any other evidence of pecuniary gain by company insiders at shareholders' expense, is inconsistent with an intent to defraud shareholders.").  The Opposition's citation to a single Ninth Circuit case, *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003), is inapposite, as while each defendant did not trade, the case nonetheless involved a "massive" amount of insider trading by officers, directors, and the two controlling stockholders.  *Id.* at 938-41.  There is no trading alleged at all here.

The Opposition defaults to the speculative assertion that defendants' compensation somehow motivated them to commit fraud.  Opp. at 24-25.  But completely absent from the Opposition is any effort to tie any defendant's "compensation" to the alleged misstatements (or

3

any other metric), much less particularized facts showing that such "compensation" would not have otherwise been paid or achieved. Simply asserting that bonuses might be paid based on "corporate performance objectives" (*id.*) provides none of the essential facts (including whether the bonuses plaintiff vaguely references were ever paid). *See ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) (rejecting compensation as a culpable motive and noting that plaintiff failed to allege "a direct link between the compensation package and the fraudulent statements"); *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 158 (D. Conn. 2007) ("[T]he Second Circuit has rejected performance-based or incentive compensation as evidence of motive sufficient to support a strong inference of scienter, noting that '[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'" (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995))), *aff'd*, 312 F. App'x 400 (2d Cir. 2009).

Nor is it sufficient for the Opposition to assert that "[d]efendants had a desire to enter into a lucrative agreement with GeneDx," "were motivated to raise capital," or were motivated to "seek compliance with the Company's debt covenants." Opp. at 21-24.[1] Like the AC, the Opposition does not identify a *single fact to establish that any defendant actually possessed such motives.* As courts have repeatedly held — in cases the Opposition fails to address — absent such factual allegations, generic "motives" which could be applied to any company are patently insufficient to establish scienter. *See* Mot. at 27-28 (citing *In re DRDGOLD Ltd. Sec. Litig.*, 472

---

[1] *Howard v. Everex Systems, Inc.* is also inapposite, as there was specific evidence at trial that the defendants had the motive to inflate sales to meet a certain loan covenant threshold and that the company had then quoted its value as just over that threshold. 228 F.3d 1057, 1064 (9th Cir. 2000). Here, the allegations do not come close to the showing in *Howard* — the Company's revenue guidance for full year 2021 was $215-225 million, which is nearly $100 million more than the loan covenant that plaintiff cites. *Compare* Ex. 1 *with* Opp. at 24.

F. Supp. 2d 562, 571 (S.D.N.Y. 2007) ("The assertion that [the company] sought to keep its share price elevated so that it could complete transactions on more favorable terms 'does not demonstrate defendants' intent to benefit themselves . . .'" (citation omitted)) and *Woolgar v. Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 234 (S.D.N.Y. 2020) ("Plaintiff does not explain why the Individual Defendants' compensation or bonuses, even if 'tied to the Company's income and combined ratio which was directly impacted by loss reserves,' . . . establishes a 'concrete and personal benefit' to them.")); *see also Malin v. XL Cap., Ltd.*, 312 F. App'x 400, 402 (2d Cir. 2009) ("Four cubic zirconias will never add up to one real diamond and neither will four generic motives add up to one or more specific motives." (quoting *In re Carter-Wallace, Inc. Sec. Litig.*, 1999 WL 1029713, at \*5 (S.D.N.Y. Nov. 9, 1999), *aff'd*, 220 F.3d 36 (2d. Cir. 2000))).[2]

Finally, tellingly absent from the Opposition is any effort to argue that, viewed holistically, the inference of fraud is cogent and at least as compelling as the competing inference against fraud. *See Tellabs*, 551 U.S. at 314. Even ignoring the different positions and different time periods in which different defendants served as Company executives, which itself renders the fraud claim here implausible, no defendant traded Company shares or profited during the alleged class period. The Company also consistently disclosed that its business was largely dependent on reimbursement from third-party payors, and it detailed the associated risks. These

