UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------- x
NABIL HELO, *Individually and On Behalf of All*   :
*Others Similarly Situated*,   :
   :
                 Plaintiff,   :   **MEMORANDUM &**
   :   **ORDER GRANTING**
   -against-   :   **DEFENDANTS' MOTION**
   :   **TO DISMISS**
SEMA4 HOLDINGS CORP., ERIC SCHADT,:
KATHERINE STUELAND, ISAAC RO, and:   3:22-CV-01131 (VDO)
RICHARD MIAO,   :
   :
                 Defendants.   :
------------------------------------------------------------- x

**VERNON D. OLIVER**, United States District Judge:

This matter is before the Court on a motion to dismiss the First Amended Complaint, filed by Defendants Sema4 Holdings Corp. ("Sema4" or the "Company"), Eric Schadt ("Schadt"), Katherine Stueland ("Stueland"), Isaac Ro ("Ro"), and Richard Miao ("Miao") (the "Individual Defendants," and, collectively with Sema4, "Defendants"). The lead plaintiff, Nabil Helo ("Helo" or "Plaintiff"), brings this putative class action alleging that Defendants committed securities fraud and seeks remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Exchange Act"). (*See generally* First Amended Complaint ("FAC"), ECF No. 33.) Defendants move to dismiss the First Amended Complaint with prejudice under Fed. R. Civ. P. 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). (Defs. Mot., ECF No. 50.)

After careful consideration of the record, the Court finds that the matter is appropriate for a decision without a hearing. For the following reasons, the Court **GRANTS** Defendants' motion to dismiss the FAC.

I.   <u>**BACKGROUND**</u>[1]

A.   **The Parties**

Plaintiff and the Class are individuals who acquired Sema4 securities between March 14, 2022 and August 15, 2022. (FAC ¶ 1.) Sema4 is a health company that uses artificial intelligence ("AI") to enable personalized medicine for patients. (*Id.* ¶¶ 2-3.) Since its inception, Sema4 has racked up net losses. (*Id.* ¶ 37.) The Company was initially part of Icahn School of Medicine at Mount Sinai's Department of Genetics and Genomic Sciences and the Icahn Institute for Genomics and Multiscale Biology. (*Id.* ¶ 29.) In June 2017, Sema4 commenced operations as a commercial entity and, after completing a business combination with CM Life Sciences in July 2021, debuted on the Nasdaq Stock Market as a publicly traded company. (*Id.*) Sema4 leverages longitudinal patient data, AI-driven predictive modeling, and genomics in combination with other data to affect disease diagnosis, treatment, and prevention. (*Id.* ¶¶ 2, 30, 31.) Sema4 maintains a database that includes de-identified clinical records, including more than 500,000 records with genomic profiles, integrated in a way that it claims to enable physicians to proactively diagnose and manage disease. (*Id.* ¶ 32.)

In January 2022, the Company announced that it would be acquiring GeneDx, Inc. ("GeneDx"), which provides rare disease diagnostic and exome sequencing services, in a $623 million acquisition. (*Id.* ¶ 37.) On May 2, 2022, the Company announced the closing of its acquisition of GeneDx. (*Id.* ¶ 42.)

---

[1] The Court accepts as true the factual allegations in the FAC and draws all reasonable inferences in Plaintiff's favor for the purpose of deciding Defendants' motion. The Court also considers documents incorporated into the FAC by reference and "legally required public disclosure documents filed with the SEC," which are properly considered at the motion to dismiss stage. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

The Individual Defendants were, during the Class Period, senior executive officers and/or directors of the Company who were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects. (*Id.* ¶ 17.)  Schadt is the founder of Sema4 and served as its Chief Executive Officer ("CEO") until May 2022. (*Id.* ¶ 12.) Stueland has served as CEO of Sema4 since May 2022 and, prior to the Company's acquisition of GeneDx, was the President and CEO of GeneDx. (*Id.* ¶ 13.) Ro was the Chief Financial Officer ("CFO") of Sema4 from July 2021 to June 14, 2022. (*Id.* ¶ 14.) Miao was Interim CFO of Sema4 from June 14, 2022 to September 2, 2022. (*Id.* ¶ 15.)

### B.    Procedural History

Helo filed a putative class action complaint against Defendants on September 7, 2022. (ECF No. 1.) On November 16, 2022, the Court appointed Helo as the lead plaintiff, Glancy Prongay & Murray LLP as lead counsel, and Hurwitz, Sagarin, Slossberg & Knuff, LLC as liaison counsel. (ECF No. 20). On January 30, 2023, Plaintiff filed the Amended Complaint. (FAC, ECF No. 33.)

