**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NABIL HELO, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br><br> SEMA4 HOLDINGS CORP., ERIC SCHADT, KATHERINE STUELAND, ISAAC RO, AND RICHARD MIAO, <br><br> Defendants. | Case No.: 3:22-cv-01131-KAD <br><br><br><br><br><br><br><br><br><br> JANUARY 24, 2025 |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**ORAL ARGUMENT REQUESTED**

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS ................................................................................. 3

    A.    Background Of Sema4's Business.......................................................... 3

    B.    The Start of the Class Period: Sema4 Announces A $200 Million Private
          Placement Offering In Connection With The Acquisition Of GeneDx .................. 4

    C.    The GeneDx Transaction Closes And Defendants Continue To Tout Their
          Positive Outlook For The Combined Company ...................................... 5

    D.    The Risks Of Defendants' Fraud Materialize And Sema4's Stock Price Plummets
          ...................................................................................................................... 7

    E.    After the Class Period, The Risks Of Defendants' Fraud Continue To Materialize 8

III.  APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION........... 9

IV.   PLAINTIFF ALLEGES VIOLATIONS OF THE EXCHANGE ACT............................. 9

    A.    Plaintiff Alleges Falsity ...................................................................... 10

          1.    The Court Should Not Disrupt Its Previous Holding That Defendants
               Made False and Misleading Statements Regarding Centrellis ................. 10

          2.    Defendants' Statements Were Not Corporate Optimism Or Puffery........ 14

          3.    The PSLRA Safe Harbor Does Not Immunize Defendants' Misstatements
               ...................................................................................................................... 15

    B.    Plaintiff Alleges That Defendants Acted With Scienter ..................................... 17

          1.    The Former Employee Accounts Support a Strong Inference of Scienter 18

          2.    Plaintiff Alleges Strong Circumstantial Evidence That Defendants Knew
               Or Had Access To Information That Contradicted Their Public
               Statements .............................................................................................. 22

          3.    The Core Operations Doctrine Bolsters The Inference Of Scienter ......... 29

          4.    Plaintiff Alleges Corporate Scienter ......................................................... 30

          5.    Plaintiff's Motive Allegations Support A Strong Inference Of Scienter .. 32

    C.    Plaintiff Adequately Alleges Loss Causation ....................................... 37

    D.    Plaintiff Alleges Control Person Liability ............................................ 39

V.    CONCLUSION................................................................................................ 40

# TABLE OF AUTHORITIES

CASES

*Abbad v. Amman*,
   285 F. Supp. 2d 411 (S.D.N.Y. 2003)..................................................................... 43

*Abuhamdan v. Blyth, Inc.*,
   9 F. Supp. 3d 175 (D. Conn. 2014)......................................................................... 23

*Acito v. IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995)........................................................................................ 43

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002) ..................................................................................... 43

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
   28 F.4th 343 (2d Cir. 2022) .................................................................................... 23

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................................ 15

*Barrett v. PJT Partners Inc.*,
   2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017)......................................................... 37

*Behrendsen v. Yangtze River Port & Logistics Ltd.*,
   2021 WL 2646353 (E.D.N.Y. June 28, 2021) ........................................................ 36

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................................ 15

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
   506 F. App'x 32 (2d. Cir. 2012) ............................................................................. 20

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
   556 F. Supp. 3d 100 (D. Conn. 2021)................................................................ 35, 45

*Burstyn v. Worldwide Xceed Grp., Inc.*,
   2002 WL 31191741 (S.D.N.Y. Sept. 30, 2002)..................................................... 40

*Cohen v. Kitov Pharms. Holdings, Ltd.*,
   2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) ....................................................... 44

*CompuDyne Corp. v. Shane*,
   453 F. Supp. 2d 807 (S.D.N.Y. 2006).................................................................... 46

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)..................................................................................... 43, 44, 45

*E. Ohman J:or Fonder AB v. NVIDIA Corp.,*
  2023 WL 5496507 (9th Cir. Aug. 25, 2023)...................................................... 19, 31

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015)............................................................................. 26, 28

*Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
  300 F. Supp. 3d 551 (S.D.N.Y. 2018)..................................................................... 20

*Firefighters Pensions & Retirement Sys. v. Six Flags Entertainment Corp.,*
  58 F.4th 195 (5th Cir. 2023) ................................................................................ 42

*Francisco v. Abengoa, S.A.*,
  481 F. Supp. 3d 179 (S.D.N.Y. 2020).................................................................. 38, 41

*Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017)...................................................................... 40

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010).............................................................. 16, 26, 45

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018)...................................................................... 26

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d Cir. 2000)............................................................................... 15, 43

*Hall v. The Children's Place Retail Stores, Inc.*,
  580 F. Supp. 2d 212 (S.D.N.Y. 2008)...................................................................... 34

*Helo v. Sema4 Holdings Corp.,*
  2024 WL 3593677 (D. Conn. July 31, 2024) ............................................................ 16

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) ............................................................................... 42

*In re Adient plc Sec. Litig.*,
  2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)............................................................... 26

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  980 F. Supp. 2d 564 (S.D.N.Y. 2013)...................................................................... 41

iv

*In re Canopy Growth Sec. Litig.*,
2024 WL 3445436 (S.D.N.Y. July 17, 2024) ................................................................ 26

*In re Citigroup Inc. Sec. Litig.,*
753 F. Supp. 2d 206 (S.D.N.Y. 2010) .......................................................................... 44

*In re DNTW Chartered Accountants Sec. Litig.*,
172 F.Supp.3d 675 (S.D.N.Y. 2016) ............................................................................ 16

*In re Doral Fin. Corp. Sec. Litig.*,
563 F. Supp. 2d 461 (S.D.N.Y. 2008) .......................................................................... 26

*In re EVCI Colleges Holding Corp. Sec. Litig.,*
469 F. Supp. 2d 88 (S.D.N.Y. 2006) ..................................................................... 22, 27

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) ................................................................ 28

*In re Global Brokerage, Inc.*,
2019 WL 1428395 (S.D.N.Y. Mar. 28, 2019) ............................................................. 16

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivs. Litig.*,
2012 WL 1632762 (S.D.N.Y. May 4, 2012) ............................................................... 42

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
2012 WL 2512280 n.141 (S.D.N.Y. June 29, 2012) .............................................. 22, 46

*In re MF Global Holdings Ltd. Sec. Litig.*,
2013 WL 5996426 (S.D.N.Y. Nov. 12, 2013) ............................................................. 38

*In re MRU Holdings Sec. Litig.*,
769 F. Supp. 2d 500 (S.D.N.Y. 2011) .......................................................................... 38

*In re N. Telecom Ltd. Sec. Litig.*,
116 F. Supp. 2d 446 (S.D.N.Y. 2000) .......................................................................... 38

*In re Quality Sys., Inc. Sec. Litig.,*
865 F.3d 1130 (9th Cir. 2017) ...................................................................................... 31

*In re Reserve Fund Sec. and Deriv. Litig.*,
2010 WL 685013 (S.D.N.Y. Feb. 24, 2010) ................................................................ 35

*In re Sadia, S.A. Sec. Litig.,*
643 F. Supp. 2d 521 (S.D.N.Y. 2009) ..................................................................... 32, 34

v

*In re Salix Pharm., Ltd.*,
   2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)..................................................................... 22, 33, 35

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)............................................................................................ 25, 43

*In re Scot. Re Grp. Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007)..................................................................... 25, 29, 32, 34

*In re ShengdaTech, Inc. Sec. Litig.*,
   2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014)........................................................................ 46

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)........................................................................ 16

*In re SolarEdge Techs., Inc. Sec. Litig.*,
   2024 WL 4979296 (S.D.N.Y. Dec. 4, 2024) ............................................................. 30, 31, 34

*In re Synergy Pharms. Inc.*,
   2023 WL 5526675 (2d Cir. Aug. 28, 2023)........................................................................... 28

*In re Teva Sec. Litig.*,
   671 F. Supp. 3d 147 (D. Conn. 2023).................................................................................. 45

*In re Twinlab Corp. Sec. Litig.*,
   103 F. Supp. 2d 193 (E.D.N.Y. 2000) .................................................................................. 41

*In re Vale S.A. Sec. Litig.*,
   2020 WL 2610979 (E.D.N.Y. May 20, 2020) ...................................................................... 23

*In re VEON Ltd. Sec. Litig.*,
   2017 WL 4162342 (S.D.N.Y. Sept.19, 2017)........................................................................ 37

*In re Vertiv Holdings Co. Sec. Litig.*,
   2023 WL 7689961 (S.D.N.Y. Nov. 6, 2023)..................................................................... 28, 33

*In re Vivendi Universal, S.A.*,
   381 F. Supp. 2d 158 (S.D.N.Y. 2003)................................................................................... 39

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)............................................................................................ 21, 22

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003)................................................................................... 46

*Johnson v. Holder*,
    564 F.3d 95 (2d Cir. 2009)..................................................................................... 16

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)................................................................................... 43

*Karimi v. Deutsche Bank Aktiengesellschaft*,
    607 F. Supp. 3d 381 (S.D.N.Y. 2022)......................................................... 28, 32, 34

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)................................................................................... 43

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)................................................................................... 37

*Luce v. Edelstein*,
    802 F.2d 49 (2d Cir. 1986)..................................................................................... 46

*Malin v. XL Cap. Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007)................................................................... 26

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
    518 F. Supp. 3d 772 (S.D.N.Y. 2021).................................................................. 26

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)........................................................................................... 15, 38

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
    277 F. Supp. 3d 500 (S.D.N.Y. 2017)............................................................. 31, 34

*Metz v. U.S. Life Ins. Co. in the City of New York*,
    662 F.3d 600 (2d Cir. 2011)................................................................................... 15

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
    761 F.3d 245 (2d Cir. 2014)............................................................................. 16, 17

*Moshell v. Sasol Ltd.*,
    481 F. Supp. 3d 280 (S.D.N.Y. 2020)............................................................. 25, 31

*Mulligan v. Impax Labs., Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) .................................................................... 21

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 Fed App'x 10 (2d Cir. 2011)........................................................................... 35

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ...................................................................... 38

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)................................................................... 24, 38

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) .................................................................... 31

*Ohio Pub. Emps.' Ret. Sys. v. Meta Platforms, Inc.*,
  2024 WL 4353049 (N.D. Cal. Sept. 30, 2024) ............................................ 28

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
  432 F. Supp. 3d 131 (D. Conn. 2019)........................................................... 39

*Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
  595 F.3d 86 (2d Cir. 2010).......................................................................... 19

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
  2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020)................................................. 20

*Porwal v. Ballard Power Sys., Inc.*,
  2019 WL 1510707 (S.D.N.Y. Mar. 21, 2019) ............................................... 23

*PR Diamonds, Inc. v. Chandler*,
  364 F.3d 671 (6th Cir. 2004) ...................................................................... 41

*Rex & Roberta Ling Living Tr. u/a Dec. 6, 1990 v. B Commc'ns Ltd.*,
  346 F. Supp. 3d 389 (S.D.N.Y. 2018)..................................................... 36, 37

*RMED Intern., Inc. v. Sloan's Supermarkets, Inc.*,
  878 F. Supp. 16 (S.D.N.Y. 1995) ................................................................ 40

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)........................................................................ 23

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000).......................................................................... 39

*S.E.C. v. Platforms Wireless Int'l Corp.*,
  617 F.3d 1072 (9th Cir. 2010) .................................................................... 20

*S.E.C. v. StratoComm Corp.*,
  2 F. Supp. 3d 240 (N.D.N.Y. 2014).................................................... 18, 19, 20

*Schottenfeld Qualified Associates, L.P., v. Workstream, Inc.,*
2006 WL 4472318 (S.D.N.Y. May 4, 2006) ................................................................. 39

*Sec. & Exch. Comm'n v. e-Smart Techs., Inc.,*
85 F. Supp. 3d 300 (D.D.C. 2015) ............................................................................... 19

*Sgalambo v. McKenzie,*
739 F. Supp. 2d 453 (S.D.N.Y. 2010) .......................................................................... 22

*Skiadas v. Acer Therapeutics Inc.,*
2020 WL 3268495 (S.D.N.Y. June 16, 2020) ....................................................... 40, 41

*Slayton v. Am. Express Co.,*
604 F.3d 758 (2d Cir. 2010) ................................................................................... 21, 22

*Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.,*
2023 WL 4744197 (S.D.N.Y. July 25, 2023) ............................................................... 29

*Stein v. Tangoe, Inc.,*
2014 WL 12767210 (D. Conn. Sept. 30, 2014) ............................................................ 41

*Stevelman v. Alias Research Inc.,*
174 F. 3d 79 (2d Cir. 1999) ......................................................................................... 24

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank,*
250 F.3d 87 (2d Cir. 2001) .......................................................................................... 38

*Tecku v. Yieldstreet, Inc.,*
2022 WL 1322231 (S.D.N.Y. May 3, 2022) ............................................................... 43

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007) .................................................................................. 15, 23, 36, 38

*Woolgar v. Kingstone Companies, Inc.,*
477 F. Supp. 3d 193 (S.D.N.Y. 2020) ......................................................................... 26

*Zucco Partners, LLC v. Digimarc Corp.,*
552 F.3d 981 (9th Cir. 2009) ....................................................................................... 31

## STATUTES

15 U.S.C. §78j(b) ............................................................................................................. 15
15 U.S.C. §78u-4(b)(2) ..................................................................................................... 23
15 U.S.C. §78u–5(c)(1)(B)(i) ............................................................................................ 23

RULES

Fed. R. Civ. P. Rule 8 ................................................................................................... 43, 46

## I.    INTRODUCTION

During the period between January 18, 2022 and August 15, 2022, inclusive,[1] Sema4 and several of its chief officers and executives[2] defrauded investors by making material misrepresentations about the Sema4's core product, a purported "sophisticated data and analytics engine" called Centrellis.  Defendants were highly motivated to artificially increase Sema4's share price.  Sema4 had just reached an agreement to acquire GeneDx and Defendants needed to raise $200 million to close the transaction by Q2 2022.  Accordingly, Defendants repeatedly touted to investors Centrellis' groundbreaking capabilities to structure and synthesize human health data and create predictive models to enable medical providers to give more accurate diagnoses and design personalized treatment plans for patients.

Defendants told investors that the acquisition would allow them to unleash the power of Centrellis because Sema4 would acquire all of GeneDx's human health data, and projected that if the transaction closed by Q2 2022, the Company would generate *$350 million* in fiscal year 2022 revenue.  Considering that Sema4 had been unprofitable for years and had an accumulated deficit of over $575 million by the start of the Class Period, the market reacted very favorably to Defendants' announcements.  On May 2, 2022, after successfully raising $200 million through sales of Sema4's common stock, Defendants announced that they had closed the GeneDx transaction.

---

[1] The "Class Period" is the time period of January 18, 2022 and August 15, 2022, both dates inclusive.

[2] Sema4 Holdings Corp. ("Sema4" or the "Company"), Eric Schadt ("Schadt"), Katherine Stueland ("Stueland"), Isaac Ro ("Ro"), and Richard Miao ("Miao"), are collectively referred to as "Defendants".  Schadt, Stueland, Ro, and Miao are collectively referred to as the "Individual Defendants".  Citations to "Mot." refer to Defendants' Memorandum of Law in Support of their Motion to Dismiss the Second Amended Complaint.  Citations to "¶__" refer to Plaintiff's Second Amended Complaint (Dkt. No. 57; the "SAC").  Unless otherwise indicated, all emphasis is added and all internal citations and quotations are omitted.

Unbeknownst to investors, Centrellis could not perform its stated capabilities. According to former employees of Sema4 who worked on various aspects of Centrellis' attempted development, and contrary to Defendants' public representations, Centrellis did not exist in an operational, deployable form and it would require many more years of work and billions of more dollars before Centrellis might exist in such form.

Thus, investors were shocked on August 15, 2022, when Defendants disclosed that they had slashed the Company's fiscal year 2022 revenue guidance from $350 million to a range of $245-$255 million; Schadt - Sema4's founder and the architect of Centrellis - was resigning, and; 250 employees were being eliminated.  Defendants stated that they would continue to focus on Centrellis but admitted that there was "a lot of work to do" before they would be able to "productize" Centrellis and figure out how to scale it.  On this news, Sema4's share price dropped by *33.33%.*  Investors lost millions.

Plaintiff has sufficiently alleged Defendants' violations of §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.   This Court has already found that Defendants' representations about Centrellis were materially false and misleading because a credible former employee confirmed that Centrellis did not exist.  Defendants point to no compelling reason that the Court should disturb its prior ruling on falsity.

Further, Plaintiff sufficiently alleges scienter in the SAC.  The Court previously held that Plaintiff failed to allege scienter because only one former employee who did not have any direct interactions with the Individual Defendants attested to Centrellis' nonexistence.  Plaintiff has cured these deficiencies by adding the accounts of two additional former employees who worked on Centrellis during the Class Period and interacted regularly with the Individual Defendants.  Both

of the newly added former employees corroborate FE 1's account of Centrellis' nonexistence.  The former employee allegations constitute strong circumstantial evidence that Defendants knew or had access to information that contradicted their positive statements about Centrellis.  The inference of scienter is further bolstered by Defendants' motive to raise necessary funds to close the GeneDx transaction in Q2 2022 and maintain the Company as a going concern.  The SAC's allegations, which must be viewed together holistically, accepted as true and with all reasonable inferences drawn in Plaintiff's favor, support an inference of scienter that is at least as cogent and compelling as any non-culpable inference.

Finally, Plaintiff has alleged loss causation, which only requires Plaintiff to allege that the Company's share price fell significantly after the truth became known or the risks of Defendants' undisclosed fraud materialized.  As Sema4's share price dropped by 33.33% as a result of Defendants' disclosures on August 15, 2022, Plaintiff has alleged loss causation.

Defendants' Motion should be denied in its entirety.

## II.     STATEMENT OF FACTS

### A.     Background Of Sema4's Business

Founded by Defendant Schadt, Sema4 is a health diagnostics testing company that began publicly trading on the Nasdaq Stock Market in July 2021.  ¶¶2, 42.  During the Class Period, Sema4 touted its aspirations to expand its business into data and analytics solutions; specifically, Sema4 sought to commercialize its data and analytics platform called Centrellis.  ¶¶2, 43.  Since its inception, Sema4 struggled financially to stay afloat.  ¶107.  By the start of the Class Period, Sema4 had accumulated a deficit of approximately $575.4 million at year-end 2021.  *Id.*

3

**B.      The Start of the Class Period: Sema4 Announces A $200 Million Private Placement Offering In Connection With The Acquisition Of GeneDx**

On January 18, 2022, the first day of the Class Period, Sema4 announced in a press release that it had reached a deal to acquire and merge with GeneDx.  ¶51.  As part of the transaction, Sema4 had entered into definitive agreements for a $200 million private placement offering of its Class A shares from a syndicate of institutional investors, including Pfizer.  ¶109.  Sema4 touted the benefits that would be realized from the business combination, projecting $350 million in pro forma 2022 revenue following the completion of the transaction, expected to close in the second quarter of 2022.  ¶¶4, 51.  Sema4 emphasized the growth and prospects through Centrellis that would result from the transaction, stating specifically:

> Following completion of the acquisition, Sema4 will be optimally positioned to partner with health systems and biopharma companies to further transform the standard of care throughout the patient health journey. ***GeneDx's leadership in rare disease diagnostic and exome sequencing services brings more than 300,000 clinical exomes and over 2.1 million expertly annotated phenotypes to strengthen Sema4's 12 million de-identified clinical records for Centrellis®, its proprietary health intelligence platform[.]*** Sema4 plans to leverage this combined health information database to transform patient care and therapeutic development and enable precision medicine for all.  ¶51.

In a January 18, 2022, conference call hosted by Stueland, Schadt and Ro to discuss the transaction, Schadt reiterated the purported benefits of the deal to growing Centrellis.  ¶¶63-64.[3]

For example, Schadt stated:

> No other company will have the deep expertise in next-generation sequencing, rigorous science underpinning our clinical offerings and advanced capabilities to put these disciplines together with data-driven insights. ***The transaction will significantly enhance the power of our market-leading Centrellis database by adding more than 2.1 million expertly curated phenotypes and over 300,000 clinical exomes GeneDx has generated to date.*** The largest such effort of its kind in the clinical arena and growing.  ¶63.

---

[3] *See* Mot. at Ex. 2 (Dkt. No. 68-3 at p.4).

