UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------- x

NABIL HELO, *Individually and On Behalf of All*
*Others Similarly Situated*,

                               Plaintiff,

        -against-

SEMA4 HOLDINGS CORP., ERIC SCHADT,
KATHERINE STUELAND, ISAAC RO, and
RICHARD MIAO,

                          Defendants.

------------------------------------------------------------- x

**MEMORANDUM &
ORDER DENYING
DEFENDANTS' MOTION
TO DISMISS**

3:22-CV-01131 (VDO)

**VERNON D. OLIVER**, United States District Judge:

The lead plaintiff, Nabil Helo ("Helo" or "Plaintiff"), commenced this securities class action in September 2022 against Sema4 Holdings Corp. ("Sema4" or the "Company"), Eric Schadt ("Schadt"), Katherine Stueland ("Stueland"), Isaac Ro ("Ro"), and Richard Miao ("Miao") (the "Individual Defendants," and, collectively with Sema4, "Defendants"). By Order dated July 31, 2024, the Court dismissed all claims against Defendants with leave to replead.[1] Plaintiff has since filed the Second Amended Complaint, alleging that Defendants committed securities fraud and seeks remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Exchange Act").[2]

Before the Court is Defendants' renewed motion to dismiss all claims with prejudice under Rule 9(b) and 12(b)(6) of Federal Rules of Civil Procedure. After careful consideration

---

[1] ECF No. 54 (*Helo v. Sema4 Holdings Corp.*, No. 22-CV-01131, 2024 WL 3593677 (D. Conn. July 31, 2024).)

[2] Second Amended Complaint ("SAC"), ECF No. 57.

of the record, the Court finds that the matter is appropriate for a decision without a hearing. For the reasons herein, the Court **denies** Defendants' motion to dismiss.

## I.    BACKGROUND[3]

### A.    The Parties

Plaintiff and the Class are individuals who purchased Sema4 securities between January 18, 2022, and August 15, 2022.[4] Sema4 is a health diagnostics testing company with a stated mission to use artificial intelligence ("AI") to enable personalized medicine for patients.[5] Since its inception, Sema4 has racked up net losses and was low on cash.[6] The Company was initially part of Icahn School of Medicine at Mount Sinai's Department of Genetics and Genomic Sciences and the Icahn Institute for Genomics and Multiscale Biology.[7] In June 2017, Sema4 commenced operations as a commercial entity and, after completing a business combination with CM Life Sciences in July 2021, debuted on the Nasdaq Stock Market as a publicly traded company.[8] Sema4 originally derived the majority of its revenue from its diagnostic testing focused on women's health and oncology, but sought to shift its business to data and analytics solutions by commercializing its health intelligence platform, Centrellis.[9] Sema4 maintains a

---

[3] The Court accepts as true the factual allegations in the SAC and draws all reasonable inferences in Plaintiff's favor for the purpose of deciding Defendants' motion. The Court also considers documents incorporated into the SAC by reference and "legally required public disclosure documents filed with the SEC," which are properly considered at the motion to dismiss stage. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

[4] SAC ¶ 1.

[5] *Id.* ¶ 2.

[6] *Id.* ¶ 3.

[7] *Id.* ¶ 42.

[8] *Id.*

[9] *Id.* ¶ 2

database that includes de-identified clinical records, including more than 500,000 records with genomic profiles, which is allegedly integrated in a way that it claims to enable physicians to proactively diagnose and manage disease.[10]

In January 2022, the Company announced that it would be acquiring GeneDx, Inc. ("GeneDx"), which provides rare disease diagnostic and exome sequencing services, in a $623 million acquisition.[11] On May 2, 2022, the Company announced the closing of its acquisition of GeneDx.[12]

The Individual Defendants were, during the Class Period, senior executive officers and/or directors of the Company who were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects.[13] Schadt is the founder of Sema4 and served as its Chief Executive Officer ("CEO") until May 2022; from May 2022 until his resignation, Schadt served as President and Chief R&D Officer of the Company.[14] Stueland has served as CEO of Sema4 since May 2022 and, prior to the Company's acquisition of GeneDx, was the President and CEO of GeneDx.[15] Ro was the Chief Financial Officer ("CFO") of Sema4 from July 2021 to June 14, 2022, and

---

[10] *Id.* ¶ 47.