---

[2] None of the cases cited in the Opposition hold that the "the artificial inflation of stock price in the acquisition context [was] sufficient for securities fraud scienter." Opp. at 22. *Rothman* found that the alleged "acquisitions . . . cannot support motive to commit fraud." *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000). In *Workstream*, the court found allegations of motive "adequate" where the increase in stock price was used to acquire seven companies in a short time period and this "buying binge" "had the direct effect of . . . increasing [the individual defendant's] compensation," facts not pleaded here. *Schottenfeld Qualified Assocs., L.P. v. Workstream, Inc.*, 2006 WL 4472318, at \*4 (S.D.N.Y. May 4, 2006). *Vivendi* involved allegations of an "acquisition spree" that "resulted in the accumulation of a sizeable debt," facts that the AC does not allege. *See In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 166, 185 (S.D.N.Y. 2003). Finally, the *Teva* plaintiffs pleaded *specific admissions* by the defendants that raising the stock price would "allow for its use as currency to fund transactions," and such allegations are not present here. 432 F. Supp. 3d at 170. In short, plaintiff's cases address companies whose primary strategy was acquisition; none found motive adequately pleaded because a company used stock to fund a single transaction.

disclosed risks came to fruition in the second quarter of 2022, and the Company promptly disclosed these developments on August 15, 2022.  Making timely disclosure of a business setback is not a fraud, and that is all this case presents.[3]

## III.    PLAINTIFF'S ARGUMENTS ABOUT THIRD-PARTY PAYORS IGNORE THE COMPANY'S ACTUAL DISCLOSURES

Plaintiff's argument that the Company "made false and misleading statements regarding [its] financial results, ASPs, test volumes and reimbursements" disregards the Company's actual disclosures.  *See* Opp. at 10.  The challenged statements, from March 14, 2022 and May 12, 2022, announce financial results for fiscal year 2021 and the first quarter of 2022, respectively.  AC ¶ 55 ("Total revenue increased 24% in the fourth quarter . . . resulting in total revenue of $47.3 million compared to $38.2 million"); *id.* ¶ 65 ("[t]otal revenue for the first quarter of 2022 . . . was $53.9 million" with "84,925 tests resulted").[4]  At the time those statements were made, the Company explained that third-party payors may request audits or refunds for alleged overpayments. Ex. 3 at 36; Ex. 6 at 51 ("Our third-party payors have also requested, and in the future may request, audits of the amounts paid to us. We have been required to repay certain

---

[3] Plaintiff cannot salvage the fundamental illogic of his fraud theory just by incanting the phrase "recklessness" and pointing to the CW allegations. *See* Opp. at 25-32. As demonstrated in the Motion, the CW allegations are woefully insufficient to show that any defendant (let alone each of them) had contemporaneous facts that contradicted any statement necessary to show falsity, much less that they made any statement with such egregious recklessness as to be tantamount to actual intent. *See ECA*, 553 F.3d at 201-03.

[4] The Opposition claims that defendants have "waived any challenge" to the March 14, 2022 press release because "[d]efendants do not challenge" those statements. Opp. at 17 n.10. Not so. The Motion clearly argues both that plaintiff engages in impermissible puzzle-pleading and fails to state a claim with respect to any of the March 14 statements. *See, e.g.*, Mot. at 12-13, 16, 23, 24.   Relatedly, the Opposition faults the Motion for arguing that portions of statements constituted puffery without providing sufficient "context," Opp. at 19-20, but this too is a problem borne from puzzle pleading (and ignores defendants' submission of each earnings release, earnings call transcript and Form 10Q or 10K in the class period).  Plaintiff asserts that "when examined in such context," the falsity of the cheerleading statements identified in the Motion "is apparent."  *Id.*  But the Opposition does not cite to any pleaded fact contradicting the "context."  For example, plaintiff now argues that the statement, "the performance between the Mount Sinai system, NorthShore and Avera in terms of testing volume now accounts for a substantial percentage of the testing volume" is so obviously false it renders the accompanying statement ("we're . . . pleased with the health system partnership we've formed today") false by association.  *Id.* at 20.  But there is no allegation in the AC that any of these statements were false.  The AC cannot be fairly read to present this argument, and defendants should not be faulted for failing to guess it.

amounts to payers as a result of such audits, and we could be adversely affected if we are required to repay other payers for alleged overpayments.").