Defendants moved to dismiss the FAC on August 21, 2023 (Defs. Mot., ECF No. 50), which Plaintiff opposed. (Pl. Opp., ECF No. 51.) On October 20, 2023, Defendants filed a reply. (Defs. Reply, ECF No. 52.)

### C.    The Amended Complaint

#### 1.    Claims

Plaintiff alleges two claims. First, he alleges that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 because they "disseminated or approved [] materially false

and misleading statements . . . which they knew, or were deliberately reckless in not knowing, were misleading." (FAC ¶ 126.) Specifically,

> Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact/and or omitted to state material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

(*Id.* ¶ 127.) Second, Plaintiff claims the Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act and are thus liable for securities fraud. (*Id.* ¶¶ 131-134.)

### 2.    Alleged Misleading Statements

Plaintiff, in his opposition brief, organized the purported misrepresentations into two categories. These include (**1**) statements regarding Centrellis, the Company's data platform, and (**2**) statements about financial results, average selling prices of tests ("ASP" or "ASPs"), test volumes, and reimbursements from third-party payors.

Regarding the Centrellis platform, Plaintiff alleges that Defendants made false statements about its existence and capabilities in hopes of increasing the Company's valuation. Plaintiff points to a March 14, 2022 press release, a March 14, 2022 earnings call, and a June 16, 2022 conference. In the March 2022 press release, the Company wrote: "We also continue to expect to close the acquisition of GeneDx by the end of Q2, which will **significantly enhance the power of our Centrellis® platform and distance us as the market leader with the most comprehensive clinically relevant data set available for research and development purposes**." (*Id.* ¶ 55 (emphasis in citation).) The Company also touted Centrellis and the pending GeneDx acquisition, stating:

**Combining GeneDx's clinical genomic solutions with our core women's health business allows us to better serve health system and pharmaceutical and biotech partners in a more holistic way. This transaction will significantly enhance the power of our Centrellis database by adding more than 2.1 million expertly curated phenotypes and well over 300,000 clinical exomes that GeneDx has generated to date.** Following the close of the acquisition, Sema4 will have the most comprehensive clinically relevant data set available for our research and development purposes.

(*Id.* ¶ 40 (emphasis in citation).) At the accompanying March 2022 conference call, while discussing financial results, Schadt stated, "We believe that Centrellis is the most extensive and fastest-growing database of clinically relevant patient data in the industry." (*Id.* ¶ 56.)

On June 16, 2022, Stueland participated in the Goldman Sachs Global Healthcare Conference, where she stated:

But then when you think about the data engine, **Centrellis**, that Eric and the team have expertly built. That is an incredible combination of just being able to put a data engine that **will be able to deliver improved and personalized health insights with our exome and genome as a backbone**. That really enables something that is very different from any other company in this space. And I think that that really sets the foundation for how we can work with health systems and pharma companies to deliver on the promise of personalized medicine.

(*Id.* ¶ 67 (emphasis added).)

Regarding the second category of statements, Plaintiff alleges that Defendants made false statements related to the Company's financial reporting, which are found in the following sources:

- March 14, 2022 press release reporting on fourth quarter and 2021 year-end results (*id.* ¶¶ 38, 55; ECF No. 50-2);

- March 14, 2022 conference call with analysts (FAC ¶ 56);

- the 2021 10-K (*id.* ¶ 57);

- May 12, 2022 press release reporting on first quarter 2022 results (*id.* ¶ 65);

- May 12, 2022 conference call (*id.* ¶ 66); and

- June 16, 2022 Goldman Sachs Global Healthcare Conference. (*Id.* ¶ 67).

The March 14, 2022 press release reporting on fourth quarter and 2021 year-end results claimed that "2021 was a transformative year during which we grew our test volumes and patient database." (*Id.* ¶ 55.) It also stated that the Company experienced a "37% increase in fourth quarter test volumes… compared to the same period last year" and noted "[r]ecord quarterly test volume." (*Id.*) It further stated that the Company's increased revenue from $179.3 million in 2020 to $212.2 million in 2021 was "driven primarily by an increase in testing volumes of both our Women's Health and Oncology product lines." (*Id.* ¶ 38.)