On March 14, 2022, Sema4 announced its Q4 and FY 2021 financial results.  ¶65.  On that same day, Sema4 issued a press release, filed its 2021 Form 10-K with the SEC, and held a public conference call with investors, wherein Defendants reiterated how the pending GeneDx transaction would bolster the success of Centrellis.  ¶¶52, 63-67.  For example, on the call, Schadt stated, "We believe that *Centrellis is the most extensive and fastest-growing database of clinically relevant patient data in the industry*…. Combining GeneDx's clinical genomic solutions … allows us to better serve health system and pharmaceutical and biotech partners in a more holistic way.  *This transaction will significantly enhance the power of our Centrellis database*[.]"  ¶66.

The 2021 Form 10-K touted Centrellis' then-existing advanced capabilities, for example:

> *We have built comprehensive solutions in Centrellis that enable clinicians, researchers, and patients to engage with the relevant structured health data and to leverage our predictive models of disease and wellness and produce clinically actionable insights*…. Unstructured data derived from EMR and associated data are run through multiple pipelines leveraging machine learning-enabled natural language processing, augmented as needed by human annotators, to extract information and knowledge from that data and then structure and implement extensive quality assurance processes for the resulting annotations.

¶67.  In the press release, Sema4 reiterated that it had entered into definitive agreements for a $200 million private placement offering to support the GeneDx acquisition, and that it expected the acquisition to close in Q2 2022.  ¶65.

C.    **The GeneDx Transaction Closes And Defendants Continue To Tout Their Positive Outlook For The Combined Company**

On May 2, 2022, Defendants announced that the GeneDx transaction had closed.  ¶110.  Defendants announced that in connection with the transaction, Sema4 had completed the private placement offering, in which it sold $200 million of Sema4's Class A common stock, and in which a number of institutional investors, including Pfizer, had participated in.  ¶110.  The Company announced that GeneDx's CEO, Stueland, would serve as the combined company's co-CEO with Schadt, while Schadt would focus on monetizing Centrellis.  ¶110.  The market reacted favorably

5

to this news, and the next day, the Company filed a registration statement on Form S-1 with the SEC, in connection with the sale of 160,864,198 shares of the Company's Class A stock.  ¶¶110-12.

On May 12, 2022, the Company filed a Form 10-Q filed with the SEC, and held a public conference call, wherein Defendants continued to tout Centrellis and reaffirmed FY 2022 guidance of pro forma revenue of $350 million.  ¶71.  For example, on the conference call, Schadt stated:

> ***Our sophisticated platform draws on information from many sources: from advanced genomic testing solutions; to patient electronic medical records, including physician notes and other unstructured data; to hospital records and population health among many other large-scale sets of data available in the digital universe. With this platform, Sema4 enables patients and providers to derive differentiated insights in real time that can dramatically improve the standard of care.***

¶71.

On June 16, 2022, the Company participated in the Goldman Sachs Global Healthcare Conference.  ¶72.  During the conference, Stueland touted the prospects of Centrellis.  ¶72. Specifically, Stueland stated:

> GeneDx is bringing an incredible rare disease asset to bear, both in terms of our exome, our interpretation platform that is not only applicable to our exome, but to genome as well in addition to the rare disease dataset that we have.
>
> ***But then when you think about the data engine, Centrellis, that Eric and the team have expertly built. That is an incredible combination of just being able to put a data engine that will be able to deliver improved and personalized health insights with our exome and genome as a backbone. That really enables something that is very different from any other company in this space. And I think that that really sets the foundation for how we can work with health systems and pharma companies to deliver on the promise of personalized medicine.***

¶72.

**D.    The Risks Of Defendants' Fraud Materialize And Sema4's Stock Price Plummets**

On August 15, 2022, after the close of market, Defendants announced that the Company was making significant changes to its business model, its R&D strategy, and its R&D leadership team.  Defendants stated that they had slashed the Company's 2022 revenue guidance to a range of $245 to $255 million, that Schadt was resigning, and that they were eliminating about 250 employees, bringing the percentage of legacy Sema4 workers that had been laid off since the start of the Class Period to about 30%.  ¶57.  Defendants stated that the Company would continue to focus on Centrellis, but with a new approach.  For example, Stueland stated on a public conference call that day:

> Our new management team has been reviewing our business lines and…we're making changes to ensure we strengthen our foundation and financials, so we can continue to realize our mission of unlocking insights from data….***What remains the same is our vision to deliver personalized health and wellness plans for patients based on comprehensive data. How we realize that vision will be very different*** by virtue of strategy, execution and how we show up in the world….[O]ur mission of delivering health insights from data remain strong, albeit with an evolution of that strategy …. ***We're shifting from an academic spin-off strategy for R&D to a scalable one. Data insights will continue to be the way that we design our products roadmap, but we need to start by having a deliberate and clear strategy that puts an equal premium on scale as it does on innovation.*** ¶55.

Stueland assured investors that the Company was turning over a new leaf, in which its R&D efforts would be focused on scaling and growing Centrellis, and that the Company had hired a new R&D officer who would be focused "utilizing the data developed and curated on the Centrellis platform."  ¶57.  However, Stueland admitted that there was "a lot of work to do" before Defendants could productize Centrellis.  Specifically, Stueland stated on the August 15, 2022 conference call:

> [W]hat we are doing is taking a look at the existing health systems that we're working with. I think historically, they've been characterized as learning

7

partnerships.  And what we're doing is working with them to figure out exactly how to ensure we can scale before we add additional health partnerships….*[W]e've actually hired somebody to join the team to be able to work with our new R&D leads to really build that road map to scale health systems before we continue to invest in yet another learning system*….Once we have an approach to being able to scale them, I think we'll be able to provide a better insight in terms of how we might be able to go to market to bring more online…. *But we have a lot of work to do to really pull those through and realize them into partnerships that will be gross margin positive. And again, what we want to do is spend some time figuring out how to productize that.* So we can actually go to health systems with a very clear suite of services that we can provide to them rather than approaching each one as kind of a unique go-to-market approach. ¶56.

On this news, the Company's share price dropped by $0.80, or *33.3%,* to close at $1.60 per share on August 16, 2022, on unusually heavy trading volume.  ¶58.  Sema4's investors lost millions.

### E.    After the Class Period, The Risks Of Defendants' Fraud Continue To Materialize

After the Class Period, Sema4's share price continued to fall.  ¶61.  On November 14, 2022, Defendants announced that they were closing down Sema4's main laboratory in Stamford, CT and were eliminating approximately 500 more employees, mostly comprised of the remaining legacy Sema4 workforce.  ¶¶59, 61.  On December 8, 2022, the Company was informed by Nasdaq that based on the closing bid price of its common stock for the prior 30 trading days, it no longer complied with the required minimum bid price of $1 per share for continued listing on the Global Select Market.  ¶61.

On January 9, 2023, the Company issued a press release, announcing that its common stock would begin to trade on the Nasdaq under the new ticker symbol "WGS" and provided the Company's preliminary 2022 financial results and 2023 guidance.  ¶¶60-61.  In the press release, the Company stated that 2022 revenues would be between $170-173 million – a far cry from Defendants' representations at the start of the Class Period that the combined company would

deliver $350 million in 2022 revenue.  ¶60.  The Company further stated that it projected 2023 revenues of $205-$220 million and that it did not expect to turn profitable until 2025.  ¶60.

## III.    APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION

In ruling on a motion to dismiss under Rule 12(b)(6), courts must "accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff."  *Metz v. U.S. Life Ins. Co. in the City of New York,* 662 F.3d 600, 602 (2d Cir. 2011); *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Further, courts must also draw "all reasonable inferences in the plaintiffs' favor."  *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000).  A plaintiff's allegations need only be "plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, a court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

## IV.    PLAINTIFF ALLEGES VIOLATIONS OF THE EXCHANGE ACT

Section 10(b) of the Exchange Act makes it unlawful "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. §78j(b).  To state a claim, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011).  Defendants

challenge the SAC with respect to falsity, scienter, and loss causation.  As to these and all other required elements, the SAC is sufficient.

### A.        **Plaintiff Alleges Falsity**

"To allege a material misrepresentation or omission adequately [under §10(b) and Rule 10b-5 promulgated thereunder], a plaintiff must plead facts that, if true, would be sufficient to show that the defendant either made an untrue statement of a material fact or omitted to state a material fact necessary to make whatever statements it made not misleading."  *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *11 (S.D.N.Y. Nov. 26, 2018). "A statement is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010). "[A] statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue." *In re Global Brokerage, Inc.*, 2019 WL 1428395, at *9 (S.D.N.Y. Mar. 28, 2019).  In assessing falsity, "the proper inquiry requires an examination of defendants' representations, taken together and in context." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250-51 (2d Cir. 2014).

### 1.        **The Court Should Not Disrupt Its Previous Holding That Defendants Made False and Misleading Statements Regarding Centrellis**

The Court already held that Defendants' statements regarding Centrellis were materially false and misleading (*Helo v. Sema4 Holdings Corp.,* 2024 WL 3593677, at *7 (D. Conn. July 31, 2024 ("Ord.")), and Defendants offer no compelling reason for the Court to now hold differently. "The law of the case doctrine commands that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009); *see also In re DNTW Chartered Accountants Sec. Litig.*, 172 F.Supp.3d 675, 686 (S.D.N.Y. 2016)

10

("under the law of the case doctrine, when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages of the same case unless cogent and compelling reasons militate otherwise," but declining to apply the doctrine against plaintiffs in context of scienter, which requires a court to consider *all* facts holistically).

The Court cited as examples of actionable statements about Centrellis the following: statements in the Company's press release issued on March 14, 2022 (FAC[4] ¶55; SAC ¶65); Schadt's statement on the Company's public conference call on March 14, 2022 (FAC ¶56; SAC ¶66), and; Stueland's statement on the Company's public conference call on June 16, 2022 (FAC ¶67; SAC ¶72). Ord. at *7. These statements are still actionable. Moreover, the Court should reach the same conclusion with respect to Defendants' January 18, 2022 statements about Centrellis (¶¶62-64), which were added to the SAC and are substantially similar to the statements that the Court found actionable.

Defendants incorrectly argue that dismissal is warranted because Plaintiff has "abandoned" their original theory about Centrellis, claiming that Plaintiff's theory has shifted from "Centrellis never existed" to "Centrellis lacked the ability to utilize the data in a correct or appropriate way[.]" Mot. at 26-27. Not so. Defendants further argue, based on their mischaracterization of the SAC, that Plaintiff's "new" theory required Plaintiff to identify which "specific, concrete features of its technology" that Centrellis lacked and that Plaintiff failed to meet this burden. Mot. at 27. But Defendants may not restate the SAC's allegations and Plaintiff's theory of liability. Instead of accepting Defendants' version of the allegations, the Court must take Plaintiff's well-pleaded allegations as true and draw inferences in Plaintiff's favor. *See Jinkosolar,* 761 F.3d at 249; Ord.