[11] *Id.* ¶ 49.

[12] *Id.* ¶ 50.

[13] *Id.* ¶ 24.

[14] *Id.* ¶ 19.

[15] *Id.* ¶ 20.

provided consulting services to Sema4 until February 2023.[16] Miao was Interim CFO of Sema4 from June 14, 2022 to September 2, 2022.[17]

### B.    Procedural History

Helo filed a putative class action complaint against Defendants on September 7, 2022.[18] On November 16, 2022, the Court appointed Helo as the lead plaintiff, Glancy Prongay & Murray LLP as lead counsel, and Hurwitz, Sagarin, Slossberg & Knuff, LLC as liaison counsel.[19] On January 30, 2023, Plaintiff filed the Amended Complaint.[20]

After the Court dismissed the claims for failure to state a claim, on September 13, 2024, Plaintiff filed a Second Amended Complaint.[21] Defendants moved to dismiss the SAC on November 26, 2024, which Plaintiff opposed.[22] On February 20, 2025, Defendants filed a reply.[23]

### C.    The Amended Complaint

#### 1.    Claims

Plaintiff alleges two claims. First, he alleges that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 because they disseminated or approved materially false and misleading statements which they knew, or were deliberately reckless in not knowing, were

---

[16] *Id.* ¶ 21.

[17] *Id.* ¶ 22.

[18] ECF No. 1.

[19] ECF No. 20.

[20] ECF No. 33.

[21] SAC, ECF No. 57.

[22] Defs. Mot., ECF No. 68; Pl. Opp., ECF No. 69.

[23] Defs. Reply, ECF No. 70.

misleading.[24] Specifically, Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact/and or omitted to state material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.[25] Second, Plaintiff claims the Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act and are thus liable for securities fraud.[26]

### 2.    Alleged Misleading Statements

Plaintiff alleges that, throughout the Class Period, Defendants made misleading statements regarding the abilities and potential of Centrellis, the Company's data platform.[27] Plaintiff challenges statements about Centrellis made on four dates: January 18, 2022 (announcing the upcoming GeneDx acquisition); March 14, 2022 (announcing Q4 and full year 2021 results), May 12, 2022 (announcing Q1 results), and June 16, 2022 (at the Goldman Health Care Conference).[28]

On January 18, 2022, the Company, in announcing that it had reached a deal to acquire and merge with GeneDX, stated how Centrellis would grow from the transaction:

> **GeneDx's leadership in rare disease diagnostic and exome sequencing services brings more than 300,000 clinical exomes and over 2.1 million expertly annotated phenotypes to strengthen Sema4's 12 million de-identified clinical records for Centrellis®, its proprietary health intelligence platform**[.] Sema4 plans to leverage this combined health

---

[24] SAC ¶ 135.

[25] *Id.* ¶ 136.

[26] *Id.* ¶¶ 140-143.

[27] *Id.* ¶ 7.

[28] Pl. Opp. at 14-16

information database to transform patient care and therapeutic development and enable precision medicine for all.[29]

Then, on a January 18, 2022, public conference call, Schadt stated that "The transaction will significantly enhance the power of our market-leading Centrellis database by adding more than 2.1 million expertly curated phenotypes and over 300,000 clinical exomes GeneDx has generated to date. The largest such effort of its kind in the clinical arena and growing."[30]

In the Form 10-K filed with the SEC in March 2022, the Company wrote that Centrellis was "a sophisticated data management and analytics engine" which had the ability to mine and analyze health data "across multiple therapeutic areas" using "state-of-the-art AI, probabilistic causal reasoning and machine learning approaches" to "construct predictive models" that would "transform the disease and diagnosis treatment paradigm for the entire healthcare ecosystem: patients, physicians, health systems, payers, and Biopharma companies."[31]