The Company also disclosed that the statements were made in accordance with the Company's publicly disclosed revenue recognition policy. Mot. at 16-17. Like most healthcare companies, the Company does not generally collect payment from patients at the moment of service, but rather bills third-party payors like insurance companies after services are rendered. *See* Ex. 3 at 103-04. Accordingly, it can experience significant delays in collecting payment. *Id.* at 35-36. But, "in accordance with GAAP," the Company recognizes revenue at the time services are rendered. *Id.* at 103. The mismatch between the time revenue is recognized and the time payment is received "require[s] significant judgments in determining" the amount of revenue to report. *Id.*

To exercise this judgment, the Company follows the policy it described in each of its quarterly and annual filings. Pursuant to that policy, reported diagnostic test revenue is based on *estimates* informed by "historical collection experience, contractual provisions and insurance reimbursement policies, payor mix, and other relevant information for applicable payor portfolios." *Id.* at 104. The Company "monitor[s] [its prior revenue] estimates at each reporting period based on actual cash collections to assess whether a revision to the estimate is required" and, if it is, the Company "will adjust the[] estimates . . . in the period such variances become known." *Id.* In other words, when the Company becomes aware of new information bearing on prior periods' collection estimates, it revises downward (or upward) the *current* period's revenue estimate. Anyone reading the Company's SEC filings knew that.

This policy describes precisely what happened here. In the second quarter of 2022, the Company became aware of new information (real-time information about collections compared

7

to estimates) that was "unknown at the time of performance." Ex. 10 at 23. In accordance with its policy, the Company announced on August 15, 2022 that it was revising downward the current period's revenue estimate by approximately $30 million. AC ¶¶ 47-48. The Company could not have known the collection rate on its bills before enough time passed to collect on the bills, and the Opposition does not identify any *facts* alleged in the AC to support the theory that defendants knew collections would be lower than estimated in the second quarter of 2022. As explained in the Motion, "[w]ithout contemporaneous falsity there simply is no fraud." *C.D.T.S. v. UBS AG*, 2013 WL 6576031, at *3 (S.D.N.Y. Dec. 13, 2013) (citation omitted), *aff'd sub nom. Westchester Teamsters Pension Fund v. UBS AG*, 604 F. App'x 5 (2d Cir. 2015) (cited in Mot. at 15); *see also Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (cited in Mot. at 15). Plaintiff has no response to this authority.

Instead, plaintiff repeats defective "former employee" accounts. Opp. at 11-13. But the Opposition makes no effort to explain how any of the "facts" reported by these former employees contradict the reported revenue and satisfy the "contemporaneous falsity" requirement. For example, the Opposition argues that one former employee believed that when Dr. Schadt wrote in "mid-2020" — in other words, *two years* before the putative class period even begins — that "[t]he reimbursements are under attack" (AC ¶ 69), he meant "that payors and health systems were claiming that they did not have to pay the Company's bills at the full rate," and that another former employee recounted calls from insurers seeking refunds for overpayments. Opp. at 11. Setting aside the temporal mismatch, there is no inconsistency between the supposed email and the Company's disclosures: the Company warned repeatedly that third-party payors may not pay the negotiated rate or seek to renegotiate their fee, that they had done so in the past and may do so in the future. *E.g.*, Ex. 3 at 30, 35 ("If third-party payors