Also on March 14, 2022, at a conference call reporting on first quarter 2021 results, Ro stated that the Company was making positive progress regarding reimbursements from health plans:

> I should also remind you that from a reimbursement perspective, we had a bunch of irons in the fire this year to drive better payment so that the revenue attached to our volume starts to catch up. And if we do that, that will also be important to improving our gross margin profile in the second half of the year.

(*Id.* ¶ 39.) On that call, Schadt reiterated Sema4's increasing test volumes at that conference call, noting the "substantial progress advancing key initiatives as evidenced by the nearly 83,000 resulted tests in the quarter …. We are pleased to see our growing patient and provider engagement translate into increasing test volumes[.]" (*Id.* ¶ 56.)

On May 12, 2022, the Company announced its first quarter results for 2022 and, in a press release, Schadt stated "We delivered record test volume and expanded engagement across our health system partnerships." (*Id.* ¶ 43.) That May 12, 2022 release quoted Stueland as saying,

> We have strong momentum that puts us on a path to deliver on our 2022 pro forma revenue target of $350 million .... Since closing the GeneDx acquisition, we have streamlined our leadership team and established a new, agile, operating model to drive growth, operating efficiency, and the delivery of transformational partnerships, all of which put us on a scalable path to profitability.

(*Id.* ¶ 65.) The Company also held a public conference call on May 12, 2022, where Ro similarly discussed its first quarter 2022 financial results, stating

> [T]otal revenue in the first quarter was $50.1 million, up 4% year-on-year and up 6% versus the fourth quarter of 2021. Regarding volumes, we achieved a new record this quarter .... This represents a 27% year-over-year increase versus the first quarter of 2021. Women's Health grew 23% and Oncology grew 159%.

(*Id.* ¶ 66.) In response to a question about where ASPs were headed for the rest of the year, Ro stated:

> So now that we've got a really significant capability that we didn't have just a few quarters ago, we're in a position to, I think, push on several fronts to drive better ASPs.
>
> Of course, on the oncology front, we've talked before about pushing forward with reimbursement for somatic profiling. That's making good progress and on track with our plan to realize better reimbursement by the middle part of the year. And then on the market access side, there's just a huge universe of ways in which we can optimize our efforts in partnership with our commercial team, in partnership with payers, in partnership with our health system partners, a whole bunch of things that I would say, together, should allow us to, with the same amount of volume like-for-like, drive better amounts of revenue and, therefore, ASP. So I'm personally very excited about the opportunity that we have this year to drive improvement there. It's a meaningful part of the gross margin improvement strategy.

(*Id.*)

Then, on June 15, 2022, Stueland participated in the Goldman Sachs Healthcare and, at an interview, stated that "there is top line growth in terms of volume, revenue and improved ASPs." (*Id.* ¶ 67.) Stueland also noted that the Company is "taking a close look at how the business is operating and ensuring that we're really targeting revenue that is high-value

revenue[.]" (*Id.*)  In response to being questioned about the "areas of R&D that [she was] going to be focused on," Stueland answered:

> So I've now spent, I think, the past decade in this space really and seeing what it takes from a building, scaling and sharing genomic information standpoint and having worked now at 3 companies in the genomic space. What I think is really interesting about the Sema4 GeneDx combination? **One, we have a leading reproductive health franchise on the Sema4 side of things.**
>
> Two, GeneDx is bringing an incredible rare disease asset to bear, both in terms of our exome, our interpretation platform that is not only applicable to our exome, but to genome as well in addition to the rare disease dataset that we have.
>
> **But then when you think about the data engine, Centrellis, that Eric and the team have expertly built. That is an incredible combination of just being able to put a data engine that will be able to deliver improved and personalized health insights with our exome and genome as a backbone. That really enables something that is very different from any other company in this space.** And I think that that really sets the foundation for how we can work with health systems and pharma companies to deliver on the promise of personalized medicine.

(*Id*. (emphasis in original).)

### 3. Alleged Revelations and Subsequent Plummeting Stock Price

On August 15, 2022, it was announced that the Company had "reversed $30.1 million of revenue this quarter related to prior periods. This reversal was in connection with negotiations with] one of [Sema4's] larger commercial payors regarding the potential recoupment of payments for Sema4 carrier screening services rendered from 2018 to early 2022." (*Id.* ¶ 47.) The Company also disclosed that it established a reserve of $39.2 million for potential recoupments of payments previously made by third-party payors:

> The Company is currently engaged in discussions with one of the Company's third-party payors regarding certain overpayments the Company allegedly received from the payor for services that the payor alleges are not covered by, or were not otherwise properly billed to, the payor. This payor has asserted in informal discussions that it will seek recovery or recoupment in relation to the

alleged overpayments if the matter cannot be settled. While the Company believes it has defenses to the payor's allegations, it is currently engaged in discussions seeking to resolve the matter and any claim that may arise in connection therewith in a mutually satisfactory manner.