---

[4] Citations to "FAC" refer to Plaintiff's First Amended Complaint (Dkt. No. 33).

11

at *7.  The SAC does not abandon its successful theory; it *adds* allegations which *further* demonstrate that Centrellis was non-existent and, thus, not commercially viable.

Defendants' representations about Centrellis are actionable because they created a misleadingly rosy picture for investors about Centrellis' capabilities and commercial viability. ¶¶62-67, 71, 72.  For example, Defendants touted Centrellis' then-existing capabilities, stating for example that "our platform processes and stores data in a highly structured and accessible way … [then] deploys state-of-the-art AI, probabilistic causal reasoning and machine learning approaches, and complementary analytics capabilities" which "delivers increasingly accurate insights to patients, providers, and researchers" (¶67), and touted Centrellis as "the most extensive and fastest-growing database of clinically relevant patient data in the industry" which would "be able to deliver improved and personalized health insights with our exome and genome as a backbone[,]" (¶¶66, 72).

Defendants' overwhelmingly positive representations were false and misleading because they gave the impression that Centrellis "actually existed in operational, readily deployable form," when, according to former Sema4 employees, Centrellis did *not* exist in such a form, and was nowhere near being commercially viable.  *See S.E.C. v. StratoComm Corp.,* 2 F. Supp. 3d 240, 255 (N.D.N.Y. 2014).  For example, according to FE 1, whom the Court previously found "would have had access to information about Centrellis" (Ord. at *7), Centrellis did not really exist and was fabricated by Defendants in hopes of increasing Sema4's valuation by touting it as a data company rather than just a diagnostics company.  ¶93.  According to FE 2 and FE 3, Centrellis was incapable of doing anything meaningful with human health data.  ¶¶98, 101.  FE 3 stated that Centrellis did not even have features that would allow users to access data and parse data.  ¶37. FE 2 and FE 3 further stated that Centrellis was years away from commercial viability.  ¶¶34, 37,

40. FE 3 believed that the Company's public statements, such as on March 14, 2022 and June 16, 2022 made Centrellis sound far more advanced than it actually was at the time.  ¶40.

Thus, Defendants' statements would lead a reasonable investor to believe that there was a commercially viable "piece of technology" called Centrellis that allowed the Company to "perform capabilities."  *See* Ord. at *7.  These statements were misleading because, as the former employee accounts show, Centrellis could not perform capabilities and was not commercially viable.  *See id.; StratoComm,* 2 F. Supp. 3d at 253 ("Statements that create a false impression that a company has a developed, tested and presently available product when, in fact, it has not, are false, misleading, and constitute misrepresentations under the antifraud provisions of the federal securities laws."); *Sec. & Exch. Comm'n v. e-Smart Techs., Inc*., 85 F. Supp. 3d 300, 306 (D.D.C. 2015) (statements that company had developed a highly functional smart card ready for commercial deployment were materially misleading where company had only developed a prototype which did not work as promised);.

Moreover, Defendants' assertion that their description of Centrellis' "quantum of data" was true does not render their statements not misleading.  Mot. at 28.  A statement can be literally true, but still misleading in context.  *See Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) ("the veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers."); *StratoComm*, 2 F. Supp. 3d at 253.  Thus*, even if, arguendo*, Defendants' representations about the "quantum of data" available to Centrellis were true, Defendants' statements were still misleading because they "would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists."  *E. Ohman J:or Fonder AB v. NVIDIA Corp.,* 2023 WL 5496507, at *7 (9th Cir. Aug. 25, 2023).  Similar to *StratoComm,* Defendants

13

created the misleading impression that Centrellis "actually existed in operational, readily deployable form", when in fact, Centrellis did not yet exist in such form. *See* 2 F. Supp. 3d at 255-56*; S.E.C. v. Platforms Wireless Int'l Corp.,* 617 F.3d 1072, 1095 (9th Cir. 2010) (present-tense description of platform's capabilities actionable because it left a false impression that a "functioning [system] exists and has been tested.").[5]

### 2.    Defendants' Statements Were Not Corporate Optimism Or Puffery

Defendants assert that certain portions of their statements in ¶¶65, 66, 67, and 71 are not actionable as vague expressions of puffery and corporate optimism. Mot. at 28-29. However, "[w]hether a representation is mere puffery depends, in part, on the context in which it is made." *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at \*10 (S.D.N.Y. Apr. 14, 2020). Defendants ignore the context of the statements they challenge. For example, Defendants challenge the word "sophisticated" at ¶71, but ignore that Defendants were describing Centrellis' then-existing capabilities – "Our sophisticated platform draws on information from many sources …. With this platform, Sema4 enables patients and providers to derive differentiated

---

[5] Defendants' cited authorities are inapposite. Unlike in *Boca Raton Firefighters & Police Pension Fund v. Bahash,* 506 F. App'x 32, 38-39 (2d. Cir. 2012) (Mot. at 28) Plaintiff here does not allege that Defendants' statements about any particular "quantum of data", such as that GeneDx had "300,000 clinical exomes" were, standing alone, false or misleading. Thus, unlike in *Boca Raton,* Plaintiff does not allege that Defendants violated the federal securities law "premised upon … disclosure of accurate historical data." Mot. at 28. Rather, Plaintiff alleges that Defendants' representations about Centrellis' then-existing capabilities, and what it would be able to do once it *obtained* that quantum of data through the GeneDx acquisition, were false and misleading because Centrellis did not exist in an operational, deployable form in accordance with Defendants' representations.

 *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 572 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas Pub. Emps. Ret. Sys. v. Xerox Corp.,* 771 F. App'x 51 (2d Cir. 2019) (Mot. at 27) is also distinct. There, claims about defendant's technology as having a "pretty replicable process" that would be "plug and play", were too vague to be actionable; plaintiff failed to allege that the technology was "incapable" of doing what defendant claimed it was capable of doing. *See id.* at 572-73. Here, in contrast, Defendants made much more specific claims about Centrellis' then-existing capabilities, such as that Centrellis had the ability to mine and analyze health data "across multiple therapeutic areas … using state-of-the-art AI, probabilistic causal reasoning and machine learning approaches" to build "predictive models" (¶6). Unlike in *Xerox,* as stated by the former employees, Centrellis "clearly was [*not*] capable" of performing its stated capabilities. *See Xerox,* 300 F. Supp. 3d at 573.

14

insights in real time".    Defendants also challenge statements that "Centrellis is designed to transform" data analytics while ignoring the multitude of accompanying statements about Centrellis' then-existing, specific capabilities, such as "[u]nstructured data derived from EMR and associated data are run through multiple pipelines leveraging machine learning-enabled natural language processing, augmented as needed by human annotators, to extract information and knowledge from that data" (¶67).    These and the other statements Defendants claim are nonactionable puffery or corporate optimism must be assessed in context, and when examined in such context, their falsity is apparent.  Further, "courts must exercise great caution" in determining whether a statement constitutes nonactionable puffery or expressions of corporate optimism in ruling on a motion to dismiss, as these are "fact-intensive assessments that are more properly left to the jury." *See Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014).

### 3.    The PSLRA Safe Harbor Does Not Immunize Defendants' Misstatements

Contrary to Defendants' assertions (Mot. at 29-30), the PSLRA's safe harbor provision does not protect their misrepresentations in ¶¶62, 64, 65, 66, and 72.  "Under that provision a defendant is not liable if (1) the forward-looking statement is identified and accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016).  "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Id.* at 247; *Slayton v. Am. Express Co.*, 604 F.3d 758, 772 (2d Cir. 2010).  Thus, defendants, "carry the burden of demonstrating that they are protected by the meaningful

15

cautionary language prong of the safe harbor . . . ." *Slayton*, 604 F.3d at 773; *Vivendi*, 838 F.3d at 247.

Even if parts of Defendants' statements were forward-looking, the safe harbor does not apply because the statements were embedded with misrepresentations of past or present facts. *See In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016) ("safe harbor provision does not apply to any allegedly false statement that has both a forward-looking aspect and an aspect that encompasses a representation of present fact."); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 478 (S.D.N.Y. 2010) ("Many of the alleged misstatements are not forward-looking because they either state a present or historical fact alone or incorporate forward-looking aspects into statements of present or historical fact."). For example, Defendants challenge the statement that Sema4's technology "will deploy into the GeneDx arena" (¶64), but embedded in this statement were historical facts about Centrellis, such as, "our whole history has been…how to consume those different kinds of data, how to abstract from unstructured data…how to map those in a common data model so that they're comparable and can be integrated into 1 central database repository of the Centrellis platform". Thus, "these statements are only partially forward-looking and not protected." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 2012 WL 2512280, at *9 n.141 (S.D.N.Y. June 29, 2012).

Moreover, and contrary to Defendants' contentions (Mot. at 30), Defendants' purported disclaimers did not constitute meaningful cautionary language. "To be meaningful, cautionary language must precisely address the substance of the specific statement or omission that is challenged." *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006). Defendants' "warnings", such as "we have limited experience with the development and commercialization of our databases" were far too vague to warn a reasonable investor that

Centrellis was non-existent and could not perform any of its stated capabilities. Further, Defendants' risk disclosures themselves were false and misleading because they were couched as hypothetical risks, when such risks had *already* materialized. "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).[6]

### B.     Plaintiff Alleges That Defendants Acted With Scienter

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2); *Tellabs*, 551 U.S. at 314. Importantly, "courts must consider the complaint in its entirety . . . [t]he inquiry is whether **all** of the facts alleged, taken collectively, give rise to a strong inference of scienter . . . ." *Tellabs*, 551 U.S. at 323 (emphasis in original). A strong inference of scienter arises if, "[w]hen the allegations are accepted as true and taken collectively," a "reasonable person would deem the inference of scienter at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324-26. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences" – the inference need only be equally plausible to any non-culpable inference. *Id.* at 324. Moreover, "at the motion to dismiss stage, a tie on scienter goes to the plaintiff." *City of Pontiac*, 875 F. Supp. 2d at 372.