In the March 2022 press release, the Company wrote: "We also continue to expect to close the acquisition of GeneDx by the end of Q2, which will significantly enhance the power of our Centrellis® platform and distance us as the market leader with the most comprehensive clinically relevant data set available for research and development purposes."[32] The Company also touted Centrellis and the pending GeneDx acquisition, stating:

> Combining GeneDx's clinical genomic solutions with our core women's health business allows us to better serve health system and pharmaceutical and biotech partners in a more holistic way. This transaction will significantly enhance the power of our Centrellis database by adding more than 2.1 million expertly curated phenotypes and well over 300,000 clinical exomes that GeneDx has

---

[29] SAC ¶ 51 (emphasis added).

[30] *Id.* ¶ 63.

[31] *Id.* ¶ 6.

[32] *Id.* ¶ 65.

generated to date. Following the close of the acquisition, Sema4 will have the most comprehensive clinically relevant data set available for our research and development purposes.[33]

At the accompanying March 2022 conference call, while discussing financial results, Schadt stated, "We believe that Centrellis is the most extensive and fastest-growing database of clinically relevant patient data in the industry."[34]

On May 12, 2022, the Company filed a Form 10-Q filed with the SEC, and held a public conference call, wherein Schadt stated:

> Our sophisticated platform draws on information from many sources: from advanced genomic testing solutions; to patient electronic medical records, including physician notes and other unstructured data; to hospital records and population health among many other large-scale sets of data available in the digital universe. With this platform, Sema4 enables patients and providers to derive differentiated insights in real time that can dramatically improve the standard of care.[35]

On June 16, 2022, Stueland participated in the Goldman Sachs Global Healthcare Conference, where she stated:

> But then when you think about the data engine, Centrellis, that Eric and the team have expertly built. That is an incredible combination of just being able to put a data engine that will be able to deliver improved and personalized health insights with our exome and genome as a backbone. That really enables something that is very different from any other company in this space. And I think that that really sets the foundation for how we can work with health systems and pharma companies to deliver on the promise of personalized medicine.[36]

---

[33] *Id.* ¶ 66.

[34] *Id.*

[35] *Id.* ¶¶ 69, 71.

[36] *Id.* ¶ 72.

### 3.     Alleged Revelations and Subsequent Plummeting Stock Price

On August 15, 2022, when, after the market closed, Sema4 announced significant changes to its core R&D strategy and overall approach.[37] The Company disclosed that Schadt—whose primary focus had been the Centrellis project–was stepping down from his roles as President and Chief R&D Officer.[38] The Company also disclosed that it was eliminating approximately 250 employees, bringing the percentage of legacy Sema4 employees that had been laid off since the start of the Class Period to about 30%.[39] The Company announced that it had also hired two new R&D officers, stating: "To lead our R&D evolution to a new chapter of innovation and scale, we are pleased to welcome Matt Davis, former Head of AI at Invitae, who is joining us as Chief Technology and Product Officer. Together with Gustavo Stolovitzky leading our research and data sciences effort, we will continue to invest in the development of commercial products, utilizing the data developed and curated on the Centrellis platform."[40]

On this news, the Company's share price plummeted by $0.80, or 33.33%, to close at $1.60 per share on August 16, 2022.[41] Then, on November 14, 2022, it was disclosed to investors that the Company was eliminating Sema4's reproductive testing segment, which would include closing down Sema4's Stamford, CT laboratory and eliminating approximately 500 more employees—a third reduction of the Company's workforce.[42]

---

[37] *Id.* ¶ 10.

[38] *Id.* ¶ 11.

[39] *Id.* ¶ 57.

[40] *Id.*

[41] *Id.* ¶ 58.

[42] *Id.* ¶ 59.