8

. . . do not provide adequate reimbursement for our tests [or] seek to amend or renegotiate their fee reimbursement schedules, . . . our commercial success could be negatively affected."); *id.* at 36 (Payors "have also requested, and in the future may request, audits of the amounts paid to us [and] [w]e have been required to repay certain amounts to payors as a result."); *id.* at 20 ("We cannot provide any assurance that we will be able to obtain and maintain third-party coverage or adequate reimbursement for our products and services in whole or in part.").  The Opposition fails to explain how confidential witnesses reporting a *disclosed* risk demonstrates that a statement made subject to that disclosure is false or misleading.  *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580 (S.D.N.Y. 2014) (rejecting general and vague confidential witness (CW) allegations, holding that the complaint "does not contain the kind of required specific factual allegations (by CWs or otherwise) that suggest if, when, or how [the defendants] knew about the issue (or its magnitude) at any time prior to" publicly disclosing the issue), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

The Opposition also makes the puzzling claim that "[d]efendants' statements relating to reserves were false and misleading."  Opp. at 13.  To be clear, none of the challenged statements "relat[e] to reserves."[5]  The Motion discussed the reserve the Company announced on August 15, 2022 — a balance sheet entry associated with the contingent claim of a third-party payor asserted that quarter — because plaintiff had apparently alleged that it showed the falsity of earlier statements in March and May 2022.  The law squarely rejects that theory.  *See* Mot. at 17-18; *see also Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 408 (S.D.N.Y. 2020) (announcing a reserve based on a later study cannot, "[a]s a matter of law," make earlier

---

[5] The Complaint alleges that the Company "disclos[ed] [on August 15, 2022] that it had established a reserve of $39.2 million for potential recoupments of payments previously made by third-party payors."  AC ¶ 50.  The AC does not allege, and the Opposition does not argue, that this statement was false or misleading.

9

statements false and misleading); *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 301 (S.D.N.Y. 2010) (rejecting plaintiff's assertion that defendant "should have recorded much larger write-downs earlier than it did" because "the securities laws do not allow fraud by hindsight claims," and "after-the-fact 'allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud'" (citation omitted)).  The Opposition does not meaningfully contend with this caselaw.  *Cf.* Opp. at 13 n.4 (purporting to distinguish these cases by citing the irrelevant proposition that technically accurate statements may nonetheless mislead).  Put simply, when the Company took the reserve, it promptly informed the market, which is exactly what it is required to do and is the antithesis of fraud.

## IV.    CONCLUSION

In addition to those set forth above, there are numerous deficiencies in the AC (including improper group and puzzle pleading, the wholly made-up and deficient allegation about Centrellis,[6] and the absence of loss causation, among others) that support the granting of this Motion.  Because, however, those discussed in this reply cannot possibly be fixed with more pleading (which plaintiff elected to forego in the pre-motion conference), the dismissal should be with prejudice.

---

[6] Plaintiff concedes that Centrellis did exist.  Opp. at 14 n.5.

Dated: October 20, 2023     Respectfully submitted,


/s/ Dean S. Kristy
Dean S. Kristy *pro hac vice*
Catherine D. Kevane *pro hac vice*
Rebecca Matsumura *pro hac vice*
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA  94104
Telephone: (415) 875-2300
Facsimile: (415) 281-1350
dkristy@fenwick.com
ckevane@fenwick.com
rmatsumura@fenwick.com

Joseph W. Martini
Federal Bar No. ct07225
Leslie A. Cahill
Federal Bar No. ct31242
SPEARS MANNING & MARTINI LLC
2425 Post Road, Suite 203
Southport, CT 06890
Telephone: (203) 292-9766
Facsimile: (203) 292-9628
jmartini@spearsmanning.com
lcahill@spearsmanning.com


*Counsel for Defendants Sema4 Holdings Corp.,*
*Eric Schadt, Katherine Stueland, Isaac Ro, and*
*Richard Miao*

## CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2023, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of the filing will be sent by e- mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Dean S. Kristy*
Dean S. Kristy

1