**As a result of this matter, and in connection with a review of certain billing policies and procedures undertaken by management following the acquisition of GeneDx, the Company considered the need to establish reserves for potential recoupments of payments previously made by third-party payors. As of June 30, 2022, the Company has established liabilities of $39.2 million as a result of this matter and other potential settlements with payors based on the current facts and an evaluation of anticipated results that the Company believes reasonable for all potential recoupments for all third-party payors combined.**

(*Id.* ¶ 50 (emphasis in original).) The Company updated its guidance in light of the developments, including by "taking a more conservative view on both volume and ASPs, but we are revising our underlying assumptions at the legacy GeneDx business up based off of the demand we're seeing for the whole suite of GeneDx's products to date." (*Id.* ¶ 49.) The Company lowered its fiscal 2022 revenue guidance to a range of $245 million to $255 million, down from its prior guidance range of $305 million to $315 million. (*Id.* ¶ 48.) On this news, the Company's share price plummeted by $0.80, or 33.33%, to close at $1.60 per share on August 16, 2022. (*Id.* ¶ 51.)

Then, on November 14, 2022, it was disclosed to investors that the Company was eliminating Sema4's reproductive testing segment, which would include closing down Sema4's Stamford, CT laboratory and eliminating approximately 500 more employees—a 1/3 reduction of the Company's workforce. (*Id.* ¶ 52.)

## II.  LEGAL STANDARD

A party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). On a motion to dismiss, all factual allegations in

the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). "To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead enough facts to state a claim to relief that is plausible on its face." *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 416 (2d Cir. 2023). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, there are heightened pleading requirements where a plaintiff pleads securities fraud:

> Pursuant to Rule 9(b), a complaint sounding in fraud also "must state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), and under the PSRLA, it must "specify each statement alleged to have been misleading[ ] [and] the reason . . . why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(1), (2)(A).

*In re Philip Morris*, 89 F.4th at 418. Therefore, allegations "must do more than say that the statements were false and misleading; they must demonstrate with specificity why and how that is so." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (internal citation and quotation marks omitted).

When considering a Rule 12(b)(6) motion, a district court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,'

which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal citation omitted).

## III.    DISCUSSION

### A.    Section 10(b) and Rule 10b-5 Liability

The Exchange Act makes it unlawful for a party to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission ["SEC"] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b–5 implements Section 10(b) of the Exchange Act by making it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 CFR § 240.10b–5(b). Therefore, "[t]o state a private securities-fraud claim under section 10(b) and Rule 10b-5, a plaintiff must plead '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *In Re Philip Morris*, 89 F.4th at 417 (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

### 1.    Material Misrepresentation or Omission

To plausibly allege a material representation or omission, there must be either a half-truth or a false statement. *Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*, No. 22-355, 2024 WL 2890968, at *3 (2d Cir. June 10, 2024). "Silence, absent a duty to disclose, is not misleading under Rule 10b–5" and, "[e]ven a duty to disclose, however, does not automatically

render silence misleading under Rule 10b–5(b)." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 265 (2024) (internal citation and quotation marks omitted). "A pure omission occurs when a speaker says nothing, in circumstances that do not give any particular meaning to that silence." *Id.* at 258. "Rule 10b–5(b) does not proscribe pure omissions." *Id.* at 264. For omissions to become actionable half-truths, or "statements that are misleading under the second prong of Rule 10b–5 by virtue of what they omit to disclose," *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016), there must be "representations that state the truth only so far as it goes, while omitting critical qualifying information." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 188 (2016). "Disclosure is required . . . only when necessary 'to make statements made, in the light of the circumstances under which they were made, not misleading.'" *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (alteration in original) (internal citation omitted). A false statement is "an actual statement" that is "untrue outright." *In re Vivendi*, 838 F.3d at 239. Whether a misstatement or omission[2] by the defendant is material "depends on whether there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." *ECA*, 553 F.3d at 197. "To be 'material' within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud claim." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014).

---

[2] Courts often use the term "omission" when referring to half-truth statements that fall under the second prong of Rule 10b–5. *In re Vivendi*, 838 F.3d at 240 n.9.