---

[6] This fact renders Defendants' cited authorities inapplicable because unlike here, the risk had not already transpired. *See* Mot. at 30-31 (*citing Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343 (2d Cir. 2022); *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175 (D. Conn. 2014); *Porwal v. Ballard Power Sys., Inc.*, 2019 WL 1510707 (S.D.N.Y. Mar. 21, 2019)). Additionally, contrary to Defendants' contention (Mot. at 21), Plaintiff alleges Defendants' actual knowledge of the falsity of their statements. *See, e.g.*, ¶¶92-106; 15 U.S.C. §78u–5(c)(1)(B)(i). "Given factual allegations that defendants knew their statements were false or misleading when made, the Court cannot at this stage conclude that they are protected by the PSLRA safe harbor . . . ." *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *16 (E.D.N.Y. May 20, 2020).

A plaintiff may establish scienter in one of two ways: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious behavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). "Either set of allegations will suffice to satisfy the necessary scienter element of a securities fraud claim." *Stevelman v. Alias Research Inc.*, 174 F. 3d 79, 84 (2d Cir. 1999). Plaintiff adequately alleges scienter under both prongs of the test.

### 1.    The Former Employee Accounts Support a Strong Inference of Scienter

Plaintiffs can establish a strong inference of scienter through accounts of former employees and other confidential witnesses, "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. Plaintiff has done so here.

The Court already found that it was "probable that FE-1 would have had access to information about Centrellis", and found FE 1's account that Centrellis did not exist credible. Ord. at *7. The Court found that FE 1's account was probative of falsity of statements about Centrellis, but did not establish scienter because Plaintiff did not allege that FE 1 had any interactions with the Individual Defendants about Centrellis. Ord. at *11. The SAC adds two more former employee accounts who bolster FE 1's account about Centrellis' non-existence and provide strong circumstantial evidence that the Individual Defendants knew or had access to information about Centrellis that contradicted their positive public representations.

FE 2 and FE 3, like FE 1, were in positions at the Company where they had access to information about Centrellis. Contrary to Defendants' assertions, Plaintiff is not required to allege that FE 2 or FE 3 was "a data scientist working with the platform to analyze [] data" to show that it was probable they would have had access to information about Centrellis. Mot. at 17. Indeed,

FE 1 was not a "data scientist" either, and the Court found FE 1 sufficiently credible.  Ord. at *7.

FE 2 was the Senior Vice President of Business Development during the Class Period, and for FE

2's entire tenure, FE 2's focus was on advancing Centrellis, primarily by obtaining human health

data for use with Centrellis and presenting Centrellis to potential customers alongside Schadt.

¶¶94, 95.  FE 3 was the Chief Information Officer of the Company during the Class Period, who

was responsible for ensuring that the Company handled the human health data for use with

Centrellis in a compliant manner.  ¶99.  Obtaining and managing human health data was crucial to

Centrellis' advancement.  The larger and better the database, the more material Centrellis would

be able to analyze and build predictive models with.  Accordingly, both FE 2 and FE 3 occupied

positions that make it highly probable they would have information about Centrellis.  *See In re*

*Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 392–93 (S.D.N.Y. 2007) (crediting former

employees who each claimed knowledge about "a systemic failure in the Company's ability to

manage its financial information" because they "occupied positions that would have allowed for

relevant hands-on experience in various parts of the Company."); *Moshell v. Sasol Ltd.,* 481 F.

Supp. 3d 280, 289 (S.D.N.Y. 2020) (confidential witnesses credited due to their positions at the

company, because they each were "working directly on the [project] in a manner that would have

provided him or her with direct, contemporaneous information about [it]".).

Defendants argue that FE 2's account should be discounted because FE 2 worked at the

Company for five years, including before and after the Class Period. Mot. at 19.  But FE 2 worked

at the Company for the entirety of the Class Period.  That FE 2 *also* worked at the Company before

and after the Class Period does not discredit FE 2's testimony.  Indeed, even accounts of former

employees who did not work for a company *at all* during the class period can still be probative of

scienter.  *See In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 72 (2d Cir. 2001) ("Any information

that sheds light on whether class period statements were false or materially misleading is relevant."); *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) ("allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period.").    Further, unlike in Defendants' cited authorities, *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 141-42 (D. Conn. 2007), and *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 221-22 (S.D.N.Y. 2020) (Mot. at 19), the "bulk of information relayed by [FE 2]" does not "relate[] to the time prior to the start of the Class Period" and FE 2's account demonstrates that "the situations and problems described continued through the class period".  At no point during FE 2's tenure – including the entire Class Period – was Centrellis operational.[7]  ¶98.

That the FEs' accounts are consistent with one another further bolsters scienter.  *See Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 301 (S.D.N.Y. 2018) ("[c]orroboration from multiple sources", such as in the form of consistent former employee accounts from employees who "span different levels of the Company" bolsters a strong inference of scienter); *Freudenberg,* 712 F. Supp. 2d at 197 (same).  By all three of the FEs' accounts, Centrellis was nonexistent, and the Court must consider all of their allegations together and take them as true. ¶¶93, 98, 101-05; *see Freudenberg,* 712 F. Supp. 2d at 197.  Contrary to Defendants' assertions,

---

[7] Defendants' other cited authorities are also inapposite (Mot. at 19-20).  In *Maloney v. Ollie's Bargain Outlet Holdings, Inc.,* 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021), unlike FE 2 and FE 3 here, the confidential witnesses were not alleged to have had any interactions with top executives.  Unlike in *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *28 (S.D.N.Y. Apr. 2, 2020) where top executives were alleged only to have general knowledge about one component of the company's projected margin expansion at issue, here, Schadt was deeply involved with Centrellis and voiced doubts to FE 2 that the Company would be able to make Centrellis a meaningful product before running out of funding. ¶¶95-96. In *In re Canopy Growth Sec. Litig.*, 2024 WL 3445436, at *13 (S.D.N.Y. July 17, 2024) the confidential witness did not attend any of the meetings referenced, whereas here, FE 3 attended regular weekly meetings with Schadt and other members of the C-suite.  In *In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008), allegations concerning the FE's interactions with the individual defendants were discredited because there was no time frame given of those interactions; here, during the entirety of the Class Period, FE 3 attended weekly standing meetings with Schadt, and a separate weekly product meeting often attended by Schadt. ¶¶99-100.

FE 2 does not confirm that Centrellis "existed".  Mot. at 19.  By FE 2's account, Centrellis could not utilize human health data in a correct or appropriate manner in accordance with Defendants' objectives, and it would require billions of additional dollars and many more years of work before Centrellis could do so – Centrellis was thus not a piece of technology "that could perform capabilities."  ¶98; Ord. at *7.

Though Defendants assert the contrary (Mot. at 18-20), "there is no baseline requirement of [contact with individual defendants]" to credit confidential witness testimony.  *See Plumbers*, 89 F. Supp. 3d at 615-16 ("it is highly probable that the regional director of sales in a region, who has interacted directly with a President of that unit in the past, would be well-positioned to attest to the participation of the individual defendants in promoting certain sales practices in that region"); *EVCI.,* 469 F. Supp. 2d at 97 ("It is highly probable that persons employed in the admissions office—both individually and, collectively, at every level in the office—are privy to details about the admissions process that they administer and implement.").

Moreover, the SAC alleges a significant amount of "contact" between FE 2 and FE 3 and the Individual Defendants, which bolsters the inference of scienter.  FE 2 worked closely on a daily basis every day of the week with Schadt during FE 2's tenure specifically on attempting to commercialize Centrellis and FE 2 often discussed these efforts with Ro and Miao.  ¶¶94-97.  FE 3 participated in a weekly standing meeting with Schadt and other high-ranking executives and officers concerning the patient data which was intended to be used with Centrellis, and FE 3 participated in a separate weekly product call which Schadt often attended.  ¶99.  FE 3 further stated that FE 3 attended a weekly meeting about the Company's operations and planning with members of the C-suite, such as Schadt.  ¶100. Accordingly, Plaintiff is not required to allege the FEs' accounts with the level of specificity that Defendants posit – such as, *inter alia,* the details of

21

each presentation and proposal that FE 2 worked with Schadt on, the dates on which FE 2 discussed Centrellis with Ro and Miao, or the dates of FE 3's meetings with Schadt where Centrellis was discussed.  Mot. at 18-20.  *See In re Vertiv Holdings Co. Sec. Litig.,* 2023 WL 7689961, at *8-*10 (crediting former employee accounts that did not identify specific reports or documents provided to defendants); *Karimi v. Deutsche Bank Aktiengesellschaft,* 607 F. Supp. 3d 381, 398 (S.D.N.Y. 2022) (crediting confidential witnesses that did not specify facts or documents provided to defendants, as "allegations of scienter need not be supported by documentation, particularly at the pleadings stage.").

It is "highly probable" given the multitude of Plaintiff's allegations, that like FE 1, FE 2 and FE 3 were "well-positioned" to attest to Centrellis' lack of capabilities, and as such, their accounts are credible.  *See Plumbers*, 89 F. Supp. 3d at 615-16; *In re Fairway Grp. Holding Corp. Sec. Litig.*, 2015 WL 249508, at *16 (S.D.N.Y. Jan. 20, 2015) (rejecting argument that confidential witness allegations were insufficient because witness "did not have contact with the defendants").

### 2.    Plaintiff Alleges Strong Circumstantial Evidence That Defendants Knew Or Had Access To Information That Contradicted Their Public Statements

"Circumstantial evidence can support an inference of scienter" where defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Blanford*, 794 F.3d at 306.  Circumstantial evidence supporting scienter may be alleged by "a combination of facts, none of which need to be from confidential witnesses, internal reports, or other specific sources." *Ohio Pub. Emps.' Ret. Sys. v. Meta Platforms, Inc.,* 2024 WL 4353049, *15 (N.D. Cal. Sept. 30, 2024).

Here, the FE accounts, viewed holistically and taken together with Plaintiff's other allegations, provide circumstantial evidence supporting the inference that Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *See In re*

22

*Synergy Pharms. Inc.*, 2023 WL 5526675, at *2 (2d Cir. Aug. 28, 2023); *Scot.*, 524 F. Supp. 2d at 395 (confidential witness testimony that company's reporting systems were in such poor condition that they could not properly track unprocessed claims supported the inference that defendants were reckless in their failure to discover and disclose the systems' weaknesses). These allegations, on a defendant-by-defendant basis, include the following:

*Defendant Schadt.* Schadt was the founder of Sema4 and during the Class Period occupied the positions of President, CEO, and, following the close of the GeneDx transaction, co-CEO. ¶¶19, 53. Schadt worked closely with FE 2 presenting Centrellis to potential users and trying to obtain data for use with Centrellis; as part of this work, Schadt engaged in a consistent seven-day-per-week dialog for four years about such efforts with FE 2 and traveled around the United States with FE 2 to deliver proposals to potential Centrellis users (¶¶94-95). Further, Schadt and other top executives attended weekly meetings about Centrellis' data with FE 3 (¶100), and Schadt often attended the Company's separate weekly product meeting which FE 3 also attended (¶100). *See Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.,* 2023 WL 4744197, at *6 (S.D.N.Y. July 25, 2023) (confidential witness account that individual defendant was "involved with key business partnerships" and "negotiations related to those partnerships" supported strong inference that defendant would have been privy to adverse information about active accounts).