## II.    LEGAL STANDARD

A party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). On a motion to dismiss, all factual allegations in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). "To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead enough facts to state a claim to relief that is plausible on its face." *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 416 (2d Cir. 2023). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, there are heightened pleading requirements where a plaintiff pleads securities fraud:

> Pursuant to Rule 9(b), a complaint sounding in fraud also "must state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), and under the PSRLA, it must "specify each statement alleged to have been misleading[ ] [and] the reason . . . why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(1), (2)(A).

*In re Philip Morris*, 89 F.4th at 418. Therefore, allegations "must do more than say that the statements were false and misleading; they must demonstrate with specificity why and how that is so." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (internal citation and quotation marks omitted).

When considering a Rule 12(b)(6) motion, a district court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and

matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal citation omitted).

III.    **DISCUSSION**

A.    **Section 10(b) and Rule 10b-5 Liability**

The Exchange Act makes it unlawful for a party to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission ["SEC"] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b–5 implements Section 10(b) of the Exchange Act by making it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 CFR § 240.10b–5(b). Therefore, "[t]o state a private securities-fraud claim under section 10(b) and Rule 10b-5, a plaintiff must plead '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *In Re Philip Morris.*, 89 F.4th at 417 (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

### 1.    Material Misrepresentation or Omission

Defendants again argue that Plaintiff has not alleged an actionable misstatement, asserting that Plaintiff fails to plead falsity and that the statement Plaintiff identified are inactionable "puffery" or forward-looking statements protected by the PSLRA's safe harbor.[43]

To plausibly allege a material representation or omission, there must be either a half-truth or a false statement. *Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*, No. 22-355, 2024 WL 2890968, at *3 (2d Cir. June 10, 2024). "Silence, absent a duty to disclose, is not misleading under Rule 10b–5," and "[e]ven a duty to disclose, however, does not automatically render silence misleading under Rule 10b–5(b)." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 265 (2024) (internal citation and quotation marks omitted). "Material statements of fact are actionable if they are untrue." *In Re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 43 (2d Cir. 2025). "A pure omission occurs when a speaker says nothing, in circumstances that do not give any particular meaning to that silence." *Macquarie Infrastructure Corp.*, 601 U.S. at 258. "Rule 10b–5(b) does not proscribe pure omissions." *Id.* at 264. For omissions to become actionable half-truths, or "statements that are misleading under the second prong of Rule 10b–5 by virtue of what they omit to disclose," *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016), there must be "representations that state the truth only so far as it goes, while omitting critical qualifying information." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 188 (2016). "Disclosure is required . . . only when necessary 'to make statements made, in the light of the circumstances under which they were made, not misleading.'" *Kleinman v. Elan Corp., plc*, 706 F.3d 145,

---

[43] Defs. Mem., ECF No. 68-1 at 33–38.

153 (2d Cir. 2013) (alteration in original) (internal citation omitted). A false statement is "an actual statement" that is "untrue outright." *In re Vivendi*, 838 F.3d at 239. Whether a misstatement or omission[44] by the defendant is material "depends on whether there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." *ECA*, 553 F.3d at 197. "To be 'material' within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud claim." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014).

The Court may properly consider the alleged testimony of the former employees, FE-1, FE-2, and FE-3. A complaint sufficiently pleads testimony from a confidential witness when that source is described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 123 (2d Cir. 2013) (internal citation and quotation marks omitted). There is no reason to disturb the Court's previous finding that FE-1's testimony could be credited at this juncture. The SAC alleges that FE-1 was Senior Vice President, Production Bioinformatics at Sema4 from February 2020 through September 2022 and was responsible for all the data that came from the Company's clinical testing operation.[45] In his role, FE-1 analyzed lab results through pipelines, including quality checks of samples, utilized those analyses into test results or diagnoses, accessed a dashboard

---

[44] Courts often use the term "omission" when referring to half-truth statements that fall under the second prong of Rule 10b–5. *In re Vivendi*, 838 F.3d at 240 n.9.

[45] SAC ¶ 29.

that included information about the Company's costs incurred to deliver services, and reported to the Company's Chief Data Officer.[46] Therefore, because it is probable that FE-1 would have had access to information about Centrellis, the Court may credit FE-1's testimony.