### a.   Centrellis Statements

Plaintiff asserts that statements regarding Centrellis were false and misleading because Centrellis was made up by Defendants in hopes of increasing the Company's valuation. (Pl. Opp. at 25.) Defendants argue that the statements describing Centrellis have not been plausibly alleged to be false or misleading. In support of their argument, Defendants criticize the testimony from a former employee ("FE-1") named in the FAC, asserting that the testimony is conclusory and that he contradicts himself by acknowledging that "there was a piece of technology called Centrellis at the Company." (Defs. Mem. at 30 (internal citation omitted).)

As an initial matter, and contrary to the defendants' assertion, the Court may properly consider the alleged testimony of FE-1. A complaint sufficiently pleads testimony from a confidential witness when that source is described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 123 (2d Cir. 2013) (internal citation and quotation marks omitted). Here, the FAC alleges that FE-1 was Senior Vice President, Production Bioinformatics at Sema4 from February 2020 through September 2022 and was responsible for all the data that came from the Company's clinical testing operation. (FAC ¶ 22.) In his role, FE-1 analyzed lab results through pipelines, including quality checks of samples, utilized those analyses into test results or diagnoses, accessed a dashboard that included information about Company costs incurred to deliver services, and reported to the Company's Chief Data Officer. (*Id.*) Therefore, because it is probable that FE-1 would have had access to information about Centrellis, the Court may credit FE-1's testimony.

FE-1's testimony supports the claim that, if a reasonable investor viewed the Company's marketing materials or disclosures, it would be understood that there was a piece of technology called Centrellis that allowed the Company to perform capabilities. (*Id.* ¶¶ 58, 69.) For example, in March 2022, Schadt described Centrellis as "the most extensive and fastest-growing database of clinically relevant patient data in the industry." (*Id.* ¶ 56.) The Company also stated in a press release that the GeneDx acquisition would establish "the power of our Centrellis® platform and distance us as the market leader." (*Id.* ¶ 67.) In June 2022, Stueland claimed Centrellis would "be able to deliver improved and personalized health insights with our exome and genome as a backbone[.]" (*Id.* ¶ 55.) However, according to FE-1, Centrellis "never existed." (*Id.* ¶¶ 58, 69.)

Defendants dispute the truth of these allegations, characterizing the claim that Centrellis did not exist to be "nonsense." (Defs. Mem. at 30.) But the Court must accept as true the well-pleaded allegations. Drawing all reasonable inferences in the plaintiff's favor, FE-1 testified that, while there was a piece of technology called Centrellis at the company, the reality is that Centrellis did not exist. (*Id.* ¶¶ 58, 69.) These allegations support with particularity the claim that statements regarding Centrellis were misleading.

### b. Statements about Financial Results, ASPs, Test Volumes, and Reimbursements from Third-Party Payors

Plaintiff also asserts that Defendants misled investors regarding the Company's financial results, ASPs, test volumes, and reimbursements from third-party payors. To illustrate, regarding financial results, Plaintiff highlights statements from the March 2022 press release stating that "[t]otal revenue increased 24% in the fourth quarter of 2021 . . . resulting in total revenue of $47.3 million compared to $38.2 million" (*id.* ¶ 55); and the May 2022 press

release stating that "total revenue for the first quarter of 2022 was $53.9 million" with "84,925 resulted tests." (*Id.* ¶ 65.) Regarding the remaining metrics, in the opposition memorandum, Plaintiff points to statements from the March 2022 press release stating that the Company experienced a "37% increase in fourth quarter test volumes… compared to the same period last year" and "[r]ecord quarterly test volume" (*id.* ¶ 38); and Ro's May 2022 statement that reimbursement was "making good progress and on track with our plan to realize better reimbursement by the middle part of the year" and "now that we've got a really significant capability that we didn't have just a few quarters ago, we're in a position to … push on several fronts to drive better ASPs." (*Id.* ¶ 66.) Plaintiff asserts that these statements were fraudulent in light of the revelation on August 15, 2022, where the Company announced that "reversed $30.1 million of revenue this quarter related to prior periods" and that this reversal was in connection with negotiations with one of the Company's "larger commercial payors regarding the potential recoupment of payments for Sema4 carrier screening services rendered from 2018 to early 2022." (*Id.* ¶ 47.) The Company established a $39.2 million reserve to cover potential recoupment disputes with other TSPs (*id.* ¶ 50) and disclosed that the Company was "expecting for the remainder of the year, at least double-digit sequential declines from 2Q into 3Q for those ASPs." (*Id.* ¶ 48.)