Defendants argue that FE 2 and FE 3's accounts fail to offer sufficient "particulars" supporting an inference that Schadt had access to information which would have put him on notice about Centrellis' deficiencies. Mot. at 19-20. Defendants argue that there is no allegation that putative deficiencies with Centrellis were discussed at meetings Schadt attended, and that there is no allegation as to when these meetings took place. *Id.* But given that it was under Schadt's

23

direction that Sema4 changed its core business to Centrellis, and that Schadt worked seven days per week during the Class Period seeking to build Centrellis, which included traveling around the U.S. pitching Centrellis to potential users in sometimes day-long presentations, the inference that Schadt did *not* have access to adverse information about Centrellis' lack of capabilities cannot reasonably be viewed as *more* cogent and compelling than the inference that he *did*.

Further, FE 3's allegations that meetings and calls concerning Centrellis were standing weekly occurrences during the Class Period is sufficient to establish "the timeframe[] in which Defendants were put on notice of contradictory information."  *In re SolarEdge Techs., Inc. Sec. Litig.,* 2024 WL 4979296, at *15-*16 (S.D.N.Y. Dec. 4, 2024) (allegations that "daily" inventory reports were provided to senior leadership during the class period were sufficient).

Moreover, Plaintiff's "allegations are sufficient for the Court to infer that these [calls] and [meetings] contradicted Defendants' public statements" about Centrellis.  *See SolarEdge*, 2024 WL 4979296, at *15-*16 (allegation that defendants received reports "with data on inventory" was sufficient to show that defendants had access to information contradicting their public statements about inventory levels).  Given that Centrellis was nonexistent and that the Company had no significant commercial client for Centrellis (*e.g.,* ¶98), it is reasonable to infer that discussions about Centrellis would have contradicted Defendants' representations that Centrellis was operational, deployable, and performing capabilities.  *See SolarEdge,* 2024 WL 4979296, at *15-*16 (where plaintiff alleged inventories were increasingly saturated, it was reasonable to infer that inventory data that defendants received reflected that trend, which contradicted defendants' statements).

In addition, that Schadt expressed concerns to FE 2 that the Company would not be able to make Centrellis a meaningful product before running out of funding supports scienter (¶96).  *See*

*Moshell,* 481 F. Supp. 3d at 290 (confidential witness account supported inference of recklessness where, *inter alia,* individual defendant told witness that "things are not good with the [project] based on the updates on progress and costs."); *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 999 (9th Cir. 2009) (a statement made directly to a confidential witness by a defendant can be "indicative" of scienter).

Schadt's own public statements further demonstrate the depth of his knowledge of Centrellis.  *E.g.,* ¶¶62, 63, 64, 66, 71.  For example, Schadt described the "history" of Centrellis on the Company's January 18, 2022 conference call and the Company's focus on "acquiring patient data … to map those in a common data model so that they're comparable and can be integrated into 1 central database repository of the Centrellis platform and kind of seamlessly queried" (¶64), and the Company's 2021 Form 10-K, which Schadt signed and certified, described in detail Centrellis' then-existing capabilities.  ¶67.  *See SolarEdge,* 2024 WL 4979296, at *15 (touting company's inventory to investors supported an inference that defendants "had knowledge of the contents of the reports"); *NVIDIA*, 81 F.4th at 940 (that CEO expressed "familiar[ity] with specific revenue numbers attributable to particular categories of sales" supported scienter); *In re Quality Sys., Inc. Sec. Litig.,* 865 F.3d 1130, 1145-46 (9th Cir. 2017) (top executives' statements about having monitored a database supported scienter).[8]

Schadt also signed and certified pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") the Company's 2021 Form 10-K which contained false and misleading statements about Centrellis (¶67).  *See Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017) (signing of SOX certifications can "be indicative of scienter").

---

[8] *See also Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.,* 380 F.3d 1226, 1231 (9th Cir. 2004) (executives' representations regarding "hard numbers" associated with company's data and "large portions of [company]'s sales data" supported scienter).

The timing and circumstances of Schadt's resignation also supports scienter. *See Plumbers,* 89 F. Supp. 3d at 619 ("the timing and circumstances of individual defendants' resignations may add some further weight to an overall inference of scienter."). Schadt resigned from the Company at the end of the Class Period, on the same day that the Company issued its corrective disclosures concerning Centrellis. No reason was provided for Schadt's departure. ¶¶55-57. *See Scot.,* 524 F. Supp. 2d at 394 n.176 (resignations of officers at the time of the company's corrective disclosure supported scienter).

***Defendant Stueland.*** Prior to Sema4's acquisition of GeneDx, Stueland was the CEO of GeneDx, and following the acquisition, Stueland became the Company's co-CEO. ¶86. As FE 3 confirmed, during the Class Period, Sema4's high-ranking officers and executives had standing weekly meetings and calls where Centrellis was regularly discussed. ¶100. It is reasonable to infer that Stueland, who like Schadt, was part of the Company's C-Suite, would also have had access to adverse information about Centrellis. *See In re Sadia, S.A. Sec. Litig.,* 643 F. Supp. 2d 521, 534 (S.D.N.Y. 2009) (confidential witness allegations that individual defendants "by virtue of their office, participated in weekly meetings during the Class Period to discuss sales, marketing efforts, and other operational issues" supported scienter); *Karimi*, 607 F. Supp. 3d at 398 (confidential witnesses accounts supported scienter even though witnesses could only speculate that adverse information reached the executive level).

Further, Stueland made statements at ¶72 touting Centrellis' capabilities, signed and certified pursuant to SOX the Company's Form 10-Q filed with the SEC on May 12, 2022 (which contained false and misleading statements about Centrellis (¶69)), and at the end of the Class Period, told investors that the Company's "new management team [of which Stueland was a part] has been reviewing our business lines" and accordingly, had decided to shift to their strategy to

26

"productize" Centrellis through a "scalable" R&D approach.  ¶¶55-57.  Such representations, which must be viewed together with Plaintiff's other allegations, including Schadt's representations and the FE accounts, support an inference of scienter.  *See Vertiv,* 2023 WL 7689961, at \*10 ("Defendants' own representations" supported scienter where one individual defendant stated that "executive leadership personally reviewed pricing" and "company leadership told investors on multiple occasions that [company] employed 'sophisticated' price-monitoring tools."); *Salix*, 2016 WL 1629341, at \*14 (defendant's statement to analysts about "how he knew inventory levels with specificity ... weighs in favor of scienter").

***Defendants Ro and Miao.***  During the Class Period, FE 2 frequently interacted with Ro (who served as CFO during the Class Period until August 9, 2022 (¶21)) and Miao (who served as interim CFO from June 14, 2022 until shortly after the Class Period on September 2, 2022 (¶22)), and discussed Centrellis with both individuals.  ¶33.  Most of FE 2's conversations with Ro and Miao focused on how to build and invest into the Company's relationships with its health system partners that provided data for use with Centrellis without burning too many costs.  ¶33.

Defendants assert that Plaintiff must allege something more about the nature of the conversations that Ro and Miao had with FE 2.  Mot. at 18.  However, it is reasonable to infer that as CFOs, Ro and Miao would, like FE 2, have known that the Company had not yet secured even one significant commercial customer for Centrellis (¶98), and, if Ro and Miao were concerned about the costs associated with commercializing Centrellis (the Company's core product), it is reasonable to infer that they had some understanding about Centrellis' lack of capabilities and how far away Centrellis was from being deployable.  It is also reasonable to infer that Ro and Miao, as members of the Company's C-suite like Schadt and Stueland, also had access to information about

27

Centrellis that contradicted their statements. *See Sadia,* 643 F. Supp. 2d at 534; *Karimi,* 607 F. Supp. 3d at 398.

In addition, the timing and circumstances of Ro and Miao's departures from the Company are indicative of scienter. Ro resigned on August 9, 2022, shortly before the undisclosed risks of Defendants' fraud materialized (¶21), whereas Miao served as interim CFO of the Company up until his departure on September 2, 2022, shortly after the undisclosed risks of Defendants' fraud materialized. ¶22. *See Hall v. The Children's Place Retail Stores, Inc.,* 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (resignation of officer in the wake of company's admission that it had material weaknesses in its internal controls supported scienter); *Sadia,* 643 F. Supp. 2d at 534 (resignation of officer two weeks after corrective disclosure supported scienter). Further, Ro signed and certified pursuant to SOX the Company's 2021 Form 10-K and the Company's Form 10-Q filed with the SEC on May 12, 2022, both which contained false and misleading statements about Centrellis (¶¶67, 69, 85). *See Menaldi*, 277 F. Supp. 3d at 517.

At bottom, all of Plaintiff's allegations taken together, accepted as true, and "read most favorably to the [P]laintiff", support an inference which is at least as cogent and compelling as any non-culpable inference that the Individual Defendants had knowledge or access to information which undercut their rosy representations about Centrellis to investors. *See Plumbers*, 89 F. Supp. 3d at 617; *SolarEdge,* 2024 WL 4979296, at *15 (allegations that information about inventory levels was available to and shared with the individual defendants; one of the individual defendants and unspecified "other senior leadership" received inventory reports, and; individual defendants' public statements touting inventory, alleged circumstantial evidence of scienter); *Scot.,* 524 F. Supp. 2d at 395 (confidential witness testimony that company's reporting systems were in such

28

poor condition that they could not properly track unprocessed claims supported the inference that defendants were reckless in their failure to discover and disclose the systems' weaknesses).