Similarly, FE-2 and FE-3 were in positions at the Company where it is probable that they would have accessed information about Centrellis. The SAC alleges that FE-2 was the Senior Vice President of Business Development during the Class Period, and during that tenure, FE-2 obtained human health data for use with Centrellis and presented Centrellis to potential customers alongside Schadt.[47] FE-3 is alleged to be the Chief Information Officer of the Company during the Class Period, who handled the human health data for use with Centrellis in a compliant manner.[48]

To withstand dismissal, Plaintiff asserts that statements regarding Centrellis were false and misleading because they created a rosy picture for investors about Centrellis' capabilities and commercial viability.[49] The former employee's accounts support the claim that, if a reasonable investor viewed the Company's marketing materials or disclosures, it would be understood that there was a piece of technology called Centrellis that allowed the Company to perform capabilities.[50] For example, in March 2022, Schadt described Centrellis as "the most extensive and fastest-growing database of clinically relevant patient data in the industry."[51]

---

[46] *Id.*

[47] SAC ¶¶ 94, 95.

[48] *Id.* ¶ 99.

[49] Pl. Opp. at 22.

[50] SAC ¶¶ 30, 93.

[51] *Id.* ¶ 105.

The Company also stated in a press release that the GeneDx acquisition would establish "the power of our Centrellis platform and distance us as the market leader."[52] In June 2022, Stueland claimed Centrellis would "be able to deliver improved and personalized health insights with our exome and genome as a backbone[.]"[53] However, according to FE-1, Centrellis "never existed."[54] And according to FE-2 and FE-3, the substantial amount of human health data obtained by the Company was ultimately unusable by Centrellis because Centrellis lacked the ability to utilize the data in accordance with its objectives.[55] FE-3 noted that the Company experienced hiring difficulties and regulatory hurdles that further stymied the Centrellis project.[56]

Defendants dispute the truth of these allegations and previously characterized the claim that Centrellis did not exist to be nonsense. And Defendants assert that Plaintiff does not identify a specific feature Centrellis lacked. But the Court must accept as true the well-pleaded allegations. Drawing all reasonable inferences in the Plaintiff's favor, the former employees testified that, while there was a piece of technology called Centrellis at the company, the reality is that Centrellis did not exist or lacked the ability to utilize the data in accordance with its objectives. These allegations support with particularity the claim that statements regarding Centrellis were misleading.

---

[52] *Id.* ¶ 104.

[53] *Id.* ¶ 54.

[54] *Id.* ¶¶ 30, 93.

[55] *Id.* ¶¶ 98, 101.

[56] *Id.* ¶ 101

**a.    Safe Harbor**

Defendants argue that the statements regarding the Company's intentions or plans for Centrellis are not actionable as a matter of law, because they were forward looking and were subject to meaningful cautionary language.[57]

"The PSLRA includes several definitions of a forward-looking statement, including 'a statement containing a projection of . . . income (including income loss), earnings (including earnings loss) per share, . . . or other financial items' and 'a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 246. A forward-looking statement also includes "a statement of the plans and objectives of management for future operations" or "any statement of the assumptions underlying or relating to any statement" of those plans or objectives. 15 U.S.C. §§ 78u–5(i)(1)(B), (D). The PSLRA includes a safe harbor for forward-looking statements, providing that "a forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010).

Defendants fail to show that the plain language of the alleged statements are forward-looking. Defendants overlook that, in each of the statements flagged as forward-looking, the speaker necessarily represents that Centrellis presently exists.[58] Therefore, after severing the

---

[57] Defs. Mem. At 36–38.