Defendants argue that the challenged statements are not misleading because they are either: (1) accurate representations of the Company's revenue or test results, (2) forward-looking statements covered by the PSLRA safe-harbor, or (3) non-actionable opinion or puffery. (Defs. Mem. at 25-30.) The Court agrees that Plaintiff has failed to plausibly allege any misleading or false statements regarding financial results, ASPs, test volumes, and reimbursements.

"[I]t bears emphasis that § 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary to make ... statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (internal citation and quotation marks omitted). Plaintiff does not allege that the financial results, ASPs, test volumes, and reimbursements were false. Instead, Plaintiff asserts that, by choosing to release positive outlooks on these metrics, the failure to disclose that the Company's business practices as being allegedly unsustainable and unprofitable made these statements become actionable half-truths. (Pl. Opp. at 24.)

Here, contrary to Plaintiff's characterizations of Defendants' public disclosures, the record is clear that Defendants disclosed that there was considerable risk to the Company's business model. The Company disclosed in the 2021 10-K that the business "is subject to a number of risks and uncertainties," including:

> If third-party payors, including managed care organizations, private health insurers and government health plans, do not provide adequate reimbursement for our tests, or seek to amend or renegotiate their fee reimbursement schedules, or if we are unable to comply with their requirements for reimbursement, our commercial success could be negatively affected.

(ECF No. 50-4 at 18.) The Company also disclosed the challenges in complying with the procedural requirements for reimbursements with third-party payors and that there were audits of the amounts paid to the company:

> We have also experienced, and may continue to experience, delays in or denials of coverage if we do not adequately comply with … requirements. Our third-party payors have also requested, and in the future may request, audits of the amounts paid to us. We have been required to repay certain amounts to payers as a result of such audits, and we could be adversely affected if we are required to repay other payers for alleged overpayments due to lack of compliance with their reimbursement policies.

16

(*Id.* at 22.) The Company further disclosed that "each payor makes its own decision" as to whether it will provide reimbursement and the reimbursement rate (*id.* at 30), and that "third-party payors often attempt to, or do in fact, amend or renegotiate their fee for reimbursement schedules," resulting in a "[l]oss of revenue." (*Id.* at 22.) The Company also cautioned the public by disclosing that "[w]e cannot provide any assurance that we will be able to obtain and maintain third-party coverage or adequate reimbursement for our products and services in whole or in part." (*Id.* at 17.)

Thus, reviewed in the context of the Company's disclosures, a reasonable investor would not have been misled with the statements regarding financial results, ASPs, test volumes, and reimbursements from third-party payors. Disclosure of additional information was not necessary, "in the light of the circumstances under which [the statements] were made" to make the challenged statements not misleading. *Matrixx Initiatives, Inc.*, 563 U.S. at 47. These statements are therefore not actionable under the Exchange Act. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of 'defendants' representations, taken together and in context.'") (internal citation omitted); *see also Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2, 9 (2d Cir. 1996) ("Since the plaintiffs' claims are contradicted by the disclosure of risk made on the face of each prospectus, no set of additional facts could prove the plaintiffs' claims.").

Even if there was an omission of a material fact necessary to make the statements not misleading, the Court finds that the statements about reimbursements and ASPs are not actionable because they are, at least in part, forward-looking. A forward-looking statement includes "a statement of the plans and objectives of management for future operations" or "any

statement of the assumptions underlying or relating to any statement" of those plans or objectives. 15 U.S.C. §§ 78u–5(i)(1)(B), (D). The PSLRA includes a safe harbor for forward-looking statements, providing that "a forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010).

The challenged statements also include statements of future plans and opportunities to increase reimbursements and improve ASPs over the coming year. These include Ro's responses to questions about expectations for the future in March 2022 and May 2022. In March 2022, Ro responded that the Company was making positive progress regarding reimbursements from health plans:

> I should also remind you that from a reimbursement perspective, we had a bunch of irons in the fire this year to drive better payment so that the revenue attached to our volume starts to catch up. And if we do that, that will also be important to improving our gross margin profile in the second half of the year.