### 3.    The Core Operations Doctrine Bolsters The Inference Of Scienter

That Defendants' misrepresentations involved the core operations of Sema4 – as Centrellis was Sema4's core product - further supports a strong inference of scienter.  "Once a plaintiff has adequately alleged that a defendant made false or misleading statements about the core operations of a company . . . an inference arises that the defendant knew or should have known the statements were false when made."  *In re Reserve Fund Sec. and Deriv. Litig.*, 2010 WL 685013, at \*9-\*10 (S.D.N.Y. Feb. 24, 2010); *see New Orleans Emps. Ret. Sys. v. Celestica, Inc.,* 455 Fed App'x 10, 14 n.3 (2d Cir. 2011) ("allegations of a company's core operations . . . can provide supplemental support for allegations of scienter, even if they cannot establish scienter independently"); *Salix*, 2016 WL 1629341, at \*16 ("the fact that [the alleged fraud] involved the core operations of [the company's] business also support[s] a strong inference of scienter").

Defendants' arguments regarding the core operations doctrine fail.  First, Defendants argue that Plaintiff fails to allege that Centrellis was a core business.  Mot. at 23.  But Plaintiff's allegations, such as that Sema4 was seeking to shift its core business to its data and analytics solutions, namely Centrellis, and that Sema4 touted to investors that the GeneDx transaction would "significantly enhance the power" of Centrellis, and consequently, would greatly increase the Company's revenue and prospects (*e.g.,* ¶¶2, 82), which must be taken as true with all reasonable inferences drawn in Plaintiff's favor, establish that Centrellis was a core business of Sema4.  *See Bos. Ret. Sys. v. Alexion Pharms., Inc.,* 556 F. Supp. 3d 100, 137 (D. Conn. 2021) (allegations that "Soliris was the company's most important product [] enhance[] the strong inference of scienter.").

Second, Defendants argue that standing alone, the core operations doctrine cannot establish scienter.  Mot. at 23.  Plaintiff has not suggested otherwise.  Further, as Defendants concede, and

29

as Defendants' cited authorities confirm, the core operations doctrine *can* bolster the inference of scienter. Here, when viewed holistically with Plaintiff's numerous other allegations, as they must be (*see Tellabs*, 551 U.S. at 324-26), the core operations doctrine adds support to the inference of scienter.

### 4.    Plaintiff Alleges Corporate Scienter

"When the defendant is a corporate entity, a plaintiff can show corporate scienter by pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Behrendsen v. Yangtze River Port & Logistics Ltd.,* 2021 WL 2646353, at *11 (E.D.N.Y. June 28, 2021). "[A] plaintiff may raise an inference of scienter for a corporate defendant, even if he fails to plead scienter as to the specific individual or individuals who perpetuated the fraud, where, for example, a corporation issues a statement so dramatic that it would necessarily have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Id.*, at *13.

Thus, scienter can attach to a company even where a plaintiff fails to allege "that the specific employee responsible for making or approving an actionable statement acted with scienter…. [C]ourts in this district have generally coalesced around the view that there is no requirement that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter." *See Rex & Roberta Ling Living Tr. u/a Dec. 6, 1990 v. B Commc'ns Ltd.*, 346 F. Supp. 3d 389, 409 (S.D.N.Y. 2018).

Further, corporate scienter "is generally satisfied where the employee with knowledge of the facts that make a corporate statement misleading occupies a position likely to enjoy some oversight over the company's public-facing representations." *See Rex,* 346 F. Supp. 3d at 409;

30

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 178 (2d Cir. 2015) (finding corporate scienter adequately alleged where president/founder and a managing director knew facts contradicting company's offering documents, but did not prepare the documents); *In re VEON Ltd. Sec. Litig.,* 2017 WL 4162342, at *10 (scienter of corporate executives alleged to have "orchestrated a bribery scheme" and "to have understood how th[ose] bribes could impact, or be reflected in, [their company's] financial statements" could be imputed to the company despite the lack of any allegation "that the executives with knowledge of the bribery had any role in financial reporting").

As described above, Plaintiff's allegations, including the former employee allegations, demonstrate that the Individual Defendants knew or had access to information undermining the accuracy of the Company's public statements about Centrellis.  Further, each of the Individual Defendants were high-ranking executives and officers of the Company that had "some oversight" over the Company's public statements, and did sign and certify the Company's SEC filings during the Class Period.  *See Rex,* 346 F. Supp. 3d at 409; *Barrett v. PJT Partners Inc.,* 2017 WL 3995606, at *7 (S.D.N.Y. Sept. 8, 2017) ("Courts in this district have not developed a bright-line rule to determine when an executive is sufficiently senior such that his or her scienter can be attributed to the entity.").  Schadt was President, CEO, and then co-CEO (¶11); Stueland was the President and CEO of GeneDx and then after the acquisition, was the co-CEO of the Company (¶20); Ro was Chief Financial Officer up until June 14, 2022 (¶21), and; Miao was interim Chief Financial Officer following Ro's departure up until the end of the Class Period (¶22).

Accordingly, Plaintiff's allegations establish the Company's scienter, even if the Court finds that Plaintiff has not established the scienter of the Individual Defendant who made and/or approved a misstatement.  *See Rex,* 346 F. Supp. 3d at 408-10 (where chairman of board of

31

directors who had knowledge of falsity of company's SEC filing did not sign or have any role in preparing the filing, corporate scienter was adequately alleged as it required "no great inferential leap" to surmise that chairman "deliberately stood idly by" while company's "investors were being taken for a ride").

### 5. Plaintiff's Motive Allegations Support A Strong Inference Of Scienter

Allegations of defendants' motive and opportunity to defraud investors can further bolster scienter, but such allegations are not *required* to allege scienter. "To show motive and opportunity, plaintiffs must allege a likelihood that defendants could realize concrete benefits through the deception." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001). Defendants claim that a lack of stock sales "dooms plaintiff's ability to plead scienter." Mot. at 13. But the Supreme Court has repeatedly declared that the "absence of a motive allegation" is "not dispositive." *Matrixx*, 563 U.S. at 48; *Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal"); *In re MF Global Holdings Ltd. Sec. Litig.*, 2013 WL 5996426, at *31 (S.D.N.Y. Nov. 12, 2013) ("While Plaintiffs do not plead facts to show that the Officers had special motives to act fraudulently, that is not fatal to their claim"). Thus, "[s]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003).[9]

Further, the SAC alleges that Defendants were motivated to commit the alleged fraud for several reasons. First, Defendants were motivated by their desire to enter into a lucrative agreement with GeneDx by Q2 2022, which required them to raise sufficient capital in the amount

---

[9] Defendants' authorities do not hold otherwise (Mot. at 13-14). In *Novak*, the court did not hold that the absence of stock sales "dooms" a plaintiff's ability to plead scienter. 216 F.3d at 308. The same is true for *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500 (S.D.N.Y. 2011), *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446 (S.D.N.Y. 2000), and *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179 (S.D.N.Y. 2020).

of $200 million to finance the acquisition.  Combining Sema4's platform with GeneDx's services would allow Sema4 to become one of the largest genomic screening providers in the United States, and the Company stated that the acquisition would allow it to greatly increase revenues to $350 million in 2022 for the combined companies.  ¶51.  Defendants' desire to raise necessary capital to complete the GeneDx transaction was not a "rote motive[]" generic of any company.  Mot. at 14.

Plaintiff does not allege a mere generic desire to raise Sema4's stock price, rather, Plaintiff provides a compelling and concrete motive: Defendants were desperate to close the GeneDx deal, which was contingent on a $200 million stock offering, slated to close in Q2 2022—thus, Defendants were highly motivated to mislead investors in the runup to the slated closing date.  The Second Circuit has recognized that "the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter."  *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000); *see also Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 169–70 (D. Conn. 2019) (allegation that "defendants' price-hike strategy was implemented to increase revenue and inflate the price of their stocks to use as currency" for an acquisition supported scienter); *Schottenfeld Qualified Associates, L.P., v. Workstream, Inc.*, 2006 WL 4472318, at *4 (S.D.N.Y. May 4, 2006) ("A jury could reasonably find that this motive alone – to keep the value of Workstream stock high in order to use the stock to consummate corporate acquisitions – is enough, along with the apparent falsity, to satisfy scienter.").  Thus, "[s]cienter may be imputed, as is the case here, to defendants when defendants were motivated to inflate company stock prices as a means to effectuate a specific acquisition that would not otherwise be possible without fraudulently inflating stock prices."  *See In re Vivendi Universal, S.A.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003).

33

Defendants assert that Plaintiff's motive allegations "make[] no sense" because Stueland was previously an executive at GeneDx.  Mot. at 14.  But under the terms of the acquisition agreement, Sema4 would pay consideration of $150 million in cash and 80 million shares of Sema4 common stock to GeneDx; Stueland was poised to become the CEO of the combined company after the GeneDx transaction closed and receive an attractive compensation and bonus package.  It is not implausible that Stueland also had the motive to make false and misleading statements to investors to close the transaction.  Accordingly, the SAC's motive allegations are " sufficiently concrete to support a strong inference of scienter." *Burstyn v. Worldwide Xceed Grp., Inc.*, 2002 WL 31191741, at *5 (S.D.N.Y. Sept. 30, 2002); *see Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 554 (S.D.N.Y. 2017) ("The SAC plausibly alleges that . . . defendants had the motive to inflate comScore's stock price to acquire Rentrak.").

Second, Plaintiff alleges that Defendants were motivated to raise capital to keep Sema4 afloat.  Since its inception, Sema4 had struggled financially and had an accumulated deficit of $575.4 million by the start of the Class Period.  ¶49.  Moreover, Defendants represented in the Company's 2021 Form 10-K that "[w]e must continue to invest significant resources in research and development, including through acquisition and collaborations (such as the pending Acquisition on GeneDx [ ]) … in order to enhance our current diagnostics and health information and data science technologies, and existing and new products and services based off these technologies."  ¶108.  While the motive to raise money generally is a desire common to any company, where a company "*need[s] to fundraise to survive*", "courts have found allegations of motive adequate".  *See Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020); *RMED Intern., Inc. v. Sloan's Supermarkets, Inc.*, 878 F. Supp. 16, 19 (S.D.N.Y. 1995) (allegation that defendants were motivated to defraud investors because company "was in

34

potential jeopardy of either divestiture of restrictions on the future acquisition of supermarkets in New York City or both" supported scienter).