[58] *E.g.*, SAC ¶ 62 ("Sema4 plans to leverage this combined health information database . . . ."); *id.* ¶ 64 ("That same technology that we've developed for those interactions will deploy into the GeneDx arena."); *id.* ¶ 65 ("We also continue to expect to close the acquisition of GeneDx by the end of Q2, which will significantly enhance the power of our Centrellis platform . . . ."); *id.* ¶ 66

forward-looking elements from the statements, there remains non-forward-looking representations about Centrellis that "communicate present or historical fact." *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010) ("[A] statement of confidence in a firm's operations may be forward-looking—and thus insulated by the bespeaks-caution doctrine—even while statements or omissions as to the operations in place (and present intentions as to future operations) are not."). Plaintiff asserts that Defendants' purported disclaimers did not constitute meaningful cautionary language and, even if parts of Defendants' statements were forward-looking, the safe harbor does not apply because the statements were embedded with misrepresentations of facts.[59]

Even assuming that the statements were forward-looking, Defendants fail to show that statements about Centrellis are protected by the safe harbor. A defendant is not liable under the safe harbor where (1) "the forward-looking statement is identified and accompanied by meaningful cautionary language," (2) the forward-looking statement "is immaterial," or (3) "the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 245.

To support their argument that statements about Centrellis are protected by the safe-harbor, defendants identify warnings from the Company's quarterly statements, including: (1) that the Company has "limited experience with the development and commercialization of our databases and our health information and genomic platforms," (2) that the Company has

---

("[W]e will leverage our proprietary health intelligence platform, Centrellis."); *id.* ¶ 72 ("[D]ata engine that will be able to deliver improved and personalized health insights with our exome and genome as a backbone.").

[59] Pl. Opp. at 25–27.

"limited experience with the development or commercialization of clinical or research products in connection with the databases we manage and to which we have access, including . . . Centrellis," and (3) that the Company "cannot assure you that demand for our products and services, including our Centrellis platform, will increase at levels consistent with the growth of our infrastructure."[60] The first and second alleged cautionary language are inadequate because they are vague and verge on being merely boilerplate. *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 772 (2d Cir. 2010). And the third purported cautionary language is irrelevant to the alleged misstatements regarding the existence of the Centrellis. Thus, at this posture, Defendants fail to "demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Id.*

Defendants, also in a conclusory manner, state that Plaintiff does not offer any contemporaneous facts to show actual knowledge of falsity. But, as shown below, the testimony of the former employees plausibly shows that, because of the weekly meetings regarding Centrellis, statements from the chief executives describing the then-existing capabilities of Centrellis were knowingly false.

### b.    Puffery

Defendants argue that the statements regarding Centrellis are inactionable puffery, characterizing such statements as describing corporate optimism or competitive advantage that are too general to cause a reasonable investor to rely upon them.

"Statements that are 'too general to cause a reasonable investor to rely upon them' constitute 'puffery' and cannot form the basis of a securities fraud claim." *Abuhamdan*, 9 F.

---

[60] Defs. Mem. at 37 (citing SAC ¶ 69).

Supp. 3d at 190 (quoting *ECA*, 553 F.3d at 206); *see also Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173 (2d Cir. 2020) ("Generic, indefinite statements of corporate optimism typically are not actionable.").

Defendants overlook the context of the statements, which includes descriptions of Centrellis' then-existing capabilities that are plausibly misleading. In context, where there are allegations that Centrellis does not exist, the allegations regarding the platform's existence and capabilities are "determinate, verifiable statements." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 184 (2015). To illustrate, while Defendants challenge the statement that "Centrellis is designed to transform" data analytics, while ignoring the accompanying descriptions about Centrellis including "[u]nstructured data derived from EMR and associated data are run through multiple pipelines leveraging machine learning-enabled natural language processing, augmented as needed by human annotators, to extract information and knowledge from that data."[61] Plaintiff alleges that Defendants did more than just offer rosy predictions about Centrellis; Defendants described that Centrellis existed in an operational form that "enables patients and providers to derive differentiated insights in real time" and "deliver improved and personalized health insights" while they knew that the contrary was true.[62] Considering the circumstances here, the statements describing Centrellis

---

[61] SAC ¶ 67.