(FAC ¶ 39.) In May 2022, in response to a question about where ASPs were headed for the rest of the year, Ro stated:

> So now that we've got a really significant capability that we didn't have just a few quarters ago, we're in a position to, I think, push on several fronts to drive better ASPs.
>
> Of course, on the oncology front, we've talked before about pushing forward with reimbursement for somatic profiling. That's making good progress and on track with our plan to realize better reimbursement by the middle part of the year. And then on the market access side, there's just a huge universe of ways in which we can optimize our efforts in partnership with our commercial team, in partnership with payers, in partnership with our health system partners, a whole bunch of things that I would say, together, should allow us to, with the same amount of volume like-for-like, drive better amounts of revenue and, therefore, ASP. So I'm personally very excited about the opportunity that we

have this year to drive improvement there. It's a meaningful part of the gross margin improvement strategy.

(*Id*. ¶ 44.) The statements must be considered in context of the cautionary language in the Company's SEC filings, as discussed above, and therefore, they are not actionable under the Exchange Act as a matter of law. *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 198 (D. Conn. 2014) (finding no plausible claim where a company's 10-K and 10-Q filings "sufficiently informed the market about [the company's] business model and the risks associated with that model").

Moreover, Plaintiff misconstrues the nature of several statements, which were clearly general statements of corporate optimism or puffery. "Statements that are 'too general to cause a reasonable investor to rely upon them' constitute 'puffery' and cannot form the basis of a securities fraud claim." *Abuhamdan*, 9 F. Supp. 3d at 190 (quoting *ECA*, 553 F.3d at 206). Several of the statements here are precisely of that type: "2021 was a transformative year" (FAC ¶¶ 55, 56), the acquisition of GeneDx will "distance us as the market leader" (*id.* ¶ 55), the Company is "super pleased with the health systems partnerships we formed today" (*id.* ¶ 56), "[s]o that's all gone amazing" (*id.*), and "we're off to a strong start." (*Id.* ¶ 66.) Indeed, even "misguided optimism is not a cause of action, and does not support an inference of fraud" because the Second Circuit has "rejected the legitimacy of alleging fraud by hindsight." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (citation and quotation marks omitted).

## 2.  Scienter

To plead scienter, a plaintiff alleging securities fraud must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15

U.S.C. § 78u–4(b)(2)(A). The exacting pleading standard of the PSLRA "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 308 (2007) (internal quotation marks and citation omitted). "The requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. The former requires a plaintiff to plausibly allege that a defendant "benefitted in some concrete and personal way from the purported fraud." *Id.* (internal citation and quotation marks omitted). The latter requires plausible allegations of conduct by a defendant "which is at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal citation and quotation marks omitted). An "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 309.

Plaintiff asserts that Defendants were motivated to commit fraud for several reasons. First, Defendants allegedly desired to enter in a lucrative agreement with GeneDx upon raising sufficient capital to finance the acquisition. Second, Defendants allegedly were motivated to raise capital to keep Sema4 afloat. Third, Defendants allegedly were motivated to seek compliance with the Company's debt covenants. Fourth, the compensation and bonus structure of certain executives allegedly provided a motive for their fraud. (Pl. Opp. at 31-36.) Plaintiff also argues that there is strong circumstantial evidence of recklessness. (Pl. Opp. at 36-43.)

As an initial matter, Plaintiff fails to establish scienter on a defendant-by-defendant basis consistent with the particularity requirement of the PSLRA. *In re Aceto Corp. Sec. Litig.*, No. 2:18-CV-2425 (ERK) (AYS), 2019 WL 3606745, at *8 (E.D.N.Y. Aug. 6, 2019) ("The allegations must establish scienter on a defendant-by-defendant basis.") (citing *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016)). Rule 9(b) of the Federal Rules of Civil Procedures requires that "[i]n a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009). The FAC here improperly treats the defendants as an undifferentiated group in alleging scienter. *See, e.g.*, FAC ¶¶ 100 ("Defendants were thus motivated to artificially inflate the Company's share price in order to raise much-needed capital needed to finance and close the GeneDx acquisition."). The allegations concerning Stueland illustrate this problem. While Plaintiff contends that Defendants were motivated to inflate the Company's stock price to acquire GeneDx, Stueland did not join the Company until after it closed the GeneDx acquisition on May 2, 2022. (*Id.* ¶¶ 13, 101.) Moreover, Stueland was the CEO and a stockholder of GeneDx at the time of the acquisition, and thus would not have been a perpetrator of the fraud.