Further, with respect to Schadt and Ro, who were executives at Sema4 prior to the GeneDx acquisition, "an executive at a company that will go belly up if it fails to fundraise has different incentives from a generic corporate insider." *Skiadas*, 2020 WL 3268495, at *11. "One salient difference is that the former executive has a stronger incentive to bet the farm in a reckless gamble because the alternative is certain failure." *Id.*[10]

Third, Defendants' motivation to seek compliance with the Company's debt covenants bolsters a strong inference of scienter. ¶¶115-19. Courts have found scienter where defendants were motivated "so as to provide [the company] capital to retire debt." *See In re Twinlab Corp. Sec. Litig.,* 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000); *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 690 (6th Cir. 2004) (allegations that defendants "were motivated to engage in fraud in order to forestall [the company's] default of its bank loan agreement and to preserve the Company's ability to borrow pursuant to its credit facility" are "probative of scienter").

Here, for example, the Company entered into an agreement with Silicon Valley Bank which provided for a revolver up to an aggregate principal amount of $125 million, including a sublimit of $20 million, which required the Company to comply with certain financial covenants if liquidity fell below $135 million, which included the achievement of certain minimum revenue targets. ¶115. Additionally, a $9.5 million agreement with the Connecticut Department of Economic and Community Development ("DECD") was assigned to Sema4 in 2017, which the Company amended in June 2018 by increasing the total loan commitment to $15.5 million at the same interest

---

[10] This fact renders Defendants' cases distinguishable: *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 213 (S.D.N.Y. 2020); *Stein v. Tangoe, Inc.*, 2014 WL 12767210 (D. Conn. Sept. 30, 2014); *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013), *aff'd,* 566 F. App'x 93 (2d Cir. 2014).

rate. ¶116. As of December 31, 2021, $11 million of the loan balance from the DECD was outstanding. *Id*. Thus, Defendants' motivation to misrepresent the truth "so as not to violate loan covenants" also supports a strong inference of scienter. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1063-64 (9th Cir. 2000).

Finally, the structure of Defendants' compensation and bonus packages provides a concrete, personal motive for their alleged fraud. ¶¶113-14; *see In re ITT Educ. Servs., Inc. Sec. & S'holder Derivs. Litig.*, 2012 WL 1632762, at *3 (S.D.N.Y. May 4, 2012) (allegations that defendants "had a motive to commit fraud" because of the "executive compensation structure, which awarded bonuses based in part on [the company's] earnings per share" supported scienter); *Okla. Firefighters Pensions & Retirement Sys. v. Six Flags Entertainment Corp.,* 58 F.4th 195, 215 (5th Cir. 2023) ("[P]erformance-based compensation can establish motive in circumstances when the potential bonus is extremely high"). Plaintiff alleges that Schadt and Ro were entitled to receive annual bonuses based on the achievement of corporate performance objectives. ¶113. For 2021 bonuses, the target annual bonuses for Schadt and Ro were equal to 100% and 50%, respectively, of their base salaries ($675,000 and $400,000, respectively). *Id*.

Stueland and Miao were also motivated to defraud investors for personal gain. ¶114. Specifically, Stueland entered into an employment agreement with the Company dated January 14, 2022, as amended on April 29, 2022, which included a base salary of $675,000, a discretionary incentive bonus opportunity with a target amount of 100% of the annual base salary, an initial grant of stock options and restricted stock units with an aggregate grant-date value of $9,000,000, and standard employee benefit plan participation. *Id*. In connection with Miao's appointment, the Compensation Committee of the Board of Directors of the Company approved: (i) a salary increase for a total annual base salary of $360,000; (ii) target annual bonus of 50% of annual base salary;

36

and (iii) a $100,000 cash retention bonus payable three months following the start date of the Company's permanent Chief Financial Officer.  ¶114.

All of these facts bolster the scienter inference, as they show "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."  *See Ganino*, 228 F.3d at 170.[11]

### C.      Plaintiff Adequately Alleges Loss Causation

To adequately plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  To do so, a plaintiff need merely allege that "the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005) (italics in original).  Courts within the Second Circuit have declared that loss causation "is not subject to the heightened pleading standards of Rule 9(b) or the PSLRA."  *Tecku v. Yieldstreet, Inc.*, 2022 WL 1322231, at *13 (S.D.N.Y. May 3, 2022).  "Instead, a short and plain statement suffices, as required under Rule 8 of the Federal Rules of Civil Procedure."  *Id.*  Thus, the pleading requirements for loss causation "are not meant to impose a great burden upon a plaintiff."  *Dura*, 544 U.S. at 347.

Plaintiff has adequately alleged loss causation.  Specifically, Plaintiff alleges that on August 15, 2022, Defendants announced: (1) changes to the Company's research and development leadership team, including that Schadt was resigning from the Company, and that a new officer of R&D had been hired; (2) the Company would be making a strategic shift its approach to

---

[11] Defendants suggest that allegations regarding a motive to increase executive compensation can never support an inference of scienter, citing authorities such as *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001). Mot. at 16. But "[w]hen financial incentives to exaggerate earnings go far beyond the usual arrangements of compensation based on the company's earnings, they may be considered among other facts to show scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002).  Such is the case here.

37

commercializing Centrellis, such to focus on a "scalable" strategy to leverage its data, admitting that the Company had a "lot of work to do" to "productize" Centrellis; (3) that the Company was eliminating approximately 250 employees, bringing the percentage of legacy Sema4 workers that had been laid off since the start of the Class Period to 30%, and, (4) they were slashing the Company's FY 2022 revenue guidance from $350 million to a range of $245-$250 million, and that the Company's primary lab facility would be shuttered.    ¶¶55-58.    On this news, the Company's stock plummeted by 33.33%.  These allegations adequately provide Defendants "with some indication of the loss and the causal connection that the plaintiff has in mind."  *See Dura*, 544 U.S. at 347.

Defendants assert that Plaintiff fails to allege loss causation because no analyst report, news story, or other source suggested that the share price drop was related to Centrellis.  Mot. at 25.  But there is no such requirement to allege loss causation and Defendants tellingly make this assertion without citing any authority.  Further, Defendants argue that Sema4 revealed other pieces of bad news on August 15, 2022, such as "adverse developments in pricing", and therefore, there was no causal link between any disclosures related to Centrellis and the loss.  Mot. at 24.  However, Plaintiff is not required to allege that a disclosure concerning Centrellis was the *only* plausible causal cause of the Company's share price drop.  *See Cohen v. Kitov Pharms. Holdings, Ltd.,* 2018 WL 1406619, at *6 (S.D.N.Y. Mar. 20, 2018) ("[A] complaint can sufficiently plead loss causation without alleging facts that disaggregate losses or that rule out other causes."); *In re Citigroup Inc. Sec. Litig.,* 753 F. Supp. 2d 206, 236 (S.D.N.Y. 2010) ("Plaintiffs have identified several corrective disclosures that allegedly demonstrated the falsity of defendants' previous statements, and plaintiffs have also alleged that the value of their securities declined following the corrective disclosures. Plaintiffs' allegations are sufficient at this early stage of the litigation.").

To be corrective, a disclosure need only relate back to the alleged misrepresentation – it need not precisely mirror the earlier misrepresentation or disclose the fraud alleged. *See Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 140–41 (D. Conn. 2021) ("the corrective disclosures or materializations alleged need not be a mirror image tantamount to a confession of fraud"); *Freudenberg*, 712 F. Supp. 2d at 202 ("neither the Supreme Court in *Dura,* nor any other court addressing the loss causation pleading standard require a corrective disclosure be a mirror image tantamount to a confession of fraud"). The Company's disclosures on August 15, 2022 ***related*** to the misrepresentations alleged, which is all that is required. *Freudenberg,* 712 F. Supp. 2d at 202-04. Indeed, contrary to their prior representations, Defendants' disclosures confirmed that they had failed to utilize and leverage human health data via Centrellis, and that there was a lot of work to do before they would be able to productize and scale Centrellis - in other words, Centrellis could not perform its capabilities. And contrary to Defendants' prior representations, Defendants' disclosures revealed that the data Sema4 acquired in the GeneDx transaction did nothing to advance Centrellis in a commercially viable way, let alone render Centrellis operational.

Moreover, "[l]oss causation is a fact-based inquiry," thus even if it is a "close call" as to whether the contents of a disclosure corrected a previous representation or constituted a materialization of an undisclosed risk, "it is best for the jury to make that decision." *See In re Teva Sec. Litig.,* 671 F. Supp. 3d 147, 197 n.31 (D. Conn. 2023). Thus, to the extent there is any question as to whether Plaintiff has alleged loss causation, such questions should be reserved for the trier of fact.

### D.    Plaintiff Alleges Control Person Liability

In the Second Circuit, control person liability under Section 20(a) of the Exchange Act has two elements: "(1) a primary violation by a controlled person; and (2) direct or indirect control of

the primary violator by the defendant." *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 414 (S.D.N.Y. 2003). "Control need only be alleged according to the Rule 8 standard." *Longtop*, 2012 WL 2512280, at *12. Additionally, "[w]hether a person is a controlling person is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006). Contrary to Defendants' assertions (Mot. at 31) – and as demonstrated above – Plaintiff has adequately pled a primary violation and has also sufficiently alleged the Individual Defendants' control over the Company. Thus, Plaintiff has adequately alleged a control person claim.[12]

## V.     CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion in its entirety. Alternatively, if the Court grants any portion of the Motion, Plaintiff respectfully requests leave to amend. *See Luce v. Edelstein*, 802 F.2d 49, 56-57 (2d Cir. 1986) ("Complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend.").

---

[12] Defendants cite *In re ShengdaTech, Inc. Sec. Litig.*, 2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014) (Mot. at 31), which acknowledges that some district courts in this circuit have required allegations of culpable participation. *Id*. at *10 n.1. However, even if culpable participation were required, Plaintiff has adequately alleged it. *See, e.g.*, ¶¶92-106.

Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Ex Kano S. Sams II*
Ex Kano S. Sams II (admitted *pro hac vice*)
Natalie S. Pang (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Tel: (310) 201-9150
Fax: (310) 201-9160
Email: esams@glancylaw.com
Email: npang@glancylaw.com

**HURWITZ, SAGARIN, SLOSSBERG &**
 **KNUFF, LLC**
David A. Slossberg [ct13116]
Erica O. Nolan [ct31097]
135 Broad Street
Milford, CT 06460
Tel: (203) 877-8000
Fax: (203) 878-9800
Email: DSlossberg@hssklaw.com
Email: ENolan@hssklaw.com

*Counsel for Lead Plaintiff and the Class*

41

## CERTIFICATE OF SERVICE

This is to certify that on January 24, 2025, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to all parties that are unable to accept electronic filing. Parties may access this filing through the Court's electronic system.

 /s/ Ex Kano S. Sams II
Ex Kano S. Sams II