[62] *Id.* ¶ 66 ("We believe that Centrellis is the most extensive and fastest-growing database of clinically relevant patient data in the industry."); *id.* ¶ 71 ("Our sophisticated platform draws on information from many sources: from advanced genomic testing solutions; to patient electronic medical records, including physician notes and other unstructured data; to hospital records and population health among many other large-scale sets of data available in the digital universe. With this platform, Sema4 enables patients and providers to derive differentiated insights in real time that can dramatically improve the standard of care."); *id.* ¶ 72 ("But then when you think about the data engine, Centrellis, that Eric and the team have expertly built. That is an incredible combination

are plausibly alleged to be not puffery. *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (denying dismissal for being puffery where allegations showed that the statement "that the inventory situation was 'in good shape' or 'under control'" was not true).

### 2.    Scienter

Next, Defendants argue that Plaintiff fails to plead a strong inference of scienter. To plead scienter, a plaintiff alleging securities fraud must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). The exacting pleading standard of the PSLRA "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 308 (2007) (internal quotation marks and citation omitted). "The requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. The former requires a plaintiff to plausibly allege that a defendant "benefitted in some concrete and personal way from the purported fraud." *Id.* (internal citation and quotation marks omitted). The latter requires plausible allegations of conduct by a defendant "which is at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit v. Eichler*, 264 F.3d 131,

---

of just being able to put a data engine that will be able to deliver improved and personalized health insights with our exome and genome as a backbone.").

142 (2d Cir. 2001) (internal citation and quotation marks omitted). An "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 309.

The Court finds that Plaintiff plausibly alleges strong circumstantial evidence of conscious misbehavior or recklessness on behalf of the Individual Defendants. The testimony of the three former employees, which Plaintiff alleges with particularity to show they probably possessed information related to Centrellis, provides strong evidence of scienter, showing that the Individual Defendants had knowledge or access to facts contradicting the public statements. **First**, regarding Schadt, Plaintiff alleges that he is the founder of Sema4 and served as its Chief Executive Officer ("CEO"), President, and, following the close of the GeneDx transaction, co-CEO.[63] Plaintiff alleges that Schadt worked closely with FE-2, by: (1) engaging in daily discussions seven days a week for at least four years, (2) putting together proposals and presentations for potential Centrellis partners, and (3) traveling the United States to deliver those proposals and presentations to physicians and health care providers.[64] Schadt had voiced doubts about the Company's ability to make Centrellis a meaningful product before the Company's funding ran out.[65] **Second**, regarding Schadt and the other chief executives—Stueland, Ro, and Miao[66]—Plaintiff alleged that the C-Suite attended weekly product calls with FE-3, including a weekly standing call with Mt. Sinai, which had agreed to provide

---

[63] SAC ¶¶ 19, 53.

[64] *Id.* ¶ 95.

[65] *Id.* ¶ 96.

[66] Stueland is alleged to be a former CEO. Ro and Miao are alleged to be former CFOs.

millions of patient records to the Company intended for use with Centrellis.[67] Thus, it is reasonable to infer that the Individual Defendants, who are alleged to be chief executives which are part of the Company's C-Suite, had access to adverse information about Centrellis through these weekly occurrences that contradicted representations that Centrellis was operational, deployable, and performing capabilities. *In re SolarEdge Techs., Inc. Sec. Litig.*, No. 23-cv-9748 2024 WL 4979296, at *15-*16 (S.D.N.Y. Dec. 4, 2024) (concluding that scienter was plausibly alleged where senior leadership received daily inventory reports, including regular reports from distributors, that related to their public statements); *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 572 (S.D.N.Y. 2011) (similar).

### 3. Loss Causation

Defendants also challenge loss causation. The PSLRA "codified loss causation as a separate element of federal securities fraud actions." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (citing 15 U.S.C. § 78u–4(b)(4)). Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). "To plead loss causation, plaintiffs must allege 'that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Carpenters*, 750 F.3d at 232 (quoting *Suez Equity Inv'rs, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)). A plaintiff "may do so either by alleging (a) the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud; or (b) that the loss was foreseeable and caused by the materialization of the risk concealed by the

---

[67] SAC ¶ 100.

fraudulent statement." *Id.* (internal citation and quotation marks omitted). The burden to plead loss causation "is not a heavy one." *Loreley Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 187.