Additionally, even if Plaintiff pled the circumstances regarding fraud with particularity on a defendant-by-defendant basis, the allegations fail to raise a strong inference of scienter. Regarding Plaintiff's first, second, and third contentions, "it is well established in this Circuit that the Lead Plaintiff's allegations concerning Defendants' alleged desire to maintain the 'artificial' high price of the stock and to be profitable is not sufficient to plead scienter." *Saskatchewan Healthcare Emp.'s Pension Plan v. KE Holdings Inc.*, No. 1:21-CV-11196

(GHW), 2024 WL 775195, at *30 (S.D.N.Y. Feb. 26, 2024) (collecting cases). Regarding Plaintiff's fourth contention, an alleged motive to protect executive compensation is "too generalized to demonstrate scienter" as it is "common to all corporate executives." *Kalnit*, 264 F.3d at 139.

Finally, Plaintiff's reliance on circumstantial evidence do not adequately show scienter. "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant." *Id.* at 142. "Courts may look to circumstances such as whether defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Hills v. BioXcel Therapeutics, Inc.*, No. 3:23-CV-00915 (SVN), 2024 WL 3374145, at *19 (D. Conn. July 11, 2024) (internal citation and quotation marks omitted).

First, Plaintiff contends that testimony from former employees support a strong inference of scienter (Pl. Opp. at 37.) But there is only one former employee, FE-1, who provides information about the existence of Centrellis. Absent from the FAC are allegations regarding FE-1's interactions with the Individual Defendants that involved Centrellis and thus, while FE-1's testimony is probative regarding the falsity of the alleged statement, they are not probative of Defendants' mental state. *Sun v. TAL Educ. Grp.*, No. 22-CV-01015 (ALC), 2023 WL 6394413, at *31 (S.D.N.Y. Sept. 29, 2023) (finding conclusory allegations regarding confidential witness to be insufficient to show scienter).

Moreover, Plaintiff contends that Defendants' exposure to information within the Company bolster the inference of scienter. (Pl. Opp. at 41-42.) But this position, unsupported

by any allegation regarding the content of the internal documents, is insufficient to raise the requisite inference of scienter. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (allegations that senior executives "had access to 'collection data'" that revealed certain undisclosed facts were insufficient); *IKB Int'l S.A. v. Bank of Am. Corp.*, 584 F. App'x 26, 28 (2d Cir. 2014) ("[Plaintiff's] complaint does not specifically identify the contemporaneous [] reports containing inconsistent information"). Because Plaintiff does not "specifically identify the reports or statements containing" the information suggesting the inaccuracy of the challenged Centrellis statements, Plaintiff has failed to allege scienter. *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020).

Therefore, viewing the allegations as a whole, the Court finds that Plaintiff fails to adequately allege scienter sufficient to survive dismissal.

### 3.    Loss Causation

The PSLRA "codified loss causation as a separate element of federal securities fraud actions." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (citing 15 U.S.C. § 78u–4(b)(4)). Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). "To plead loss causation, plaintiffs must allege 'that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Carpenters*, 750 F.3d at 232 (quoting *Suez Equity Inv'rs, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)). A plaintiff "may do so either by alleging (a) the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud; or (b) that that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Id.* (internal citation and

quotation marks omitted). The burden to plead loss causation "is not a heavy one." *Loreley Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 187.

Considering the above conclusions, the Court need not address whether Plaintiff plausibly alleged loss causation because none of the alleged misstatements or omissions can survive a motion to dismiss. *See Onel v. Top Ships, Inc.*, 806 F. App'x 64, 68 n.4 (2d Cir. 2020) ("Because we agree with the district court that dismissal is warranted due to the Complaint's failure to allege a manipulative act, we do not reach the [] defendants' alternative argument[] … that the Complaint fails to adequately allege … loss causation.").

### B.   Section 20(a) Liability

"To establish a *prima facie* case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

Here, "[b]ecause the Court has found that Plaintiff[] fail[s] to state a claim under Section 10(b), their Section 20(a) claim necessarily also fails." *Hills*, 2024 WL 3374145, at *20. Plaintiff's Section 20(a) claims against the Individual Defendants are therefore dismissed for failure to state a claim.

### IV.   **CONCLUSION**

For the reasons described above, Defendants' motion to dismiss (ECF No. 50) is **GRANTED**. Plaintiff's request to amend the complaint (ECF No. 51 at 47) is **GRANTED**. Within **thirty (30) days** of this Order, Plaintiff may file a Second Amended Complaint. Plaintiff must also file a redline comparison of the First and Second Amended Complaints.

Failure to timely file a Second Amended Complaint will result in dismissal of all claims with

prejudice.

                                                               **SO ORDERED.**

Hartford, Connecticut
July 31, 2024

                                              /s/Vernon D. Oliver
                                              VERNON D. OLIVER
                                              United States District Judge