Plaintiff plausibly alleges loss causation, as the allegations show that the undisclosed risks of Defendants' misrepresentations materialized after close of market in August 2022, where, as a result of disclosures regarding Centrellis, the price of the Company's stock declined by 33.33%.[68] As to whether Defendants effectively admitted that Centrellis lacked the capabilities Defendants had represented, Plaintiff alleges not only that there was a public conference call where Defendants announced that the Company is "shifting from an academic spin-off strategy for R&D to a scalable one,"[69] but also that Stueland stated the Company "had a lot of work to do" to productize their partnerships regarding Centrellis.[70] Plaintiff further alleges that Defendants announces changes to the Company's research and development team, including that Defendant Schadt was resigning from the Company and that eliminating hundreds of employees were terminated by the Company, bringing the percentage of legacy workers that had been laid off since the start of the Class Period to 30%.[71] While Defendants argue that Plaintiff cites no analyst report, news story, or any other source suggesting that the Company's stock price decline was related to Centrellis, it is enough at this posture that the falsity of alleged statements were alleged to be implicitly revealed by the August 2022 disclosures. *See In re Arqit Quantum Inc. Sec. Litig.*, No. 22-CV-2604, 2025 WL 977995, at *29 (E.D.N.Y. Mar. 28, 2025) (concluding that allegations of disclosing that a company was

---

[68] *Id.* ¶ 79.

[69] *Id.* ¶ 55.

[70] *Id.* ¶ 56.

[71] *Id.* ¶ 57.

moving away from its technology plausibly showed loss causation); *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 523 (S.D.N.Y. 2013) (noting that loss causation may exist when revealing the company's underlying condition causes the economic loss).

**B.    Section 20(a) Liability**

Finally, Defendants argue that the Section 20(a) claim, also known as "control-person liability," should be dismissed. "Section 20(a) provides that individual executives, as controlling persons of a company, are secondarily liable for their company's violations of the Exchange Act." *In Re Shanda Games Ltd. Sec. Litig.*, 128 F.4th at 59 (cleaned up). "To establish a *prima facie* case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). **First**, as to whether there was a primary violation, because Plaintiff has successfully stated a Section 10(b) violation against the Individual Defendants, Defendants' first argument fails as to those defendants. **Second**, "[c]ontrol over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2). Here, because Plaintiff alleges that the Individual Defendants are high-level executives, it is premature to resolve this issue on a motion to dismiss. *See In re Henry Schein, Inc. Sec. Litig.*, No. 18-CV-01428, 2019 WL 8638851, at *29 (E.D.N.Y. Sept. 27, 2019) ("[D]etermining whether an individual is a control-person is a fact-intensive inquiry

often inappropriate for resolution on a motion to dismiss."); *see also In re Barrick Gold Sec. Litig.*, No. 13-CV-3851, 2015 WL 1514597, at *16 (S.D.N.Y. Apr. 1, 2015) (finding control plausibly alleged where the defendants occupied "high-level positions" and were involved in the scheme). **As to the third requirement**, Plaintiff plausibly alleges that the Individual Defendants were culpable participants by alleging that they signed documents filed with the SEC pursuant to the Sarbanes-Oxley Act of 2002.[72] *In re Arqit Quantum Inc. Sec. Litig.*, 2025 WL 977995, at *30. Accordingly, Plaintiff's Section 20(a) claim withstands dismissal.

## IV.    <u>CONCLUSION</u>

For the reasons described above, Defendants' motion to dismiss (ECF No. 68) is **denied**.

SO ORDERED.

Hartford, Connecticut
June 23, 2025

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge

---

[72] SAC ¶¶ 84, 85, 87, 88.